No. 2023-

# United States Court of Appeals for the Federal Circuit

In Re

PATENT QUALITY ASSURANCE LLC,

*Petitioner.*

_____

*On Petition for a Writ of Mandamus to the Director of the United States Patent and Trademark Office in Case No. IPR2021-01229.*

_____

**PETITION FOR A WRIT OF MANDAMUS WITH**

**NONCONFIDENTIAL APPENDIX**

_____

Brian C. Banner
*Principal Attorney*
Truman H. Fenton
SLAYDEN GRUBERT BEARD PLLC
401 Congress Avenue, Suite 1650
Austin, TX 78701
(512) 402-3552

## **CERTIFICATE OF INTEREST**

Pursuant to Federal Circuit Rule 47.6, counsel for Petitioner Patent Quality Assurance LLC ("PQA") certifies the following:

I.     The full name of the party represented by me:

   Patent Quality Assurance LLC

II.    The name of the real party in interest represented by me is:

   Not applicable

III.   Parent corporations and publicly held companies that own 10% or more of stock in the party:

   None

IV.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

   Slayden Grubert Beard, PLLC:  Bruce W. Slayden II, Brian C. Banner, Truman H. Fenton, Tecuan Flores

V.     The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeals.

   *Patent Quality Assurance LLC v. VLSI Technologies LLC*, Case No. IPR2021-01229 (Patent Trial & Appeal Board)

Dated: January 24, 2023          /s/ *Brian C. Banner*

                                 Counsel for Petitioner
                                 Patent Quality Assurance LLC

i

# TABLE OF CONTENTS

RELIEF SOUGHT ................................................................................1

INTRODUCTION ...............................................................................1

ADDITIONAL FACTS NECESSARY TO UNDERSTAND THE
    ISSUES PRESENTED .................................................................9

ISSUES PRESENTED.......................................................................14

REASONS FOR ISSUING THE WRIT ............................................15

  I.   LEGAL STANDARD...............................................................15

  II.  PQA HAS NO OTHER ADEQUATE MEANS TO ATTAIN
      RELIEF...................................................................................16

  III.  PQA'S RIGHT TO MANDAMUS RELIEF IS CLEAR AND
       INDISPUTABLE IN LIGHT OF THE DIRECTOR'S
       ULTRA VIRES ORDERS ........................................................20

    A.  The Sanctions Decision Ignores the Regulations Governing
       Sanctions ...........................................................................20

    B.  The Sanctions Decision Manifestly Misapprehends the Law
       Governing IPR Discovery ..................................................23

      1.  The Governing Statue Does Not Grant the Director Power
         to Order the Mandated Discovery...................................24

      2.  The Regulations Do Not Grant Power to Issue the
         Mandated Discovery ......................................................24

        a.     37 C.F.R. § 42.51 does not authorize the Mandated
             Discovery ...................................................................24

        b.     37 C.F.R. § 42.5(a) does not authorize the
             Mandated Discovery ..................................................26

    C.  The Director Violated PQA's Due Process Rights
       Announcing a Novel Standard for Abuse of Process and
       Simultaneously Sanctioning PQA Under That New
       Standard............................................................................27

    D.  The Director Improperly Took Control of this IPR................31

  IV.  MANDAMUS IS APPROPRIATE HERE WHERE THE
       DIRECTOR HAS UNDERTAKEN ILLEGAL AND
       UNPRECENDENTED ACTIONS THAT HAVE INJURED

PQA AND ATTEMPT TO DEPRIVE THIS COURT OF
THE POWER TO REVIEW HER ACTIONS ..........................................33

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Aid Association for Lutherans v. USPS*,
   321 F.3d 1166 (D.C. Cir. 2003) ........................................................27

*Bankers Life & Cas. Co. v. Holland*,
   346 U.S. 379 (1953) ........................................................................16

*Belton v. McDonald*,
   636 F. App'x 1011, 2016 WL 46295 (Fed. Cir. 2016) ........................19

*Bookman v. United States*,
   453 F.2d 1263 (Ct. Cl. 1972) ...........................................................32

*Cheney v. United States Dist. Court*,
   542 U.S. 367 (2004) ........................................................................16

*Christopher v. SmithKline Beecham Corp.*,
   567 U.S. 142 (2012) ................................................................. 27, 28

*Cooley v. United States*,
   324 F.3d 1297 (Fed. Cir. 2003) .................................................. 14, 32

*Drumheller v. Dep't of Army*,
   49 F.3d 1566 (Fed. Cir. 1995) ............................................. 20, 23, 26

*Facebook, Inc. v. Windy City Innovations, LLC*,
   973 F.3d 1321 (Fed. Cir. 2020) .......................................................28

*Gen. Elec. Co. v. United Techs. Corp.*,
   928 F.3d 1349 (Fed. Cir. 2019) .......................................................17

*Gladstein v. McLaughlin*,
   230 F.2d 762 (9th Cir. 1955) ...........................................................18

*In re BigCommerce, Inc.*,
   890 F.3d 978 (Fed. Cir. 2018) .........................................................35

*In re Google LLC*,
   949 F.3d 1338 (Fed. Cir. 2020) .......................................................34

*In re Nintendo Co., Ltd.*,
   589 F.3d 1194 (Fed. Cir. 2009) .......................................................19

*In re Syncora Guarantee Inc.*,
757 F.3d 511 (6th Cir. 2014)................................................................34

*Kisor v. Wilkie*,
139 S. Ct. 2400 (2019)......................................................................25

*Lawrence + Mem'l Hosp. v. Burwell*,
812 F.3d 257 (2d Cir. 2016)...............................................................27

*Mallard v. U.S. Dist. Ct. for S. Dist. of* Iowa,
490 U.S. 296 (1989)..........................................................................34

*Mathews v. Diaz*,
426 U.S. 67 (1976)............................................................................19

*Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*,
839 F.3d 1382 (Fed. Cir. 2016)..........................................................33

*Memphis Light, Gas & Water Division v. Craft*,
436 U.S. 1 (1978)..............................................................................29

*Morton v. Ruiz*,
415 U.S. 199 (1974)..........................................................................26

*Mote v. Wilkie*,
976 F.3d 1337 (Fed. Cir. 2020))........................................................33

*Mylan Labs. Ltd. v. Janssen Pharmaceutica, N.V.*,
989 F.3d 1375, 1381 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 874
(2022) ..............................................................................................16

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety &
Health Admin.*,
142 S. Ct. 661 (2022) ................................................................. 20, 24

*Patlex Corp. v. Mossinghoff*,
771 F.2d 480 (Fed. Cir. 1985)............................................................29

*Queenan v. Heckler*,
581 F. Supp. 1216 (S.D.N.Y. 1984)....................................................16

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018) ....................................................... 4, 9, 16, 17

*Schlagenhauf v. Holder*,
379 U.S. 104 (1964) ................................................................... 16, 34

*Scott v. D.C.*,
101 F.3d 748 (D.C. Cir. 1996)...........................................................29

*Stark v. Wickard*,
  321 U.S. 288 (1944) ...............................................................27

*United States v. Arthrex, Inc.*,
  141 S. Ct. 1970 (2021) ................................................. 18, 31

*United States v. Tillman*,
  756 F.3d 1144 (9th Cir. 2014) .............................................18

*Woods Svcs, Inc. v. Disability Advocates, Inc.*,
  342 F. Supp. 3d 592 (E.D. Pa. 2018) ...................................29

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*,
  883 F.2d 132 (D.C. Cir. 1989) .............................................29

**Statutes**

5 U.S.C. § 706(2)(A–D) ........................................ 5, 15, 16, 18, 26, 33
28 U.S.C. § 1651(a) ...............................................................15
35 U.S.C. § 6(c) ........................................... 14, 15, 31, 33
35 U.S.C. § 314(b) ............................................... 14, 32
35 U.S.C. § 314(d) ............................................... 2, 17, 34
35 U.S.C. § 316(a)(5) ........................................ 15, 24, 27
35 U.S.C. § 316(a)(6) ...........................................................28
35 U.S.C. § 316(c) ........................................... 14, 15, 31, 33
35 U.S.C. § 318(a) ............................................... 17, 28

**Other Authorities**

*The Mangrove Partners Master Fund v. Virnetx Inc.*,
  IPR2015-01047, 2015 WL 5921228 (PTAB 2015) .............................................29

**Regulations**

37 C.F.R. § 42.5 ........................................... 24, 26, 27

37 C.F.R. § 42.11(d) ................................................................ passim

37 C.F.R. § 42.12(b)(6), (8) .............................................................6

37 C.F.R. § 42.51 ................................................................ 24, 25, 26

37 C.F.R. § 42.100(c) ................................................................ 32, 33

# <u>TABLE OF ABBREVIATIONS</u>

***Parties***

| | |
|---|---|
| Petitioner Patent Quality Assurance LLC | PQA or petitioner |
| VLSI Technologies LLC | VLSI or patent owner |

***Patent-at-Issue***

| | |
|---|---|
| U.S. Patent No. 7,523,373 | '373 patent |

***Other***

| | |
|---|---|
| Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (Sept. 16, 2011) | AIA |
| Administrative Procedure Act, 5 U.S.C. §§ 551–59 | APA |
| Final Written Decision | FWD |
| Patent Trial & Appeal Board | PTAB |
| IPR2021-01229 | '373 IPR |
| Three-Judge Panel Presiding over the '373 IPR | Panel |
| Katherine K. Vidal, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office | Director |
| Paper 101, *Patent Quality Assurance, LLC et al. v. VLSI Techs. LLC*, No. IPR2021-01229. Appx1-67. | Sanctions Decision |
| Paper 35, *Patent Quality Assurance, LLC et al. v. VLSI Techs. LLC*, No. IPR2021-01229. Appx68-81. | Scheduling Order |
| Consolidated Trial Practice Guide November 2019 (https://www.uspto.gov/about-us/news-updates/consolidated-trial-practice-guide-november-2019). | CTPG |

## RELIEF SOUGHT

Petitioner PQA requests the Court immediately stay the underlying Director review and rule on this petition for a writ of mandamus. Time is of the essence as the Director has unlawfully sanctioned PQA with dismissal and prohibited the Board from issuing the FWD, due January 27, 2023. PQA seeks mandamus (1) vacating the sanctions unlawfully imposed on PQA in the attached Sanctions Decision, (2) vacating the Director's order staying the IPR and prohibiting the Board from issuing a FWD,[1] and (3) directing the Board to comply with statutory and regulatory requirements. In the alternative, because further agency consideration is futile, PQA seeks a writ (1) vacating the attached Sanctions Decision, and underlying ultra vires orders,[2] and (2) directing the Board to issue the FWD.

## INTRODUCTION

The underlying IPR proceeding is off the rails, and PQA needs this Court to get it back on track. The Director took control of the proceeding; issued ultra vires discovery orders without statutory or regulatory authority; unlawfully sanctioned PQA, drawing adverse inferences and *dismissing PQA from the proceeding*; and indefinitely (and unlawfully) stayed the Board's review so it cannot issue its FWD. Further, even though PQA is dismissed, the Director asserts without authority that

---

[1] Appx92.

[2] Appx68, Appx82, Appx88, Appx92.

jurisdiction over PQA is retained to allow her to impose potential attorney fee sanctions.

In an apparent attempt to insulate the Director's ultra vires actions from judicial review under 35 U.S.C. § 314(d), the Sanctions Decision is improperly labeled a "review of the Board's institution decision." Moreover, as a dismissed party and because PQA has not been sued by VLSI, PQA may not be able to appeal. Mandamus is the only way to invoke this Court's jurisdiction to review and correct the agency's unprecedented and unlawful actions during the IPR proceeding.

Some history provides context. In 2019–2020, Intel filed IPR petitions challenging the validity of two VLSI patents asserted against Intel.[3] The PTAB, citing its *Fintiv* policy, discretionarily denied institution without merits consideration. Appx7; Appx192. Subsequently, VLSI obtained a record judgment of approximately $2.175 billion against Intel. Appx8. Thereafter, commentators criticized the PTAB for not hearing Intel's meritorious IPRs.[4] The Director has now determined Intel's rejected petitions presented "compelling merits." Appx61,

---

[3] IPR2020-00158 challenged the '373 patent. IPR2020-00106 and IPR2020-00498 both challenged U.S. Pat. No. 7,725,759 ("the '759 patent").

[4] *See, e.g.*, https://www.patentprogress.org/2021/03/one-case-all-the-problems-vlsi-v-intel-exemplifies-current-issues-in-patent-litigation/, https://www.patentspostgrant.com/pop-panel-to-consider-profiteers-gaming-ptab/.

Appx74. And under the Director's new *Fintiv* guidance[5]—issued during PQA's IPR—the PTAB would not now deny Intel's petitions. *See* Appx7 ("compelling … challenges will be allowed to proceed…"). Thus, VLSI obtained record judgments on likely invalid patents the PTAB now implicitly admits it should have reviewed.

Following VLSI's windfall record verdict, two unrelated entities, OpenSky and PQA, independently filed IPR petitions based on Intel's denied petitions. In OpenSky's proceeding on the '759 patent, the Director determined OpenSky abused the process by, *inter alia*, (1) "offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment" from VLSI (Appx190); (2) seeking "monetary payment from Intel in return for success in the IPR" (Appx197); (3) suggesting OpenSky "may decide not to depose VLSI's expert or file a reply brief" (Appx198); (4) offering Intel the lead position in exchange for "remuneration" (*id.*); (5) ***not*** requesting oral argument; and (6) "not meaningfully participat[ing] in the oral hearing" (Appx199).

PQA did none of those things. Instead, PQA did everything an IPR petitioner should do and normally does, including: (1) exclusively engaging the expert witnesses, (2) filing a compelling merits petition, (3) preparing and presenting PQA's expert witness for deposition, (4) deposing VLSI's expert witness, (5)

---

[5] *See* https://www.uspto.gov/about-us/news-updates/director-vidal-provides-clarity-patent-trial-and-appeal-board-practice.

presenting arguments, (6) requesting an oral hearing, and (7) solely arguing the merits at the hearing. PQA did all this without compensation from VLSI or Intel.

Shortly before the Board instituted PQA's '373 IPR, VLSI requested settlement discussions, entered into an NDA with PQA, agreed to maintain settlement discussions in confidence, then breached the NDA by publicly disclosing those discussions in a public filing[6] and arguing PQA tried to extort VLSI. Appx151, Appx154, Appx136. Rather than commend PQA for bringing a compelling merits petition, the Director faults PQA for, *inter alia*, a confidential counteroffer made during settlement discussions with VLSI. Appx31. But again—those negotiations were at VLSI's request (Appx30)—and the Board, like the courts, encourages settlement (CTPG, 86). Regardless, PQA responded by publicly stipulating it would not accept money from VLSI. Appx201.

**Then came the "shenanigans."** *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1359 (2018). After surprising Congressional interest in OpenSky and PQA's IPRs[7] (and over five months after the Board's institution decision), the Director took over by ordering Mandated Discovery not authorized by statute or regulation and inviting objections to the Mandated Discovery order based on "lawful grounds." Appx76-78; Appx85. Another five months later (11 months after institution), the new Director

---

[6] The Director has not sanctioned VLSI for its misconduct.

[7] Appx124; Appx128.

simultaneously overruled PQA's objections and sanctioned PQA (1) with adverse inferences and (2) by dismissing PQA from the proceeding. The Director's actions, labeled a "review of the Board's institution decision," are unlawful, "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," and "without observance of procedure required by law." 5 U.S.C. § 706(2)(A–D).

For example, the Director failed to comply with Office regulations which require giving a party an opportunity to explain why sanctions should not be imposed *prior to imposing sanctions*. *See* 37 C.F.R. §§ 42.11(d)(1) & (3). PQA sought rehearing and asked the Director to withdraw the sanctions and give PQA an opportunity to explain why the adverse inferences and dismissal sanctions should not be imposed. Appx167. In response, the Director admitted PQA was not given a chance to address the sanctions before they were imposed. Appx94 (the sanctioned conduct "would not readily have been the subject of a previous round of briefing"). However, the Director did not withdraw the unlawfully imposed sanctions. Appx92-95. Instead, giving mere lip service to the regulations, the Director informed PQA— still a dismissed party—that it "may submit" a ten-page paper in response to the 60-page Sanctions Order, due in seven days. Appx95. The Director also stayed the underlying IPR indefinitely and expressly prohibited "the panel" from issuing a

FWD even though the FWD deadline is January 27—*just three days from now*. Appx94-95.

PQA seeks mandamus because PQA has endured unlawful order after unlawful order after unlawful order. Each one of the Director's orders, beginning with the Scheduling Order, is ultra vires. If the harm in having to comply was not enough to invoke this Court's jurisdiction and justify mandamus, the real and immediate harm from the Sanctions Decision and subsequent stay order is.

The Director admitted the failure to follow the regulations but refuses to withdraw the unlawful sanctions. Thus, (1) the Director's unfounded adverse inferences remain in place—harming PQA's and its counsel's reputation,[8] and (2) PQA remains a dismissed party. Moreover, without citing to any authorizing statute or regulation,[9] the Director attempts to "retain[] jurisdiction" over PQA for purposes of issuing additional attorney fee sanctions. Appx4. PQA is aware of no statute or regulation authorizing this "retain[ed] jurisdiction." PQA cannot simply object. It needs this Court to intervene because the Director made it clear that objections to

---

[8] The Sanctions Decision wrongly states: "PQA, through its counsel, abused the IPR process including by advancing a misleading argument and a misrepresentation of fact…" Appx3.

[9] The Director cites only to 37 C.F.R. § 42.12(b)(6), (8), which provides "the Board may issue sanctions against **a party**." But PQA is no longer a party. The Director dismissed PQA and removed PQA from the case caption (relegating it to a footnote). Appx92.

ultra vires orders are futile. Further, the Director's refusal to lift the sanctions (even though admitting failure to follow the regulations) is further confirmation any response to the 60-page Sanctions Decision will also be futile.

Additionally, the Director's order indefinitely staying the IPR and expressly prohibiting the Panel from issuing a FWD is the latest unlawful action that creates immediate harm by interfering with the Panel's ability to issue the FWD by the statutory deadline. If the Director is merely sanctioning PQA for misconduct, why stop the Board from issuing its FWD?[10] PQA fears the answer: if no FWD issues, this Court may not have jurisdiction to review the Director's unlawful actions on appeal. If the Board issues a FWD, however, the Director will be unable to label her subsequent decision a "review of institution decision," and that subsequent decision (along with the unlawful actions described herein) *would be* reviewable.

At a minimum, PQA asks this Court to review and vacate the unlawful decisions imposing sanctions and staying the proceedings, direct the agency to provide PQA an opportunity to respond *before* imposing sanctions as required by regulation, and direct the Board to issue the FWD as required by statute. Those

---

[10] The Director's stay order expressly prohibits the Board from issuing the FWD. Appx95. Moreover, the deadline for the FWD in OpenSky's IPR has come and gone without a FWD.

sanctions, however, flow from other ultra vires agency action regarding unauthorized discovery.

Thus, PQA alternatively asks this Court to review and vacate the Sanctions Decision and all other ultra vires orders underlying that decision. Further consideration by the Director of her own unlawful discovery orders is futile because the Director already overruled PQAs objections to that discovery. Additionally, PQA already asked the Director to withdraw the sanctions and follow the agency's own regulations (Appx165-167), but the Director refused and only authorized additional briefing "out of an abundance of caution" (Appx94). If simply remanded for further sanctions proceedings, PQA will be defending itself against the vacated sanctions for the same reasons presented in this petition. The Director is unlikely to change her mind (she has already ruled on the issues), and PQA will be back in this Court seeking the same relief.

PQA's right to relief is clear. The Director's unlawful actions are not authorized by any statutes or regulations, have deprived PQA of due process (e.g., sanctioning PQA based on a newly-minted standard of "abuse of process"), and have left PQA in an untenable defenseless position.[11] The Director's unlawful involvement has created a procedural morass that will only get worse without Court

---

[11] PQA sought clarification from the Director as to whether the dismissal order is "final" or "non-final," but the Director refused to provide an answer. Appx161-162.

intervention. PQA may unwittingly lose procedural and substantive rights—including the right to a FWD or to seek or defend additional agency or even appellate review.

The Supreme Court has confirmed reviewability of unlawful actions during the proceedings:

> If a party believes the Patent Office has engaged in "'shenanigans'" by exceeding its statutory bounds, judicial review remains available … to set aside agency action "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations."

*SAS*, 138 S. Ct. at 1359. PQA seeks immediate mandamus intervention to "set aside" the Director's unlawful orders and get PQA's IPR back on track. ***With a FWD due in just three days***, time is of the essence. PQA's substantive and procedural rights hang in the balance while PQA is unlawfully dismissed and the Director has unlawfully blocked the Board from complying with Congress's mandate to timely issue the FWD.

## ADDITIONAL FACTS NECESSARY TO UNDERSTAND THE ISSUES PRESENTED

The '373 patent accounted for $1.5 billion in VLSI's verdict against Intel. Appx7-8. Following the verdict, both PQA and OpenSky filed IPR petitions seeking review of the '373 patent; OpenSky filed a month before PQA. Appx9. OpenSky's petition was denied because OpenSky filed a copy of Intel's expert declaration (Dr. Singh) without engaging the expert. Appx9. In contrast, PQA exclusively engaged

Dr. Singh and submitted a new declaration. Appx10. PQA's petition expressly invited the Board to proceed with both OpenSky's and PQA's IPRs in parallel, stating "[t]he Board can handle OpenSky's petition at the same time, negating any concerns of wasted effort." Appx140.[12]

The Board instituted PQA's petition. Appx12. Four months later, the Board joined Intel to PQA's proceeding. Appx13. The following day, the Director *sua sponte* instituted a "review of the Board's institution decision." Appx146-147.

A month later, the Director entered a Scheduling Order. Appx15. In the Scheduling Order, the Director confirmed:

> I discern no error in the Board's decision to institute review of a meritorious Petition where the challenged patent was previously litigated in district court and was the subject of previous *inter partes* review proceedings, which were not instituted based on *Fintiv*.[5] [n.5:] I have reviewed the parties' pre-institution papers concerning the merits and ***I agree with the Board's determination that PQA demonstrated a reasonable likelihood of prevailing as to at least one challenged claim.***

Appx73 (emphasis added). The Director also confirmed "no error in the Board's finding and determinations with respect to its analysis of the *Fintiv* or *General Plastic* factors." Appx74.

---

[12] Contrary to PQA's invitation to proceed in parallel, the Director mistakenly concludes PQA misled the Board regarding its exclusive engagement with Dr. Singh so the Board would deny institution of OpenSky's IPR. Appx53. PQA explains why the Director's conclusion is unsupported and contrary to the facts in Part III.A, *infra*.

Nevertheless, the Scheduling Order initiated a new inquiry requiring the parties to produce broad categories of documents and respond to interrogatories as "Mandated Discovery." Appx75-77. The Scheduling Order did not cite any statute or regulation authorizing the Director-mandated discovery. *See generally*, Appx68-81.

The Director requested input from the parties and amici curiae on, *inter alia*, how to define an "abuse of process" in the IPR context: "***How the Director … should assess conduct to determine if it constitutes an abuse of process*** or if it thwarts, as opposed to advances, the goals of the Office and/or the AIA, ***and what conduct should be considered as such?***" Appx15 (emphasis added).

The Director sought a *new* record on *new* issues by expressly forbidding the parties from addressing anything related to the Board's institution decision:

> ***[N]o further briefing is permitted as to the merits of the unpatentability challenges as it pertains to institution, or the Fintiv or General Plastic factors.***

Appx74 (emphasis added).

PQA emailed objections to the Director. Appx83. PQA specifically objected "to the ordered discovery because the Order issued without citation to a statute or regulation authorizing the Order or requested discovery, and PQA is unaware of any authority under which the Order and requested discovery may issue." Appx120. The Director "noted" PQA's objections and confirmed "production of documents as

11

required by the Scheduling Order will not constitute a waiver of that party's objections." Appx84. The Director stated: "legitimate, lawful grounds for withholding documents may be lodged…" Appx85.

PQA timely produced documents and a privilege log, subject to its objections, which PQA filed publicly as Exhibit 1039. Appx19; Appx101-118. PQA also filed an opening brief "maintain[ing] its objections to the Director's orders as filed in Exhibit 1039…" Appx157.

On December 22—eleven months after institution and just five weeks before the statutory FWD deadline, the Director *simultaneously overruled PQA's objections and sanctioned PQA* by (1) making unlawful adverse inferences, (2) unlawfully dismissing PQA, and (3) ordering PQA to show cause why it should not be liable for VLSI's attorney fees. Appx66. The Director issued these sanctions without following the governing regulations that require giving PQA an opportunity to explain why the sanctions should not be imposed *before imposition*. *See* 37 C.F.R. §§ 42.11(d)(3) & (1).

All but one sanction results from the finding of PQA's non-compliance with the ultra vires discovery order (i.e., the Director finding PQA failed to produce categories of documents and inadequately/evasively answered interrogatories). Appx25, Appx28. The only non-discovery sanction is based on the incorrect finding regarding Dr. Sing's exclusivity agreement, i.e., "PQA, through its counsel, …

advance[ed] a misleading argument and a misrepresentation of fact." Appx3. As discussed below (*see infra*, Part III.A), this Court can confirm the agreement **was** exclusive (even though exclusivity could be waived). Appx98-99.

The Director made the following adverse inferences as discovery sanctions:

- "PQA did not believe review of the '373 patent was necessary to instill confidence in 'the integrity of the patent system' and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents (Pet. 2–3) but instead sought to benefit monetarily from the petition by working to have OpenSky's petition denied so the PQA petition would be instituted." Appx45, *also* Appx48.

- "[T]he sole reason PQA filed the Petition was for the improper purpose of extracting money from VLSI after VLSI's success before the jury." Appx49, also Appx51 (PQA formed for improper purpose).

The Sanction Decision did not terminate the proceeding but left Intel as sole petitioner. Appx66. PQA sought clarification whether the Sanction Decision is a "final" or "non-final" decision. Appx161. The Director responded to PQA's email but remained silent as to the decision's finality. Appx161-162. PQA filed a request for rehearing, asking the Director to comply with 37 C.F.R. §§ 42.11(d)(1) & (3) by withdrawing the sanctions and providing PQA with an opportunity to explain why the sanctions should not be imposed. Appx165-167. The Director did not withdraw

13

the sanctions, afforded PQA ten pages of briefing to address the 60-page Sanctions Decision, and indefinitely stayed the underlying IPR. Appx92-95.

## ISSUES PRESENTED

1.      Did the Director act unlawfully and/or deprive Petitioner of its due process rights by making adverse inferences against PQA and dismissing PQA as a sanction without following the agency's own in-force regulations (37 C.F.R. §§ 42.11(d)(1) & (3)) that require PQA be given notice and an opportunity to respond *before* sanctions are imposed?

2.      Did the Director act unlawfully and/or deprive PQA of its due process rights by *sua sponte* issuing a Mandated Discovery order absent any authorizing statute or regulation and then sanctioning PQA for non-compliance with that ultra vires order?

3.      Did the Director act unlawfully and/or violate PQA's due process rights by sanctioning PQA for an "abuse of process" based on an after-the-fact standard created by the Director because "existing regulations do not attempt to specify what acts constitute an abuse of process"?

4.      Is the Director's review unlawful because it (1) "take[s] control" of the IPR proceeding in violation of 35 U.S.C. §§ 6(c) and 316(c) (requiring adjudication by a 3-member panel) and/or (2) is untimely under 35 U.S.C. § 314(b) and/or *Cooley*

14

*v. United States*, 324 F.3d 1297, 1305 (Fed. Cir. 2003) (reconsideration must be "conducted within a short and reasonable time period")?

## REASONS FOR ISSUING THE WRIT

By imposing sanctions before giving PQA an opportunity to respond, mandating novel discovery, and seeking input from amici well beyond the institution decision deadline, the Director ventured far beyond her authority to review the Board's institution decision. The Director did not follow the agency's rules regarding the imposition of sanctions (37 C.F.R. § 42.11(d) (requiring notice of specific conduct/sanction and opportunity to respond)), misapprehended 35 U.S.C. § 316(a)(5) (requiring "regulations" for discovery), and took control of the proceeding away from the 3-member Panel in violation of 35 U.S.C. §§ 6(c) and 316(c) (3-member panel must conduct IPRs). These actions were unlawful as proscribed by 5 U.S.C. §§ 706(2)(A–D), untimely, an abuse of discretion, arbitrary and capricious, and violated PQA's due process rights.

### I. LEGAL STANDARD

Appellate courts "may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). The court must determine (1) there are no other adequate means to attain relief, (2) the right to the writ is clear and indisputable, and (3) the writ is appropriate

under the circumstances. *See Cheney v. United States Dist. Court*, 542 U.S. 367, 380–81 (2004).

Courts may review an agency's unlawful actions during the conduct of proceedings. *SAS*, 138 S. Ct. at 1359 (judicial review available to set aside agency "shenanigans"); *see also Mylan Labs. Ltd. v. Janssen Pharmaceutica, N.V.*, 989 F.3d 1375, 1381 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 874 (2022) (confirming this Court's mandamus jurisdiction over IPRs).

Mandamus is appropriate "where there is clear abuse of discretion or 'usurpation of judicial power'…" *Bankers Life & Cas. Co. v. Holland*, 346 U.S. 379, 383 (1953). Indeed, "mandamus is an important means to correct abuses of discretion by an administrative agency when other relief would be inadequate to protect the rights of those injured by the agency's action." *Queenan v. Heckler*, 581 F. Supp. 1216, 1218 (S.D.N.Y. 1984) (citing *Schlagenhauf v. Holder*, 379 U.S. 104 (1964)). Mandamus may set aside agency action that is "contrary to constitutional right, power, privilege, or immunity," "in excess of statutory jurisdiction, authority, or limitations," or does not observe "procedure required by law." 5 U.S.C. §§ 706(2)(A–D).

## II.    PQA HAS NO OTHER ADEQUATE MEANS TO ATTAIN RELIEF

The Director's ultra vires inquiry has injured, and continues to injure, PQA. Mandamus is PQA's only means to correct the unlawful agency action. Because the

Director is labelling her "review" a review of an institution decision, the Director's actions may not be appealable. *See* 35 U.S.C. § 314(d). And because VLSI has not sued PQA for infringement, PQA may not have standing to appeal. *See Gen. Elec. Co. v. United Techs. Corp.*, 928 F.3d 1349, 1353 (Fed. Cir. 2019). Thus, mandamus is the only way this Court may review the Director's unlawful actions.

The ongoing and specific injuries to PQA include:

- PQA was unlawfully dismissed without recourse to be reinstated as a party. Thus, PQA is deprived of its statutory right to a FWD and to defend a favorable FWD on appeal. *See SAS*, 138 S. Ct. at 1359 ("[E]verything in the statute before us confirms that SAS is entitled to a final written decision addressing all of the claims it has challenged…"); *see also* 35 U.S.C. § 318(a). Additionally, PQA cannot seek sanctions against VLSI under 37 C.F.R. § 42.11(d)(2) for willfully violating the protective order based on the Director's confirmation in the Sanction's Decision of the propriety of sealing the parties' confidential settlement communications. Appx65.

- The Director indefinitely delayed the FWD deadline, which PQA expects VLSI to argue will nullify a late FWD. Appx94-95. As a dismissed party, PQA cannot seek timely issuance of the FWD.

- Because the Director took control from the 3-member Panel, PQA is deprived of its statutory right to an impartial decision in the first instance by the panel. *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021).

- The Director refused to clarify whether the order dismissing PQA is "final" or "non-final" (Appx161-162), a distinction impacting PQA's procedural rights (e.g., providing a deadline for filing a rehearing request and notice of appeal) and this Court's appellate jurisdiction.

- The Director unlawfully found PQA ("through its counsel" (Appx3)) engaged in "extortion" (Appx53) despite no evidence to support this serious allegation. This causes reputational harm and may subject counsel to disciplinary action. *See* 5 U.S.C. § 706(2)(A, D–E). Other courts have found mandamus appropriate to protect the reputation of counsel. *See United States v. Tillman*, 756 F.3d 1144, 1150–51 (9th Cir. 2014) (mandamus is appropriate "relief from the immediate and ongoing harm to [petitioner's] professional reputation" where district court "made factual findings and 'reached a legal conclusion that [petitioner] knowingly and wilfully violated a specific rule of ethical conduct'"). PQA and its counsel should not have to endure this unfounded reputational harm during the pendency of an appeal, as that harm is irreparable. *See Gladstein v. McLaughlin*, 230 F.2d 762, 763–64 (9th Cir. 1955) (recognizing mandamus as appropriate remedy to "the likely irreparable

18

unjust smearing of [petitioner's] reputation during the course of the proceeding below and the months of appellate procedure in this court").

This Court has denied mandamus relief when a party fails to exhaust all administrative remedies. *Belton v. McDonald*, 636 F. App'x 1011, 2016 WL 46295 (Fed. Cir. 2016) (unpublished). However, "[t]he 'no other means' requirement does not impose an insurmountable rule that the petitioner exhaust every possible avenue of relief before seeking mandamus relief." *In re Nintendo Co., Ltd.*, 589 F.3d 1194, 1200 (Fed. Cir. 2009). Here, PQA requested a partial rehearing of the Sanctions Decision seeking withdrawal of the sanctions and an opportunity to respond before sanctions are imposed. Appx164-167. The Director effectively conceded her failure to provide prior notice of at least one issue but did not lift the sanction imposed to comply with 37 C.F.R. § 42.11(d)(3). Appx94-95. Moreover, the Director already considered and overruled all other legal issues presented in this petition and already imposed sanctions. *See* Appx19-24. Asking the Director to re-consider is futile. *Cf. Mathews v. Diaz*, 426 U.S. 67, 76–77 (1976) (recognizing the exhaustion requirement may be waived if futile).

PQA has no other means to obtain the relief it seeks. Mandamus is appropriate and necessary.

## III.   PQA'S RIGHT TO MANDAMUS RELIEF IS CLEAR AND INDISPUTABLE IN LIGHT OF THE DIRECTOR'S ULTRA VIRES ORDERS

PQA's right to mandamus relief is clear and indisputable. "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). As discussed below, the Director acted beyond her statutory and regulatory authority when issuing the Mandated Discovery, sanctioning PQA, and taking control of the proceeding.

### A.   The Sanctions Decision Ignores the Regulations Governing Sanctions

The Director failed to comply with the regulation governing Board-imposed sanctions. This is unlawful because government agencies must follow their own regulations. *See Drumheller v. Dep't of Army*, 49 F.3d 1566, 1574 (Fed. Cir. 1995) (collecting cases). The regulations require the Board to (1) "specifically describe" the violative conduct and the "specific sanction" and (2) provide the party an opportunity to show why that "specific sanction authorized by the Board should not be imposed." 37 C.F.R. § 42.11(d)(3); *see also* 37 C.F.R. §42.11(d)(1). Prior to sanctioning PQA, the Director did not give PQA an opportunity to show why the imposed sanctions (i.e., specific adverse inferences and dismissal) should not be imposed. PQA could not have addressed these sanctions in its briefing because the Scheduling Order did not "specifically describe" the allegedly sanctionable conduct

(e.g., exclusively engaging the expert) or the "specific sanction" (e.g., specific adverse inferences PQA committed abuse of process and extortion, dismissal, etc.).

Instead, the Director ordered the Mandated Discovery, invited objections, and warned that failure to comply may result in non-specific "sanctions" (Appx76-77) or non-specific adverse inferences (Appx84-85). PQA objected to the ultra vires nature of the Mandated Discovery with valid, legal objections. Appx120, Appx101-118. The Sanctions Decision simultaneously overruled those objections and— without providing an opportunity to show why adverse inferences and dismissal should not be imposed—(1) made the specific adverse inferences PQA abused the IPR process and is an extortionist and (2) dismissed PQA from the proceeding. As explained in Part III.C below, PTO regulations do not define "abuse of process" and existing authority provided no notice of a risk of sanctions.

The Director failed to provide PQA with notice of the allegedly violative conduct and an opportunity to show why sanctions should not be imposed as required by 37 C.F.R. § 42.11(d)(3). For example, the Sanctions Decision concludes (mistakenly) that PQA "advanc[ed] a misleading argument and a misrepresentation of fact by representing in its Petition, that it had exclusively engaged Dr. Singh." Appx3. As this Court can readily confirm:

- PQA accurately represented its exclusive engagement of Dr. Singh (Appx140, Appx159);

- PQA filed a copy of the agreement so VLSI, the Board, and OpenSky could verify the terms (Appx144-145, Appx98-99);[13] and

- VLSI quoted the waiver-with-consent provision to the Board and OpenSky before any institution decision (Appx170-171, Appx177).

Because the Director did not follow the regulations, PQA was deprived of the opportunity to correct the Director's mistaken conclusion. For example, the Director's conclusion that PQA interfered with OpenSky's IPR petition is contrary to the record because PQA's petition expressly invited parallel IPRs: "The Board can handle OpenSky's petition at the same time, negating any concerns of wasted effort." Appx140. PQA never argued the Board should deny OpenSky's petition, as the Director mistakenly concludes. It was VLSI that weaponized the agreement against OpenSky, arguing *in the OpenSky proceeding* the Board should deny *OpenSky's petition* because "Dr. Singh **has** been exclusively retained by PQA" and OpenSky's "declarations are indeed hearsay." Appx171, Appx170. PQA's statement to the Board, that OpenSky could not present Dr. Singh for cross examination (Appx140), was *and remains* true because OpenSky never asked PQA to waive the exclusivity even after PQA publicly filed the engagement agreement so all could

---

[13] The agreement states: "Also for the Duration of this matter, you further agree you will not accept new consulting engagements related to the Challenged Patent without prior written consent." Appx99.

evaluate its terms. Thus, PQA mislead no one because the Board (and OpenSky) knew PQA could waive exclusivity.

Given the opportunity, PQA's counsel would have further explained that exclusive expert engagements are standard practice. Exclusivity ensures the expert is fairly compensated (*see* Appx133, 12:8–17; Appx134-135, 13:24–14:3) and protected from influence of other parties even if they are nominally aligned.

The Director effectively concedes she sanctioned PQA without giving PQA an opportunity to explain why the sanctions "should not be imposed." Appx94 (conceding the expert engagement "would not readily have been the subject of a previous round of briefing"); 37 C.F.R. § 42.11(d)(3). Even after informing the Director of her unlawful conduct, she refused to follow her regulations by lifting the improper sanctions. *See Drumheller*, 49 F.3d at 1574 (collecting cases holding agencies must follow their regulations).

## B.   The Sanctions Decision Manifestly Misapprehends the Law Governing IPR Discovery

The Mandated Discovery order is not authorized by statute or regulation, and the Director used her finding of non-compliance with that ultra vires discovery order to justify adverse inference and dismissal sanctions. The Sanctions Decision misapprehends both the governing statute and regulations. Appx22. Because neither authorize the Mandated Discovery, PQA should not be sanctioned for non-compliance.

23

**1.    *The Governing Statue Does Not Grant the Director Power to Order the Mandated Discovery***

The Sanctions Decision manifestly misapprehends the law by stating "35 U.S.C. § 316(a)(5) provides that discovery may be sought where 'necessary in the interest of justice[].'" Appx22. But § 316(a)(5) does not grant the Director unfettered discretion to order discovery. Rather, the statute mandates "*[t]he Director shall prescribe regulations … setting forth standards and procedures for discovery* of relevant evidence, including that such discovery shall be limited to … what is otherwise necessary in the interest of justice." 35 U.S.C. § 316(a)(5) (emphasis added). ***This statute gives the Director the authority to prescribe regulations that provide for limited discovery***. The Sanctions Decision misapprehends this statute as authorizing discovery outside the regulations. That is a manifest error of law because the Director prescribed no regulations authorizing the Mandated Discovery. *See Nat'l Fed'n*, 142 S. Ct. at 665 (agency power is limited to what Congress granted).

**2.    *The Regulations Do Not Grant Power to Issue the Mandated Discovery***

The Sanctions Decision also cites to phrases from two separate regulations as authorizing the Mandated Discovery, i.e., 37 C.F.R. §§ 42.51 & 42.5. Neither does.

**a.    *37 C.F.R. § 42.51 does not authorize the Mandated Discovery***

The Sanctions Decision concludes "37 C.F.R. § 42.51 … makes clear that 'the Board may otherwise order' additional discovery when such discovery is 'in the

24

interest of justice[.]'" Appx22. This conclusion is a manifest error. The quoted phrase, "the Board may otherwise order," as used in § 42.51(b)(1), constrains "Routine discovery":

> **(1) *Routine discovery*.** <u>Except as the Board may otherwise order</u>:
>
> > **(i)** Unless previously served or otherwise by agreement of the parties, any exhibit cited in a paper or in testimony must be served with the citing paper or testimony.
> >
> > **(ii)** Cross examination of affidavit testimony prepared for the proceeding is authorized within such time period as the Board may set.

37 C.F.R. § 42.51(b)(1) (underline added). This section authorizes the Board to suspend specific categories of "Routine discovery." It does not authorize non-routine discovery. The unprecedented Mandated Discovery, which may be the first ever Director-mandated IPR discovery, is certainly not routine. Thus, this phrase from § 42.51(b)(1) does not authorize the Mandated Discovery. *See Kisor v. Wilkie*, 139 S. Ct. 2400, 2415–16 (2019) (agency interpretation of regulation must be reasonable).

The second phrase from § 42.51 quoted in the Sanctions Decision, i.e., "in the interests of justice," is from a different subsection and similarly does not authorize the Mandated Discovery:

> **(2) *Additional discovery*.**
>
> > **(i)** The parties may agree to additional discovery between themselves. Where the parties fail to agree, <u>a party may move</u> for additional discovery. The <u>moving party</u> must show that such

> additional discovery is <u>in the interests of justice</u>, …. The Board
> may specify conditions for such additional discovery.

37 C.F.R. § 42.51(b)(2)(i) (underline added). This section relates to "Additional

discovery" and allows ***a party*** to "move for additional discovery" upon a showing

"that such additional discovery is in the interests of justice." No party moved for the

Mandated Discovery. This section does not authorize the Director to *sua sponte* issue

burdensome, intrusive discovery. *See* 5 U.S.C. § 706(2)(D); *see also Drumheller*, 49

F.3d at 1574 (agencies must follow their regulations).

### b.    37 C.F.R. § 42.5(a) does not authorize the Mandated Discovery

The Sanctions Decision also incorrectly relies on 37 C.F.R. § 42.5(a) as

authorizing the discovery. Appx22. Section 42.5(a) provides: "The Board may

determine a proper course of conduct in a proceeding for any situation not

specifically covered by this part and may enter non-final orders to administer the

proceeding."

The Director's interpretation is unreasonable because the regulation would

improperly grant more authority than the authorizing statute. The authority of an

administrative agency to promulgate a regulation is limited by the statute authorizing

the regulation. *See Morton v. Ruiz*, 415 U.S. 199, 231–32 (1974) (agency rulemaking

must "remain consistent with the governing legislation"). "When Congress passes

an Act empowering administrative agencies to carry on governmental activities, the

power of those agencies is circumscribed by the authority granted." *Stark v. Wickard*, 321 U.S. 288, 309–10 (1944).

Here, 37 C.F.R. § 42.5(a)—to the extent it applies to discovery (it does not)—fails to comply with 35 U.S.C. § 316(a)(5) which requires the Director "prescribe regulations … ***setting forth standards and procedures for discovery*** …" 35 U.S.C. § 316(a)(5) (emphasis added). Section 42.5(a) does not set forth standards and procedures for discovery. Thus, as applied in the Sanctions Decision (i.e., allowing *ad hoc* discovery orders), § 42.5(a) would be invalid because it would grant more authority to the Director than allowed by statute. *See Aid Association for Lutherans v. USPS*, 321 F.3d 1166, 1174 (D.C. Cir. 2003) ("An agency construction of a statute cannot survive judicial review if a contested regulation reflects an action that exceeds the agency's authority."); *see also Lawrence + Mem'l Hosp. v. Burwell*, 812 F.3d 257, 259 (2d Cir. 2016) (same).

**C.    The Director Violated PQA's Due Process Rights Announcing a Novel Standard for Abuse of Process and Simultaneously Sanctioning PQA Under That New Standard**

Federal "agencies should provide regulated parties 'fair warning of the conduct a regulation prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012) (citation omitted). An agency cannot apply a new interpretation to activities occurring before that interpretation was announced. *See*

27

*id.* at 155–56 (rejecting agency imposition of liability "for conduct that occurred well before [an] interpretation was announced").

The Director concedes "existing regulations do not attempt to specify what acts constitute an abuse of process." Appx37. The Director may have conducted rulemaking by inviting amici briefing to help define conduct constituting an "abuse of process," as used in 35 U.S.C. § 316(a)(6). Appx75. But the AIA only authorized formal rulemaking and the Director did not prescribe a regulation. *See* 35 U.S.C.§ 316(a) ("The Director shall prescribe regulations…"). Further, "Congress's delegation in the AIA for the adjudication of patentability in IPRs is not a delegation of authority to issue adjudicative decisions interpreting statutory provisions of the AIA." *Facebook, Inc. v. Windy City Innovations, LLC*, 973 F.3d 1321, 1349–50 (Fed. Cir. 2020) (additional views of entire panel) (analyzing statute, cases, and Board practice).

Here, the Director imposed sanctions for "abuse of process" under a novel standard announced concurrently with its Sanctions Decision thus depriving PQA of its rights without due process. This order is "the kind of 'unfair surprise' against which our cases have long warned." *See Christopher*, 567 U.S. at 156. PQA has due process rights at least because it paid its fee and is entitled to a FWD under 35 U.S.C. § 318(a), which is a "legitimate claim of entitlement" or "private interest" in the

outcome. *See Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 11–12 (1978); *Patlex Corp. v. Mossinghoff*, 771 F.2d 480, 484 (Fed. Cir. 1985).

The Director cites no statue, regulation, or other authority in concluding PQA committed "abuses of process" and leveling accusations of extortion.[14] *See* Appx54-55. Even if PQA's entire motive was economic in nature (it was not), the Board has previously held "an economic motive for challenging a patent claim does not itself raise abuse of process issues." *The Mangrove Partners Master Fund v. Virnetx Inc.*, IPR2015-01047, 2015 WL 5921228, *5 (PTAB 2015). Court decisions confirm that standard: "As the *Restatement of Torts* makes clear, the fact that a person acts spitefully, maliciously, or with an ulterior motive ***in instituting a legal proceeding*** is insufficient to establish abuse of process." *Scott v. D.C.*, 101 F.3d 748, 755 (D.C. Cir. 1996) (emphasis added); *accord Woods Svcs, Inc. v. Disability Advocates, Inc.*, 342 F. Supp. 3d 592, 606 (E.D. Pa. 2018) ("[T]here is no cause of action for abuse of process if the claimant, ***even with bad intentions***, merely carries out the process to its authorized conclusion." (emphasis added)) (cited at Appx4). An abuse of process requires proof of "success in achieving illegitimate ends with resulting injury." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 138 (D.C. Cir. 1989).

---

[14] The cited authority does not support the agency's position.

Here, the director focuses on PQA's alleged bad intentions in *filing* the IPR, which was not an abuse of process under any existing standard. Appx48 (finding PQA filed Petition for improper purpose), Appx50 (same), Appx51 (finding PQA was formed for an improper purpose); *also* Appx54 (motive to save costs by copying Intel's petition). The Director fails to identify any illegitimate ends achieved by PQA. Instead, the record shows PQA presented its arguments and evidence, cross-examined VLSI's expert, and presented oral arguments. These actions are proper and aimed at invalidating the '373 patent claims, which is the goal of an IPR. To the extent the Director's complaint is with the settlement discussions, PQA engaged in settlement discussion only after VLSI asked twice (Appx30), and the Board (and courts) encourage settlement. CTPG, 86.

The Director raises one other argument, i.e., PQA's representation to the Board that it had exclusively engaged expert Dr. Singh constitutes an abuse of process by misleading the Board and interfering with OpenSky's IPR. Appx52-53. As discussed above (*see supra*, Part III.A), (1) **PQA invited the Board to proceed with OpenSky's and PQA's IPRs in parallel**, (2) PQA did not misrepresent the exclusive nature of the engagement (even VLSI agrees it is exclusive), (3) PQA publicly filed the agreement with the Board, (4) VLSI (not PQA) argued the Board should deny institution of OpenSky's IPR, and (5) VLSI quoted the agreement's waiver-with-consent provision in a paper filed with the Board. Thus, before the

Board made either institution decision, the Board and OpenSky were fully apprised that Dr. Singh's exclusivity could be waived. Appx170-171, Appx177. PQA relied on its engagement agreement to avoid discretionary denial of *PQA's* properly supported petition in view of OpenSky's facially defective petition. Thus, PQA used its engagement of Dr. Singh for its proper purposes: (1) to present expert testimony and (2) allow cross-examination during the IPR.

**D.    The Director Improperly Took Control of this IPR**

The Director's Scheduling Order, resulting Sanctions Decision terminating PQA, and order indefinitely prohibiting the panel from issuing a FWD improperly usurp the Board's power to conduct IPRs in violation of 35 U.S.C. §§ 6(c) & 316(c). The AIA grants the power to conduct IPRs to a three-member panel, not the Director alone. *See Arthrex, Inc.*, 141 S. Ct. at 1986–87. The AIA does not grant the Director "the 'authority to take control' of a PTAB proceeding," but instead only authorizes the Director to make rules governing IPRs. *See id.* The Supreme Court in *Arthrex* found Congress's grant of authority to the Director unconstitutionally narrow and expanded that authority to allow *review* of panel decisions. *Id.* at 1988. *Arthrex* did not authorize the Director to take any other independent action in IPRs. Thus, the Director had no authority to "take control" of this IPR by ordering Mandated Discovery by the parties and amici, issuing sanctions (including adverse inferences

31

and dismissal of PQA), indefinitely postponing the FWD deadline, or staying the panel's ability to timely issue its FWD.

In addition, the Director's review is unlawful because it does not comply with 35 U.S.C. § 314(b) or, at the very least, the judicial requirement that an agency's reconsideration of its own decision must be "conducted within a short and reasonable time period." *Cooley v. United States*, 324 F.3d 1297, 1305 (Fed. Cir. 2003) (*quoting Bookman v. United States*, 453 F.2d 1263, 1265 (Ct. Cl. 1972)). The Director announced her "institution review" four months after the Section 314(b) deadline (Appx2) and issued the Sanctions Decision eleven months after that deadline, i.e., well after PQA prosecuted the entire proceeding. Appx1. Thus, the "review" was an abuse of discretion, arbitrary, capricious, untimely, and was not conducted within a short reasonable time.

The Director also unlawfully takes control by (1) "retaining jurisdiction" over PQA after dismissing PQA from the IPR and/or (2) indefinitely staying the FWD deadline. Appx5, Appx92-95. PQA can find no authorization (and the Director cited none) for retained jurisdiction here. The Director mistakenly relies on the "joinder" portion of 37 C.F.R. § 42.100(c) as authorizing her indefinite stay. It does not. That provision allows the Board to "adjust" the one-year deadline "in the case of joinder." However, (1) the Director's *indefinite stay* cannot reasonably be read as an "adjustment" to the one-year deadline; (2) Intel's IPR was joined over seven months

ago and thus, it is unreasonable, arbitrary, and capricious to now assert joinder as the reason for prohibiting the Panel from issuing its FWD; and (3) the joinder provision empowers the Board—i.e., the 3-member Panel—not the Director. 37 C.F.R. § 42.100(c) does not empower the Director to adjust the FWD deadline here, much less to indefinitely prohibit the Panel from issuing its FWD.

## IV.    MANDAMUS IS APPROPRIATE HERE WHERE THE DIRECTOR HAS UNDERTAKEN ILLEGAL AND UNPRECENDENTED ACTIONS THAT HAVE INJURED PQA AND ATTEMPT TO DEPRIVE THIS COURT OF THE POWER TO REVIEW HER ACTIONS

The third mandamus factor, whether the court is satisfied the writ is appropriate under the circumstances, is a "relatively broad and amorphous totality of the circumstances consideration." *Mote v. Wilkie*, 976 F.3d 1337, 1343 (Fed. Cir. 2020). "[T]he third factor is intended more as a final check on granting the writ than as an amorphously discretionary means of denying it, without consulting the other two factors." *Id*.

The Director's Scheduling Order and resulting Sanctions Decision and stay order improperly "take control" of the IPR in violation of 35 U.S.C. §§ 6(c) and 316(c) and as proscribed by 5 U.S.C. §§ 706(2)(A–D). By labeling this a "review of institution" and prohibiting the FWD from issuing (Appx94-95), the Director's unlawful actions may be unreviewable on appeal. *See Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*, 839 F.3d 1382, 1385 (Fed. Cir. 2016) (recognizing

§ 314(d) "bar[s] review of questions 'closely related' to the institution decision"). Mandamus is appropriate in circumstances such as this where there has been a "clear abuse of power" or "conduct amounting to 'usurpation of [the judicial] power.'" *Mallard v. U.S. Dist. Ct. for S. Dist. of* Iowa, 490 U.S. 296, 309 (1989). An agency abuses its power when acting without authority; and doing so in a manner that avoids judicial review usurps the review court's power. *See In re Syncora Guarantee Inc.*, 757 F.3d 511, 515–16 (6th Cir. 2014) ("[m]andamus is justified … to protect this court's future appellate jurisdiction. … The deprivation of meaningful and timely appellate review itself constitutes substantial and irreparable prejudice…") (citations omitted)).

Further, the Director has taken similar unlawful actions in the OpenSky Proceeding. Appx194, Appx196. Left unchecked there will be nothing to stop a repeat of what is already a pattern of unlawful agency action.

"The Supreme Court has confirmed that the requirements for mandamus are satisfied when the [underlying] decision involves 'basic' and 'undecided' legal questions." *In re Google LLC*, 949 F.3d 1338, 1341 (Fed. Cir. 2020) (*citing Schlagenhauf*, 379 U.S. at 110). Here, the question of whether a Director can issue unauthorized discovery orders, create new categories of sanctionable conduct, retain jurisdiction over a dismissed party, and interfere with the Board issuing a FWD during an IPR is both "basic" and "undecided," and has the potential to affect future

IPR proceedings. Indeed, "mandamus may be appropriate 'to further supervisory or instructional goals where issues are unsettled and important.'" *In re BigCommerce, Inc.*, 890 F.3d 978, 981 (Fed. Cir. 2018). The issues here—whether the Director must comply with the governing statutes and regulations when conducting reviews of institution decisions—are of the utmost importance. PQA's due process rights have been and continue to be violated. Mandamus is not only warranted, but necessary to restore those rights.

Dated: January 24, 2023                    Respectfully submitted,

/s/ *Brian C. Banner*

Brian C. Banner
    *Principal Attorney*
Truman H. Fenton
SLAYDEN, GRUBERT, BEARD PLLC
401 Congress Avenue, Suite 1650
Austin, TX  78701
(512) 502-3552
*Counsel for Petitioner*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 24, 2023, an electronic copy of the foregoing Motion was filed with the Clerk of Court for the U.S. Court of Appeals for the Federal Circuit, using the appellate CM/ECF system.

A copy of the foregoing was served upon the following counsel of record by electronic mail and upon the Undersecretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office ("Director") by electronic mail (service email addresses listed below). I further certify that, out of an abundance of caution, I served the Director via USPS Express Mail.

Email service to counsel for Patent Owner VLSI:

> Babak Redjaian (bredjaian@irell.com)
>
> Kenneth J. Weatherwax (weatherwax@lowensteinweatherwax.com)
>
> VLSI_IPRs@lowensteinweatherwax.com

Email service to counsel for Petitioner Intel Corp.:

> Ben Fernandez (ben.fernandez@wilmerhale.com)
>
> David Cavanaugh (david.cavanaugh@wilmerhale.com)
>
> Yvonn Lee (yvonne.lee@wilmerhale.com)
>
> Steven Horn (steven.horn@wilmerhale.com)

Email service to Director:

> Katherine K. Vidal (director_ptabdecision_review@uspto.gov)

<u>USPS Express Mail Service to Director:</u>

     Office of the General Counsel
     United States Patent and Trademark Office
     P.O. Box 1450
     Alexandria, Virginia 22313-1450

Dated: January 24, 2023       Respectfully submitted,

                   */s/ Brian C. Banner*

                   *Counsel for Petitioner*

## <u>CERTIFICATE OF COMPLIANCE</u>

The body of this brief complies with the type-volume limitation of Fed. R. App. P. 21(c)(1), because it contains 7,764 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b).



This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman.

Dated: January 24, 2023                Respectfully submitted,


                                       /s/ *Brian C. Banner*
                                       _____

                                       *Counsel for Petitioner*

38

No. 2023-

# United States Court of Appeals for the Federal Circuit

In Re PATENT QUALITY ASSURANCE LLC, *Petitioner*.

———————————

## NONCONFIDENTIAL APPENDIX

## TABLE OF CONTENTS

———————————

Decision Determining Abuse of Process, Issuing Sanctions, Ordering Petitioner Patent Quality Assurance, LLC to Show Cause, and Lifting Stay (Paper 101 Confidential; Paper 102, Public) ("Sanctions Decision") .................................................................... Appx1-67

Order Setting Schedule for Director Review (Paper 35) .......................... Appx68-81

Order Addressing Scope of Mandated Discovery (Paper 39) ................. Appx82-87

Order Staying Proceeding (Paper 100) ...................................................... Appx88-91

Order Granting Additional Briefing; Staying the Proceeding (Paper 106)....................................................................................... Appx92-97

Singh Engagement Agreement (Ex. 1034) ............................................ Appx98-100

Petitioner's Objections to Director's Orders (Ex. 1039) ...................... Appx101-119

Petitioner's Request for assurance to avoid waiver of discovery objections (Ex. 3004)................................................................... Appx120-123

Press Release: Tillis to Support Kathi Vidal's Nomination for Director of the U.S. Patent and Trademark Office (Ex. 2025) ...................................................................... Appx124-127

Ltr. U.S. Senate to The Honorable Kathi Vidal (Ex. 2046).................. Appx128-130

i

Deposition of Adit Singh, Ph.D. (Ex. 2053).......................................... Appx131-135

Petition for Inter Partes Review (Paper 1)............................................. Appx138-141

Petitioner's Reply to Patent Owner's Preliminary Response
      (Paper 8)........................................................................................ Appx142-145

Order [Granting Sua Sponte Director Review of the Board's
      Institution Decision] (Paper 31) ................................................... Appx146-149

Patent Owner's Brief in Response to Director Review Order
      (Paper 50 Confidential; Paper 68 Public).................................... Appx150-155

Petitioner's Opening Brief in Response to Director Review
      (Paper 51 Confidential; Paper 67 Public).................................... Appx156-159

Order Granting Motion for Extension of Time (Paper 104)................. Appx160-163

Patent Quality Assurance, LLC Motion for Reconsideration of Director's
      Decision Determining Abuse of Process, Issuing Sanctions,
      Ordering Petitioner Patent Quality Assurance, LLC to Show
      Cause, and Lifting Stay (Paper 105)........................................... Appx164-167

Patent Owner's Preliminary Sur-Reply, *OpenSky Industries, LLC v.*
      *VLSI Tech. LLC*, Paper 17, IPR2021-01056............................... Appx168-172

Decision Denying Institution of Inter Partes Review, *OpenSky*
      *Industries, LLC v. VLSI Tech. LLC*, Paper 18,
      IPR2021-01056........................................................................... Appx173-183

Decision Request for Rehearing, Affirming Decision on Remand,
      Dismissing Petitioner OpenSky Industries, LLC, Ordering
      Patent Owner to Show Cause, and Lifting Stay, *OpenSky*
      *Industries, LLC et al. v. VLSI Tech. LLC*, Paper 121,
      IPR2021-01064........................................................................... Appx184-187

Decision Determining Abuse of Process, Issuing Sanctions, and
      Remanding to Patent Trial and Appeal Board Panel for Further
      Proceedings, *OpenSky Industries, LLC et al. v. VLSI Tech.*
      *LLC*, Paper 102, IPR2021-01064 ............................................... Appx188-199

Notice of Stipulation (Paper 26) ........................................................ Appx200-201

Director_PTABDecision_Review@uspto.gov                    Paper No. 102
571-272-7822                                    Date: December 22, 2022

*PUBLIC VERSION*

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01229[1]
Patent 7,523,373 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

DECISION
Determining Abuse of Process, Issuing Sanctions,
Ordering Petitioner Patent Quality Assurance, LLC to Show Cause, and
Lifting Stay

_____

[1] Intel Corporation ("Intel"), which filed a Petition in IPR2022-00479, has
been joined as a party to this proceeding.  Paper 30.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

## I.     INTRODUCTION

On January 26, 2022, the Patent Trial and Appeal Board ("PTAB" or
"Board") issued a Decision granting institution of an *inter partes* review
("IPR") of claims 1–16 ("challenged claims") of U.S. Patent No. 7,523,373
B2 ("the '373 patent"), based on a Petition filed by Patent Quality
Assurance, LLC ("PQA").  Paper 10 ("Institution Decision").  VLSI
Technology LLC ("VLSI" or "Patent Owner") subsequently filed a
rehearing request and a request for Precedential Opinion Panel ("POP")
review.  *See* Paper 13 ("Req. Reh'g"); Ex. 3001.  On June 6, 2022, the Board
joined Intel as a Petitioner in this case.  Paper 30.  I initiated Director review
of the Board's Institution Decision on June 7, 2022.  Paper 31.  Concurrent
with my Order, the POP dismissed the rehearing and POP review requests.
Paper 32.

I explained that Director review would address questions of first
impression as to what actions the Director, and by delegation the Board,
should consider when addressing allegations of abuse of process or conduct
that otherwise thwarts the goals of the United States Patent and Trademark
Office ("USPTO" or "Office") and/or the America Invents Act ("AIA").
Paper 35, 7.  Due to the importance of the issues to the Office in fulfilling its
mission, I ordered the parties to respond to interrogatories and to exchange
information ("Mandated Discovery") to assist me in evaluating these
questions of first impression.  *Id.* at 8–11; *see also* Paper 37.

For the reasons discussed in more detail below, I determine that PQA
has engaged in discovery misconduct by failing to comply with my Order

IPR2021-01229
Patent 7,523,373 B2

for interrogatories and Mandated Discovery. *See* Paper 35, 8–11. Failure to
comply with an order is sanctionable. 37 C.F.R. § 42.12(a)(1).
Accordingly, when analyzing whether PQA's conduct amounted to an abuse
of process, I apply a negative inference and hold facts to have been
established adverse to PQA. *See* 37 C.F.R. § 42.12(b)(1) (providing that
sanctions may include "[a]n order holding facts to have been established in
the proceeding"); Paper 35, 10 ("Any attempt to withhold evidence based on
a narrow interpretation of the requests will be reviewed in conjunction with
any other subject conduct and may, alone or in combination with other
conduct, be sanctionable."); Paper 39, 3–4 ("As highlighted in the
Scheduling Order, failure to comply with my Order may be sanctionable. . . .
For example, and without limitation, sanctions may include '[a]n order
holding facts to have been established in the proceeding.'").

     Based on the evidence of record, and the facts held to have been
established, I determine that PQA, through its counsel, abused the IPR
process including by advancing a misleading argument and a
misrepresentation of fact by representing, in its Petition, that it had
exclusively engaged Dr. Singh, a witness relied on by another party,
OpenSky Industries, LLC ("OpenSky"), in a parallel proceeding,[2] and which
representation it later qualified as *not* being an exclusive engagement. *See*

---

[2] OpenSky filed a Petition for *inter partes* review challenging claims 1–3, 5,
6, 9–11, and 13 of the '373 patent in IPR2021-01056. IPR2021-01056,
Paper 2. On December 23, 2021, the Board denied OpenSky's petition
challenging the claims of the '373 patent. IPR2021-01056, Paper 18. *See*
below, section II.B.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

*Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 606
(E.D. Pa. 2018) ("The essence of an abuse of process claim is that
proceedings are used for a purpose not intended by the law."). In addition, I
determine that PQA abused the IPR process by filing this IPR, and
threatening to file another IPR petition seeking to join a related, instituted
IPR by OpenSky, in an attempt to extract payment from VLSI. Though the
behavior here may not be as egregious as that of OpenSky (*see* IPR2021-
01064, Paper 102), based on adverse inferences drawn because PQA did not
comply with my order for discovery, I find that PQA's behavior,
nonetheless, amounts to an abuse of process. PQA's behavior in this
proceeding, as inferred by the adverse inference, is entirely distinguishable
from conventional settlement negotiations that take place in an adversarial
proceeding. Each aspect of PQA's conduct—discovery misconduct,
violation of an express order, abuse of the IPR process, advancing a
misleading argument, and a misrepresenting of fact—taken alone,
constitutes sanctionable conduct. 37 C.F.R. § 42.12(a)(1)–(3), (6). Taken
together, the behavior warrants sanctions. Not only are the sanctions
imposed proportional to PQA's improper conduct here, but they are
necessary to deter such conduct by PQA and others in the future. *See* 37
C.F.R. § 42.11(d)(4).

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

Given PQA's conduct, I dismiss PQA from this proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions. *See* 37 C.F.R. § 42.12(b)(6), (8).[3]

I also order PQA to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding. I further order PQA to address the appropriate time period for which any fees should be assessed. *See* 37 C.F.R. § 42.12(b)(6) (providing that sanctions include "[a]n order providing for compensatory expenses, including attorney fees"). As set forth below, I order briefing from PQA and VLSI on this issue.

Lastly, as to the underlying proceeding, I also determine whether PQA's Petition, based only on the record before the Board prior to institution, presents a compelling, meritorious challenge. I recognize that the record in this proceeding has progressed through an oral hearing. Nevertheless, assessing compelling merits under the particular circumstances of this case balances competing interests. Specifically, it balances the interests of patent owners in having reliable patent rights with

---

[3] My dismissal of PQA at this stage is not meant to suggest that PQA's actions were more egregious than OpenSky's. Instead, I initially kept OpenSky in the *OpenSky* proceeding, IPR2021-01064, because the issue before me was one of first impression and I needed additional time to determine the appropriate course of action under such extraordinary circumstances. Now having the benefit of considering that case and this one, I conclude that the best course is to dismiss both PQA and OpenSky from each respective proceeding. Accordingly, contemporaneously with this order, I am also issuing an order dismissing OpenSky from the *OpenSky* proceeding.

5

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

the interests of the public in canceling unpatentable patent claims as needed, clearing the path for future innovation, and removing the tax on society caused by the litigation and licensing of clearly invalid patent claims.

I have reviewed the record before the Board prior to institution in this case. For the reasons articulated below, I find that the Petition meets the compelling merits standard as of the time of institution and on the record as it existed at that time. I therefore lift the stay in the underlying proceeding and permit this IPR to continue. I want to ensure any final decision after a trial in this proceeding benefits from our adversarial system, and that, should I take the Final Written Decision in this matter on Director Review, I will benefit from briefing on both sides of any issue I may consider at that time. With this in mind, and because compelling merits at the institution stage exist, I will not dismiss Intel from this proceeding.[4] *See Penson v. Ohio*, 488 U.S. 75, 84 (1988) ("truth—as well as fairness—is best discovered by powerful statements on both sides of the question" (internal quotation omitted)).

## II.    BACKGROUND

The dispute over the challenged patent has a long and complex history, starting with VLSI's complaint against Intel for infringing the '373 patent, filed in the Waco Division of the United States District Court for the Western District of Texas on April 11, 2019. *VLSI Tech. LLC v. Intel Corp.*, Case No. 1-19-cv-00254-ADA (consolidated as 1-19-cv-00977) (W.D. Tex.).

---

[4] Nor did Intel engage in the same discovery malfeasance as PQA.

6

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

### A.    Intel's Prior Petitions and Litigation

After being sued by VLSI, Intel filed a petition for IPR, challenging claims of the '373 patent.  IPR2020-00158, Paper 3.  Considering the factors set forth in the Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised discretion to deny institution of the proceeding.  IPR2020-00158, Paper 16, 14.  In particular, the Board highlighted "the advanced stage of the Western District of Texas litigation, a currently scheduled trial date approximately seven months before the would-be deadline for a final written decision, and the overlap between the issues." *Id*.  The Board did not address the merits of the Petition, other than determining "that the merits of the Petition do not outweigh the other *Fintiv* factors." *Id*.  Notably, the Board issued this decision prior to the issuance of the June 21, 2022, Director's Memorandum ("Memorandum"), [5], which clarifies that "the PTAB considers the merits of a petitioner's challenge when determining whether to institute a post-grant proceeding in view of parallel district court litigation" and that "compelling, meritorious challenges will be allowed to proceed at the PTAB even where district court litigation is proceeding in parallel." Memorandum at 4–5.

---

[5] Interim Procedure for Discretionary Denials in AIA Post-Grant Proceedings with Parallel District Court Litigation (USPTO June 21, 2022), *available at* www.uspto.gov/sites/default/files/documents/interim_proc_discretionary_denials_aia_parallel_district_court_litigation_memo_20220621_.pdf.

7

IPR2021-01229
Patent 7,523,373 B2

Intel requested POP review of the Board's decision, which was denied. IPR2020-00158, Papers 18 and 19. The trial in the Western District of Texas was held in February 2021, months after the date that was presented to the Board for the discretionary denial analysis. *See* Ex. 1042; *cf.* Memorandum at 8 ("A court's scheduled trial date [] is not by itself a good indicator of whether the district court trial will occur before the statutory deadline for a final written decision."). The trial resulted in a jury verdict finding that Intel literally, but not willfully, infringed claims 1, 5, 6, 9, and 11 of the '373 patent. Ex. 1031, 2–4. The jury awarded VLSI $1.5 billion in damages for infringement of the '373 patent.[6] *Id.* at 6. Intel did not challenge, and the jury did not consider, the validity of the claims of the '373 patent. Intel appealed to the Federal Circuit, and that appeal is currently pending as *VLSI Technology LLC v. Intel Corporation*, No. 22-1906 (Fed. Cir. June 15, 2022). The appeal will not resolve the invalidity issues pending before the Board.

---

[6] The jury also found that Intel neither literally nor willfully infringed U.S. Patent No. 7,725,759 B2 ("the '759 patent"), but did infringe claims 14, 17, 18 and 24 of that patent under the doctrine of equivalents. Ex. 1027, 2–4. The jury further found that Intel had not proven by clear and convincing evidence that claims 14, 17, 18, and 24 of the '759 patent were invalid as anticipated. *Id.* at 5. The jury awarded VLSI $675 million in damages for Intel's infringement of the '759 patent, bringing the total damages award to $2.175 billion. Ex. 1031, 2–4. The '759 patent is the subject of IPR2021-01064.

IPR2021-01229
Patent 7,523,373 B2

### B.    OpenSky's Petition

PQA was not the first entity to file a petition for *inter partes* review of the '373 patent after the jury verdict was announced.  One month earlier, OpenSky filed a Petition for *inter partes* review challenging claims 1–3, 5, 6, 9–11, and 13 of the '373 patent in IPR2021-01056.  IPR2021-01056, Paper 2.  OpenSky copied extensively from Intel's earlier petition.  IPR2021-01056, Ex. 2016 (redline comparison of portions of the Petition with portions of Intel's petition in IPR2020-00158).  OpenSky further refiled the declaration of Dr. Adit Singh prepared for Intel in IPR2020-00158, without Dr. Singh's knowledge and without engaging him.  *See* IPR2021-01056, Paper 2; Exs. 1002, 2037.[7]  OpenSky's failure to engage Dr. Singh proved fatal to its petition.  *See* IPR2021-01056, Paper 18, 9.

On December 23, 2021, the Board denied OpenSky's petition challenging the claims of the '373 patent.  IPR2021-01056, Paper 18.  The Board found "no indication that [OpenSky] ever spoke to Dr. Singh or attempted to retain him for this proceeding or secure his availability for cross examination before filing his declaration."  *Id.* at 8.  Instead, based on PQA's misrepresentations, the Board found that Dr. Singh had agreed to work exclusively for PQA (as discussed below), and OpenSky had not provided any factual support that Dr. Singh would be released from his

---

[7] OpenSky also filed an identical copy of the declaration of Intel's other expert, Dr. Sylvia Hall-Ellis, without change.  IPR2021-01056, Paper 17, 9; IPR2021-01056, Ex. 1027.  Dr. Hall-Ellis is a librarian who had proffered testimony regarding the prior art status of certain references relied on in Intel's previous petitions.  *See* IPR2021-01056, Ex. 1027.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

obligation to PQA so that he could be cross-examined about the content of his declaration. *Id.* at 9. The Board found that OpenSky "brought forth the testimony of an expert that [OpenSky] likely cannot produce for cross-examination and would likely be excluded." *Id.* Accordingly, the Board concluded that OpenSky's petition did not warrant institution. *Id.*

C.    *PQA's Petition*

On July 7, 2021, PQA filed the Petition for *inter partes* review in this proceeding, challenging claims 1–16 of the '373 patent. Paper 1 ("Petition" or "Pet.")[8] Like OpenSky, PQA copied extensively from Intel's earlier petition. Ex. 2016 (comparison of portions of the petition in this IPR with portions of Intel's petition in IPR2020-00158). Again like OpenSky, PQA refiled Intel's supporting declaration of Dr. Singh with minor changes. *See* Exs. 1002, 2022.[9] Unlike OpenSky, however, PQA contacted Dr. Singh prior to filing its petition and retained Dr. Singh as an expert for this proceeding. *See* Exs. 1034; 2053, 9:5–9. The terms of Dr. Singh's engagement agreement with PQA required that he "***will not accept new consulting engagements related to the Challenged Patent without prior written consent***." Ex. 1034, 2 (emphasis in original). That agreement was executed just four days after OpenSky petitioned for review of the '373

---

[8] Unless otherwise indicated, Papers enumerated herein refer to Papers filed in IPR2021-01229 and "Petition" or "Pet." refer to PQA's Petition in IPR2021-01229.

[9] Like OpenSky, PQA filed an identical copy of the declaration of Intel's other expert, Dr. Hall-Ellis, without change. Paper 7, 6.

10

IPR2021-01229
Patent 7,523,373 B2

patent, which relied on Dr. Singh's nearly identical declaration. *Id.* at 3 (signed June 10, 2021).

In its Petition, PQA argued that the Board should not exercise discretion to deny institution under 35 U.S.C. §§ 314(a) or 325(d). Pet. 2–5. In addressing discretionary denial, PQA argued that:

> the integrity of the patent system is at issue, as a jury recently found a well-known U.S. company (Intel Corporation) liable for infringement of the '373 patent and awarded $1.5 billion to Patent Owner—one of the top 5 largest infringement damage awards. . . . Because no examiner, court, or other tribunal has evaluated the '373 patent's validity in view of the grounds presented herein, review is necessary to instill confidence in the integrity of the patent system and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents.

*Id.* at 2–3. As to OpenSky's earlier-filed petition, PQA asserted that it "*exclusively* engaged Dr. Singh and Dr. Hall-Ellis to challenge the '373 patent. Thus, OpenSky cannot present either expert for cross-examination as required." *Id.* at 4 (emphasis in original). PQA thus argued that the Board should not discretionarily deny its Petition in favor of OpenSky's defective petition. *See id.* at 5.

VLSI filed a Patent Owner Preliminary Response on October 27, 2021, explaining that this was the third *inter partes* review petition filed against the '373 patent. Paper 7, 1 (noting discretionary denial of Intel's petition in IPR2020-00158 and OpenSky's then-pending petition in IPR2021-01056). VLSI argued that this Petition should be denied, alleging that shortly after the jury verdict, OpenSky and PQA were formed solely to

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

challenge the '373 patent with petitions that were largely copies of Intel's already rejected petition. *See id.* at 1–2.[10] VLSI alleged that "[t]hough inspired by OpenSky's filing but also trailing it, PQA wasted no time in throwing OpenSky under the bus, boasting that it, unlike OpenSky, actually retained the very same experts Intel used and that OpenSky's declarations were mere hearsay." *Id.* at 1–2.

In this proceeding, the Board reviewed the evidence and arguments in the Petition, Patent Owner Preliminary Response, Preliminary Reply, and Preliminary Sur-reply, and instituted the requested IPR on January 26, 2022. Institution Decision 24. Specifically, the Board found that the *Fintiv* factors did not weigh in favor of discretionary denial in large part because the district court jury trial did not resolve the unpatentability issues presented in this proceeding. *Id.* at 6–7. Because the Board did not reach the merits of the prior Intel petition, the Board disagreed with VLSI's arguments that institution should be denied because the Petition presents the same challenges as the prior Intel petition. *Id.* at 7–13 (relying on factors set forth in *General Plastic Indus. Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19 (Sept. 6, 2017) (precedential) ("the *General Plastic*" factors)); *see Code200, UAB v. Bright Data Ltd.*, IPR2022-00861, Paper 18, 5 (Aug. 23, 2022) (precedential) ("Where the first-filed petition under factor 1 was discretionarily denied or otherwise was not evaluated on the

---

[10] Such practice has become known as "copycat" petition practice and, to date, has not been held to be improper. *See, e.g., Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1350 (Fed. Cir. 2022) (referring to "copycat" petition accompanied by motion for joinder).

IPR2021-01229
Patent 7,523,373 B2

merits, factors 1–3 only weigh in favor of discretionary denial when there are 'road-mapping' concerns under factor 3 or other concerns under factor 2. . . . '[R]oad-mapping' concerns are minimized when, as in this case, a petitioner files a later petition that raises unpatentability challenges substantially overlapping with those in the previously-filed petition and the later petition is not refined based on lessons learned from later developments."). The Board also was not persuaded that "prevailing in litigation against one party should insulate a patent owner from challenge by a different party based on grounds that were not resolved in the litigation." *Id.* at 7.

On February 8, 2022, VLSI sought to challenge the institution decision, filing requests for rehearing and for POP review. In the rehearing request, VLSI argued that "[t]he Board should not permit entities formed after the verdict and facing no infringement threat to treat these proceedings as leverage to extract ransom payments in exchange for withdrawing abusive attacks." Req. Reh'g 1, 6–8. VLSI argued that such a proceeding advances no valid public interest and "fail[s] to weigh the overarching interests of fairness to the parties and the integrity of the patent system." *Id.* at 1–2, 9–10.

### D.    *Intel's Motion for Joinder*

Within a month of the Board instituting IPR in this proceeding, Intel timely filed its own Petition for IPR with a Motion for Joinder to this proceeding. Paper 30; IPR2022-00479, Papers 3 and 4. The Board joined Intel to this proceeding on June 6, 2022, determining that Intel's Petition warranted institution and declining to discretionarily deny institution under

13

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

35 U.S.C. §§ 314(a) and 325(d).  Paper 30.  In considering discretionary

denial, the Board determined that:

> [a]lthough Petitioner has directed this Petition to the same
> claims and relies on the same art as in its first petition, that the
> Board did not substantively address the merits of the prior Intel
> petitions, in our view, weighs against discretionary denial here.
> The district-court trial that led to the denial of its initial
> petitions is over and did not resolve the challenges presented
> here. Allowing Petitioner the opportunity to pursue a decision
> on the merits from the Board at this time—by joining PQA's
> substantially identical petition—best balances the desires to
> improve patent quality and patent-system efficiency against the
> potential for abuse of the review process by repeated attacks on
> patents.

*Id.* at 9–10 (citing *General Plastic*, Paper 19 at 16–17).  The Board correctly

identified that the statute expressly provides an exception to the one-year

time bar (set forth in 35 U.S.C. § 315(b)) for a request for joinder.  *Id.* at 7,

n.7, 18 (citing 35 U.S.C. § 315(b)) ("The time limitation set forth . . . shall

not apply to a request for joinder under subsection (c)").  VLSI requested

POP review of the Board's decision to join Intel to the proceeding, and that

request was denied.  Papers 34 and 40.

On August 30, 2022, the Board authorized VLSI to file a Motion to

Terminate Intel from the proceeding, setting forth VLSI's arguments on res

judicata.  Paper 70, 2.  The Board authorized Intel to file an opposition to the

motion.  *Id.*  VLSI filed the Motion to Terminate on September 29, 2022.

Paper 91.  Intel filed its opposition on October 27, 2022.  Paper 97. The

Motion is pending.

14

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

### E.    Director Review

As noted above, I ordered a *sua sponte* Director review of the Board's institution decision in this proceeding on June 7, 2022.  Paper 31. Concurrent with my Order, the POP dismissed the rehearing and POP review requests.  Paper 32.  Because I did not yet have all the facts before me, I did not stay the underlying proceeding.

On July 7, 2022, I issued a Scheduling Order for the Director review. Paper 35.  The Scheduling Order defined the scope of my review, as I determined that "this proceeding presents issues of first impression" and "involves issues of particular importance to the Office, the United States innovation economy, and the patent community."  *Id.* at 7–8.  In particular, I identified the following issues as relevant:

> 1.    What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA; and
>
> 2.    How the Director, and by delegation the Board, should assess conduct to determine if it constitutes an abuse of process or if it thwarts, as opposed to advances, the goals of the Office and/or the AIA, and what conduct should be considered as such.

*Id.*  I directed the parties to address these questions and to support their answers "in their briefing, including through new arguments and non-declaratory evidence."  *Id.* at 8.  I also invited amici curiae briefing.  *Id.*

To enable me to address those questions in the context of this review, my Scheduling Order also instructed the parties to answer interrogatories and exchange certain categories of information as Mandated Discovery.  *Id.*

15

IPR2021-01229
Patent 7,523,373 B2

at 8–11; 35 U.S.C. § 316(a)(5) ("The Director shall prescribe regulations setting forth standards and procedures for discovery of relevant evidence . . . otherwise necessary in the interest of justice."). My interrogatories ordered the parties to address specific questions related to the "issues of particular importance" in this review. Paper 35, 8–9.

I ordered the Mandated Discovery "to allow all parties to answer the questions" (interrogatories) I set forth, and to give each party an opportunity to produce evidence supporting its position. *Id.* at 9–10. The Mandated Discovery included categories of documents relating to the formation and business of PQA, documents and communications "relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record in the proceeding," and "communications with any named party relating to the filing, settlement, or potential termination of this proceeding." *Id.* My Scheduling Order warned "that sanctions may be considered for any misrepresentation, exaggeration, or over-statement as to the facts or law made in the parties' briefing" (*id.* at 9), and that "[a]ny attempt to withhold evidence based on a narrow interpretation of the [discovery] requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable." *Id.* at 10.

On July 20, 2022, PQA submitted objections to the Mandated Discovery. Ex. 3004; *see also* Ex. 1039 (Petitioner's objections to Director's Orders, filed August 4, 2022). I address PQA's specific objections below. PQA also stated that it "is willing to produce responsive third-party communications in its possession, custody, and control between

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh . . . if the Office provides written confirmation the Office will not consider PQA's act of producing the Third-Party Documents as waiver of PQA's objections to the Order." Ex. 3004 (emphasis omitted). PQA's email concluded with a listing of its preliminary objections regarding the interrogatories and discovery required in the Scheduling Order. *Id.*

On July 21, 2022, I extended the deadlines for the parties to exchange information and accordingly extended the briefing deadlines: as extended, parties' initial briefs and briefs of amici curiae were due on August 18, 2022,[11] and the parties' responsive briefs were due on September 1, 2022. Paper 37, 4. In the Order granting a two-week extension, I reminded the parties that "as set forth in the Scheduling Order, a party may lodge legitimate, lawful grounds for withholding documents, and shall maintain a privilege log of documents withheld." *Id.*

---

[11] Fourteen amici curiae briefs have been entered into the record of this proceeding, from the following: American Intellectual Property Law Association (Paper 41) ("AIPLA"); Association of Amicus Counsel (Paper 57); Naples Roundtable (Paper 56) ("Naples"); Ramzi Khalil Maalouf (Paper 55) ("Maalouf"); Engine Advocacy et al. (Paper 54) ("Engine"); High Tech Inventors Alliance (Paper 53) ("HTIA"); Robert Armitage (Paper 42); Computer and Communications Industry Association (Paper 58) ("CCIA"); BSA | The Software Alliance (Paper 59) ("BSA"); The Alliance of U.S. Startups et al. (Paper 60) ("USIJ"); Hon. Paul R. Michel (Paper 61); Unified Patents et al. (Paper 62) ("Unified"); Public Interest Patent Law Institute (Paper 63) ("PIPLI"); and Centripetal Networks, Inc. (Paper 64) ("Centripetal").

17

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

On July 29, 2022, I issued a further Order addressing the scope of Mandated Discovery. Paper 39. I reminded the parties that "they are required to comply with the full scope of the Scheduling Order, including its Mandated Discovery provisions now due to be exchanged by August 4, 2022," and "failure to comply with my Order may be sanctionable." *Id.* at 3. I explained that potential sanctions may include, for example, "[a]n order holding facts to have been established in the proceeding." *Id.* at 3–4 (quoting 37 C.F.R. § 42.12). The parties were further "reminded that legitimate, lawful grounds for withholding documents may be lodged and, if so, the party shall maintain a privilege log of documents withheld. No responsive document may be withheld without being included in such a privilege log." *Id.* (internal citations omitted). Thus, I provided actual notice to the parties of specific sanctionable conduct and corresponding potential sanctions for such conduct, in addition to the constructive notice provided by the Office's published regulations.

As discussed in detail below, PQA did not comply with the Mandated Discovery as ordered. *See* Paper 68, 15–20.[12] It produced a minimal number of documents to the other parties and provided wholly inadequate answers to my interrogatories. PQA produced a privilege log with 22 entries including work product relating to communications between PQA and Dr. Singh. Paper 43, 3; Ex. 1039, 1. In contrast, both VLSI and Intel produced responsive documents and detailed privilege logs, as ordered.

_____

[12] Paper 68 is the nonconfidential version of VLSI's Initial Brief in response to the Director review order; Paper 50 is the confidential version.

18

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

## III.    FAILURE TO COMPLY

As explained above, I initiated Director review to answer questions of first impression related to the IPR process. Paper 35, 7. Before proceeding to those questions, however, I must address PQA's deficient responses to the discovery required in my Scheduling Order.

### A.    *PQA's Objections to Mandated Discovery*

The deadline for exchange of documents and communications contemplated by my Mandated Discovery order was August 4, 2022. Paper 34, 4. The deadline for the parties to submit briefs addressing the Director's interrogatories with supporting documentary evidence was August 18, 2022. *Id.*; Paper 35, 8–10. The parties were repeatedly warned that no documents may be withheld without being included in a privilege log, and that any attempt to withhold evidence may be sanctionable. Paper 35, 10; Paper 39, 4.

On July 20, 2022, PQA sent an email with objections to my Mandated Discovery. Ex. 3004. I noted PQA's objections and reminded the parties that "they are required to comply with the full scope of the Scheduling Order, including its Mandated Discovery provisions." Paper 39, 3. PQA filed more expansive objections on August 4, 2022. Ex. 1039. For the reasons set forth below, I find their objections have no merit.

First, PQA contends that "this Director Review exceeds the Director's authority and violates PQA's due process rights." Ex. 1039, 3. Specifically, PQA argues that the Director does not have the authority to review a panel's institution decision because the Supreme Court's decision in *United States v.*

IPR2021-01229
Patent 7,523,373 B2

*Arthrex* modified 35 U.S.C. § 6(c) only with respect to final Board decisions. *Id.* (citing 141 S. Ct. 1970, 1987 (2021)). PQA's interpretation does not comport with the Supreme Court's view of the Director's authority. For example, the Court held that "[t]he Constitution [] forbids the enforcement of statutory restrictions on the Director that insulate the decisions of APJs from his [or her] direction and supervision. To be clear, the Director need not review every decision of the PTAB. What matters is that the Director have the discretion to review decisions rendered by APJs." 141 S. Ct. at 1988; *see also id.* at 1987 ("[T]his suit concerns only the Director's ability to supervise APJs in adjudicating petitions for inter partes review."). The Supreme Court thus sets forth broad discretionary power for the Director to elect to review APJ decisions, which also includes decisions on institution. Moreover, by statute, the Director determines whether to institute an IPR, and has discretion whether to do so. 35 U.S.C. § 314. Although the Director has delegated decisions on institution to the Board (37 C.F.R. § 42.4), the Director retains the power to review such decisions. Nothing in *Arthrex* or the AIA suggests otherwise. *See, e.g.,* 141 S. Ct. at 1989 (stating that "[b]ecause Congress has vested the Director with the 'power and duties' of the PTO, § 3(a)(1), the Director has the authority to provide for a means of reviewing PTAB decisions. *See also* §§ 3(a)(2)(A), 316(a)(4)."); *Medtronic, Inc. v. Robert Bosch Healthcare Sys., Inc.*, 839 F.3d 1382, 1385 (Fed. Cir. 2016) ("administrative agencies possess inherent authority to reconsider their decisions, subject to certain limitations, regardless of whether they possess explicit statutory authority to do so.").

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

Second, PQA contends that the Director's orders are *ultra vires* or otherwise prohibited because they subject PQA to undisclosed substantive and procedural standards and procedures under the threat of sanctions, and PQA has done nothing to warrant such action. Ex. 1039, 7–11 (citing Paper 31; Paper 35; Paper 39). The need for discovery into a potential abuse of process is based on the particular posture of this proceeding, where Patent Owner has argued that PQA was formed and filed its Petition only after a significant jury verdict for infringement. *See* Paper 35, 4, 5, 9. As the record demonstrates, PQA represented that it had "*exclusively* engaged" Dr. Singh, which was the basis for the Board's decision to deny institution in IPR2021-01056 involving Petitioner OpenSky. *See* Pet. 4 (emphasis in brief), IPR2021-01056 Paper 18, 5–9. Not only has PQA subsequently qualified this representation to state that Dr. Singh could be engaged by another entity with PQA's written consent,[13] the very fact that PQA entered into that arrangement shows its intent to ensure that PQA, not OpenSky, would benefit monetarily from any arrangement with VLSI or Intel. My discovery orders provided PQA an opportunity to demonstrate that they had no intention of engaging in an abuse of process. PQA chose not to provide discovery that would allow me to resolve that question. My discovery orders also provided clear notice of the potential consequences for failing to

---

[13] *See* Paper 67, 18. The underlying engagement agreement has been of record since the filing of Petitioner's Reply to the Preliminary Response. *See* Ex. 1034, 2 (engagement agreement).

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

comply. Thus, the posture of this case warrants the sanctions stated in my orders.

Third, PQA contends that the Order[14] exceeds the Office's statutory and regulatory authority. Ex. 1039, 11. I addressed PQA's arguments with respect to 35 U.S.C. § 6(c) above. PQA further contends that the Order exceeds the discovery permitted under 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51. *See id.* at 11. PQA's argument on this point is not persuasive. 35 U.S.C. § 316(a)(5) provides that discovery may be sought where "necessary in the interest of justice," which is at the heart of the inquiry as to whether PQA has abused the IPR process. And although 37 C.F.R. § 42.51 explicitly enumerates certain default categories of "limited" discovery, it also makes clear that "the Board may otherwise order" additional discovery when such discovery is "in the interest of justice," as it is here. Furthermore, in general, it is within my purview to "determine a proper course of conduct in a proceeding for any situation not specifically covered by [the other regulations]" and to "enter non-final orders," such as the Scheduling Order, "to administer the proceeding." 37 C.F.R. § 42.5(a).

Fourth, PQA argues that the Scheduling Order is inconsistent with Board procedures governing non-routine discovery. Ex. 1039, 11–15. For example, PQA contends that there is no evidence "tending to show beyond speculation that in fact something useful will be uncovered." *Id.* at 12 (quoting *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, IPR2012-00001 (PTAB Mar. 5, 2013) (Paper 26) (precedential)). Again, while Board

---

[14] PQA appears to be referring to Paper 35. *See* Ex. 1039, 1.

IPR2021-01229
Patent 7,523,373 B2

procedures governing party conduct do not formally apply to my inquiry into process abuses, my Scheduling Order makes clear the basis for the ordered discovery here. The Scheduling Order explains that the discovery would permit the parties to answer the questions I identified as germane to my inquiry into the circumstances surrounding PQA's formation and conduct—information that is uniquely in the parties' (and specifically PQA's) possession. Paper 35, 7–10; 37 C.F.R. § 42.11(a) ("Parties and individuals involved in the proceeding have a duty of candor and good faith to the Office during the course of a proceeding.").

PQA's argument that the Order is not "easily understandable" is also not persuasive. Ex. 1039, 13. No other party indicated that they had any issue understanding the Order, nor did they have issues complying. PQA's argument that the discovery is overly burdensome (Ex. 1039, 13–14) fares no better—PQA could have sought to file a motion to revise the standing protective order "[f]orbidding . . . or [s]pecifying terms . . . for the disclosure or discovery" to alleviate that burden (37 C.F.R. § 42.54(a)(1)), or at least have requested a second extension if it could demonstrate an actual burden, but instead chose noncompliance.

PQA briefly argues that the Order violates its members' constitutional rights by compelling PQA members to disclose their identities without evidence of wrongdoing or inaccurate mandatory notices. Ex. 1039, 15. PQA does not explain how complying with a discovery order results in a constitutional violation. Further, by choosing to file this IPR, PQA availed itself of my and the Board's jurisdiction and opened itself to questions regarding its members and purpose, among others.

23

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

PQA ends its objections with a series of similarly unpersuasive arguments. PQA suggests that the Order is inconsistent with the purposes of the AIA. Ex. 1039, 5–6. PQA also asserts that the Order contravenes congressional intent for "discovery in *inter partes* review proceedings to be limited in [both] scope and expense." *Id.* at 15. However, PQA fails to acknowledge that, along with the goal of improving quality, "Congress recognized the importance of protecting patent owners from patent challengers who could use the new administrative review procedures as 'tools for harassment.'" *WesternGeco LLC v. ION Geophysical Corp.*, 889 F.3d 1308, 1317 (Fed. Cir. 2018) (citing H. Rep. No. 112–98, at 48 (2011)). The Order sets forth discovery for this very purpose, to identify and address potential harassment in this proceeding.

PQA's argument that the Order is inconsistent with the guidelines for Director review rests on its contention that "the Order does not identify any issue of first impression." Ex. 1039, 16. PQA provides no citation for the claim that Director review is limited to issues of first impression. In any event, my Order indicated that the issues here are ones of first impression. *Id*. Finally, PQA contends that the Order would require it to waive privilege objections by disclosing privileged documents to a federal agency (*id.* at 17) (citing *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006)), but avoiding such waiver while still proving sufficient indicia to test that privilege claim is the point of a fulsome privilege log, which PQA failed to submit.

IPR2021-01229
Patent 7,523,373 B2

### B.    *PQA's Failure to Comply with Mandatory Discovery and Interrogatories*

PQA failed to comply with the discovery requirements set forth in the Scheduling Order by: (1) refusing to provide internal documents to the other parties in the proceeding, or instead, a privilege log listing privileged documents withheld for in camera review;[15] and (2) failing to respond in good faith to the interrogatories, with adequate evidence.  Paper 35, 8–10. Each of these failures to comply is independently sanctionable.  *Id.* at 9–10.

### 1.    *PQA refused to produce confidential documents under seal, or a privilege log of internal documents that were not produced*

As explained above, the deadline for the exchange of documents and communications was August 4, 2022.  On August 11, 2022, VLSI requested in camera review, as to the production made by PQA.  Paper 43.  VLSI asserts that it:

> cannot identify with specificity documents for in camera review as to the responsive documents . . . because PQA has (i) failed to produce internal documents; and (ii) failed to provide a meaningful privilege log, instead providing only a very limited work product redaction log in this matter, each in violation of the Director's Orders (*see* Papers 35, 37 and 39).

*Id.* at 1.  VLSI asserts that "PQA produced 111 documents and a 'privilege log' consisting of only 22 entries.  The first 21 entries correspond to redacted email chains between PQA and its technical expert, Dr. Adit Singh, and identify the basis for those redactions as 'work product protection,' but

---

[15] PQA did log work product relating to its communications between PQA and Dr. Singh.  Ex. 1039, 1.

IPR2021-01229
Patent 7,523,373 B2

not attorney-client privilege." *Id.* at 3 (internal footnote omitted). VLSI
contends that "PQA's August 4, 2022 log identifies no documents withheld
for attorney-client privilege," and instead, PQA acknowledges that it has not
logged any communications between PQA and its attorneys. *Id.* at 4. VLSI
argues that "despite the fact that the Director has expressly found that PQA's
objections are not a basis upon which to withhold documents or to not log,
PQA has chosen to stand on its objections and withheld documents and a
privilege log in violation of the Director's express Orders." *Id.* at 5–6 (citing
Ex. 1039).

On August 18, 2022, PQA filed its initial brief in response to the
Director review order. Paper 67.[16]

In its responsive brief, filed September 1, 2022, PQA asserts that it
produced responsive documents, and that it has not willfully violated any
order. Paper 77, 15–16. Instead, PQA asserts that VLSI violated my Orders
because "VLSI did not produce or log any (i) internal communications of
VLSI, Fortress Investment Group, and/or other VLSI affiliates, or
(ii) communications solely among VLSI's outside or in-house counsel." *Id.*
at 16. PQA further asserts that "VLSI's allegations of non-compliance
during the Director review are actions that occurred well after institution and
thus do not impact the Institution Decision in this proceeding." *Id.* at 17
(emphasis omitted). None of these arguments justify PQA's failure to
comply.

---

[16] Paper 67 is the nonconfidential version of PQA's Initial Brief in response
to the Director review order; Paper 51 is the confidential version.

IPR2021-01229
Patent 7,523,373 B2

PQA appears to admit that it did not produce or log any internal communications when it asserts that PQA and VLSI did the exact same thing.  Paper 71, 15–16 ("VLSI did the *exact* same thing.  VLSI only logged communications between VLSI in-house attorneys and outside counsel.  VLSI did not produce or log any . . . internal communications . . .") (emphasis omitted)).  Having overruled PQA's objections to discovery, I find that PQA did not comply with the Mandated Discovery, as required by the Scheduling Order.  *See* Paper 35, 9–10.[17]

2.  *PQA's responses to the interrogatories are inadequate and lack evidentiary support*

In addition to its express refusal to comply with the Mandated Discovery, PQA failed to respond adequately to the interrogatories set forth in the Scheduling Order, which required the parties to respond with citation to supporting documentary evidence.  Paper 35, 8. PQA's initial brief purports to address the interrogatories listed in the Scheduling Order but fails to do so adequately.  Paper 67, 8–18.  For instance, PQA refers to a declaration of Joseph A. Uradnik, Ex. 1032, which was already of record. *See id.*  As a result, many of the interrogatories remain unanswered or unsubstantiated by PQA.

For example, interrogatory (a) asked, among other things, for what purpose PQA was formed, what its business is, and who its members are? Paper 35, 8.  To answer these questions, the Scheduling Order required PQA to provide the other parties with materials including communications related

---

[17] I do not rule on the adequacy of VLSI's discovery compliance at this time.

IPR2021-01229
Patent 7,523,373 B2

to the formation of PQA and documents related to its business plan. *Id.* at 9.

PQA responds by stating that the "initial authorized business of PQA is to challenge patent(s) to ensure patent quality." Paper 67, 8. PQA refuses to discloses its members by stating that "PQA's members are United States citizens, none of whom are employed by, work for, or are affiliated with Intel, OpenSky, or VLSI." *Id.* (citing Ex. 1032 ¶ 6). PQA states that "[n]o other persons or entities beyond PQA's members have an interest in PQA, its future revenues, profits, or obligations, or any of its activities including this proceeding." *Id.* at 8–9 (citing Ex. 1032 ¶¶ 4, 5, 7–11).

This answer is not responsive. As an initial matter, this answer only makes an assertion as to who its members are not; it does not identify the members of PQA. *See* Paper 35, 8 ("Who are members of PQA?"). In addition, PQA does not answer the interrogatory seeking the purpose for which PQA was formed, nor does PQA provide any required supporting evidence that would allow me, VLSI, or Intel to verify that PQA's business interest is limited to ensuring patent quality. *See* Paper 46, 10–11; Paper 68, 2–5.

Interrogatory (b) asked, "[o]ther than communications already in the record, what communications have taken place between PQA and each of the other parties?" Paper 35, 8. To answer this question, the Scheduling Order required PQA to provide the other parties with "all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record." *Id.* at 9.

IPR2021-01229
Patent 7,523,373 B2

PQA reports that after it filed its Petition, "VLSI contacted PQA to discuss settlement," and PQA declined. Paper 67, 6. PQA also explains that VLSI contacted PQA again, after the Board instituted this proceeding. *Id.* at 7. PQA states that ███████████████████████████████████████ ████████████████████████████████████████████. Paper 51, 9. PQA further reports that "[t]he parties did not agree to settlement before institution, and they have not discussed settlement since then." *Id.* at 7; *see also id.* at 9 (responding to the interrogatory by, in part, referring to these communications).

PQA also states that since Intel's joinder as a petitioner on June 6, 2022, PQA and Intel have had a common interest and have cooperated in the prosecution of the merits of the unpatentability of the '373 patent, which is not part of the Director review, and that PQA has no other formal or informal relationship with Intel. *Id.* at 10.

PQA thus does not explain sufficiently the nature of its communications with VLSI in PQA's opening brief.[18] In its responsive brief, PQA goes into some further detail. Paper 77, 4–7; *see also* Paper 71 (confidential version), 4–7 (citing Exs. 2065 and ████. In particular, ████ ████████████████████████████████████████████████████

---

[18] According to VLSI, in the privilege log that PQA submitted to VLSI, "[t]he last entry lists several communications that appear to correspond to communications between PQA and VLSI that the log states are withheld based on only PQA's "objections," not privilege or work product protection, and that PQA's email to the Board sent along with the August 4 production states "are documents VLSI has in its own possession." Paper 43, 3 n.1 (citing Ex. 3015).

29

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2



30

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2



I find PQA's responses deficient and misleading.  For example, █████

██████████████████████████████████████████  PQA's

briefing also was not fully responsive to the interrogatory question about its

dealings with VLSI, as VLSI correctly points out.[19]  Paper 76, 1, 7–8 (citing

Exs. 2064–2078). ████████████████████████████████

██████████████████████████████████

███████████████. *See* Exs. 2075, 2076 (████████████

████████████████████████  Further, PQA did not

mention that PQA implied that █████████████████████

---

[19] VLSI alleges that PQA failed to produce communications between PQA
and Intel that are logged in a privilege log by Intel and that are not logged by
PQA.  *See* Paper 76, 1. ████████████████████████
██████████████████████████████
███████████  Ex. 1518.

31

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

█████████████████████ *See* Ex. 2069 (████████████
████████████████████████████████████
████████████████████████████████████████
██████████████████████████████████████████
█████████████████████████████████████
██████████████████████

Interrogatory (c) asked, "[c]ould PQA be subject to claims of infringement of the '373 patent," and "[d]oes PQA have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers?" Paper 35, 8. PQA resists answering this question by arguing that an invalid patent cannot be infringed, that it does not wish to admit infringement, that infringement and validity are separate questions, and that the Intel products found to infringe are used by millions of people and businesses in the United States. Paper 67, 10–12. PQA argues that it has served a public interest by highlighting what it considers to be a problem with the Office's *Fintiv* practice, that it has filed a meritorious petition, and that "the public interest in the validity of a patent is arguably at its highest when a U.S. company has been found to infringe and is liable for one of the biggest patent verdicts in history." *Id.* at 12–14. PQA's briefing was thus not responsive to the underlying question of infringement, i.e., the extent to which PQA participates in the market for products covered by the patents in question.

Interrogatory (d) asked, "[d]oes the evidence in this proceeding demonstrate an abuse of process . . . [and] if so, which evidence and how should that evidence be weighted and addressed?" Paper 35, 8–9. To

IPR2021-01229
Patent 7,523,373 B2

answer this question, the Scheduling Order required PQA to provide the other parties with "all communications with any named party relating to the filing, settlement, or potential termination of this proceeding." *Id.* at 9. PQA responds that there is no abuse of process, but fails to provide supporting evidence. Paper 67, 14. Moreover, as discussed above, PQA intentionally omitted information ███████████████████ ████ Apart from its own actions, PQA argues that the Board and Director confirmed the merits of PQA's petition and that a meritorious petition should never be considered an abuse of process or contrary to the goals of the Office. *Id.* at 14 and n.2. PQA also argues that this proceeding will be the first adjudication—by any tribunal—of the validity of the '373 patent, that PQA and Intel confirmed through document productions there is no hidden connection between Intel and PQA, and that PQA has vigorously prosecuted this IPR and ██████████████████ ████ which is consistent with public policy favoring settlement negotiations. *Id.* at 14–15 (citing, e.g., Consolidated Trial Practice Guide (Nov. 2019) at 86). PQA's briefing was thus non-responsive to this interrogatory question.

Interrogatory (e) asked, "[w]hat is the basis for concluding that there are no other real parties in interest, beyond PQA," and "[a]re there additional people or entities that should be considered as potential real parties in interest?" Paper 35, 8–9. To answer this question, the Scheduling Order required PQA to provide the other parties with "all documents relating to PQA's business plan including its funding, its potential revenue, and the future allocation of any of its profits." *Id.* at 9. PQA's response to this

IPR2021-01229
Patent 7,523,373 B2

interrogatory essentially repeats its response to interrogatory (a) and relies on the Declaration of Joseph A. Uradnik (Ex. 1032). *See* Paper 67, 15–17. For reasons similar to those I gave regarding interrogatory (a), PQA's answer is not responsive to interrogatory (e) and does not provide sufficient evidence to allow me to evaluate PQA's answer.

Interrogatory (f) asked, "[d]id PQA ever condition any action relating to this proceeding . . . on payment or other consideration by Patent Owner or anyone else?" Paper 35, 9. ███████████████████████ ███████████████████████████████████████████ ███████████████ PQA essentially argues that it has never suggested delaying, losing, or not participating in the proceeding and never attempted to influence an expert not to participate in the proceeding. *See* Paper 67, 18. PQA states that while PQA's engagement with Dr. Singh is "exclusive," that provision may be waived on request. *Id.* (citing Ex. 1034). PQA states that since its engagement of Dr. Singh, no party (including OpenSky) has ever sought to engage him in connection with the '373 patent, and thus PQA has never declined any such request. *Id.*

PQA's answer in its initial brief (Paper 67) is misleading and not fully responsive to interrogatory (f). In particular, VLSI provides evidence that ███████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████ ████████████████████████████ █████████████████████████████████ ███████████████████████████████████

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2



Moreover, one aspect of

. Paper 71, 4–5.

Paper 71, 9 (citing Ex.
2065, 1).  It is worth noting, however, that PQA only provided this
justification after VLSI exposed the parties' negotiation in VLSI's
interrogatory answer.  PQA could have provided this information in the first
instance (i.e., in its initial brief) in response to the interrogatory on whether
PQA ever conditioned any action relating to this proceeding on payment or
other consideration by Patent Owner or anyone else.  *See* 37 C.F.R.
§ 42.11(a) ("Parties and individuals involved in the proceeding have a duty
of candor and good faith to the Office during the course of a proceeding.").
I find that PQA's failure to mention anything of this nature in its initial brief
represents an attempt to subvert answering interrogatory (f).

### C.    Sanctions for PQA's Failure to Comply

PQA has identified no authority that would allow it to ignore the
Mandated Discovery and interrogatories in my Order.  Therefore, I
determine that PQA has failed to comply.  I further determine that it is

35

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

appropriate to sanction PQA for its discovery misconduct. *See* 37 C.F.R. § 42.12(b) (non-exhaustive list of sanctions).

The Director[20] has the authority to impose sanctions against a party for misconduct. 35 U.S.C. § 316(a); 37 C.F.R. § 42.12(a); *see Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020); *see also* AIPLA, 9; BAS, 6–7; Unified, 3–5, 12–17; Naples, 6. Although 37 C.F.R. § 42.12(a) does not require the Board to impose sanctions, where, as here, a party has clearly violated an order after being provided with clear notice of possible sanctions for failing to comply with that order, the integrity of practice before the Board is best served by imposing sanctions commensurate with the sanctionable misconduct to not only punish the offending party, but also to deter future misconduct. *See* 37 C.F.R. § 42.12(a) (authorizing sanctions for "misconduct"); *see also id.* at § 42.11(d)(4) (permitting sanctions to "deter repetition of the conduct or comparable conduct by others similarly situated").

Whether sanctions are appropriate is a highly fact-specific question, and the relevant considerations will vary from case to case. Prior sanction contexts have considered:

(1) whether the party has performed conduct warranting sanctions;

(2) whether that conduct has caused harm (to, for example, another party, the proceedings, or the USPTO); and

---

[20] The Director of the USPTO, the Deputy Director of the USPTO, the Commissioner for Patents, the Commissioner for Trademarks, and the Administrative Patent Judges shall constitute the PTAB. 35 U.S.C. § 6(a). Accordingly, the Director may levy sanctions as a member of the Board.

36

IPR2021-01229
Patent 7,523,373 B2

(3) whether the potential sanctions are proportionate to the harm. *See, e.g.*, *R.J. Reynolds Vapor Co. v. Fontem Holdings 1 B.V.*, IPR2017-01318, Paper 16 at 5, 8 (PTAB Aug. 6, 2018). The Director may impose sanctions, for example, for "[f]ailure to comply with an applicable rule or order in the proceeding"; "[a]dvancing a misleading or frivolous argument or request for relief"; "[m]isrepresentation of a fact"; "[a]buse of discovery"; "abuse of process"; or "[a]ny other improper use of the proceeding, including actions that harass or cause unnecessary delay or an unnecessary increase in the cost of the proceeding." 37 C.F.R. §§ 42.12(a)(1), (2), (3), (5), (6), (7). Sanctions may include, for example, "[a]n order holding facts to have been established in the proceeding"; "an order precluding a party from filing a paper"; and "an order providing for compensatory expenses, including attorney fees." *Id.* §§ 42.12(b)(1), (2), (6). Additionally, the Director may issue sanctions not explicitly provided in 37 C.F.R. § 42.12(b). *See Voip-Pal.com*, 976 F.3d at 1323–24. Any sanction must be commensurate with the harm caused. *See R.J. Reynolds*, IPR2017-01318, Paper 16 at 5.

As a result of PQA's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine PQA's assertion that it has not committed an abuse of the IPR process. Indeed, the confidential material in this Order makes clear that PQA has made misleading statements and affirmatively attempted to withhold facts that, taken alone or with other facts, might establish that PQA abused the IPR process.

37

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

PQA should not be allowed to profit from its discovery misconduct. Accordingly, I determine that the proper sanction is to hold disputed facts as established against PQA. 37 C.F.R. § 42.12(b)(1); Paper 39, 3, 4 (warning parties that "failure to comply with my Order may be sanctionable," and specifically warning that "without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding'" under 37 C.F.R. § 42.12(b)(1)). The Federal Circuit has approved this remedy of adverse inference in the context of district court litigation, stating that "when 'the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction.'" *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1363 (Fed. Cir. 2017) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

In view of the record as discussed above, including PQA's response to interrogatories (a)–(f), I find that PQA was not only non-responsive to my interrogatories but that PQA was evasive in its responses and engaged in troublesome conduct. I further apply adverse inferences in my decisions on abuse of process below.

## IV.    ABUSE OF PROCESS AND OTHER SANCTIONABLE CONDUCT

I initiated Director review in this proceeding to examine and address VLSI's allegations of abuse of process by PQA. *See* Paper 31; Paper 35, 8. Under existing Office regulations, an abuse of process is sanctionable (i.e., it

IPR2021-01229
Patent 7,523,373 B2

is "conduct that warrants sanctions"). 37 C.F.R. § 42.12(a)(6). Abuse of process is a fact-based inquiry, and existing regulations do not attempt to specify what acts constitute an abuse of process. Accordingly, I consider PQA's conduct to determine whether it demonstrates an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA.

### A.    Background Principles

Congress created the AIA to support the "important congressional objective" of "giving the Patent Office significant power to revisit and revise earlier patent grants," among other objectives. *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016). Congress did not implement a standing requirement for petitioners; any party (other than the patentee) may seek such review. 35 U.S.C. § 311(a). AIA post-grant proceedings, and more specifically, the IPR proceedings at issue here, do not exist in isolation but are part of a larger patent and innovation ecosystem. Congress intended AIA proceedings to be a less-expensive alternative to district court litigation to resolve certain patentability issues. AIA proceedings were not, however, intended to replace patent litigation, which remains a vital forum for determining patent validity. Nor were they intended to be tools of patent owner harassment. Congress expressed the intent of the AIA in the statute when it directed the Director, when prescribing regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings." 35 U.S.C. § 316(b). I consider this mandate not just when promulgating regulations, but in administering the AIA through guidance and decision-

39

IPR2021-01229
Patent 7,523,373 B2

making.  Abuse of AIA proceedings undermines these important objectives, and the Office will not tolerate it.

PQA points to an argument from an amicus that abuse of process cannot arise from the filing of a petition and can only refer to conduct that arises after litigation, relying in part on the second Restatement of Torts. *See* Paper 77, 23 (citing Paper 55, 5; Restatement (Second) Torts § 682).  I disagree.  The Restatement indicates that even a properly initiated proceeding may be abused, and further indicates that it is an abuse of process to initiate a proceeding for a purpose other than that for which it was intended.  *Id.;*[21] *see also* Fed. R. Civ. P. 11.  Further, as discussed below, the sanctions I impose in this proceeding are based on the sanctions in 37 C.F.R. § 42.12 and are not part of a suit sounding in tort for an abuse of process.

---

[21] The Restatement states:

> The gravamen of the misconduct for which the liability stated in this Section is imposed is not the wrongful procurement of legal process or the wrongful initiation of criminal or civil proceedings; it is the misuse of process, no matter how properly obtained, for any purpose other than that which it was designed to accomplish.
>
> …
>
> For abuse of process to occur there must be use of the process for an immediate purpose other than that for which it was designed and intended.  The usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it.

*Id.*

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

PQA also argues, consistent with the *Noerr-Pennington* doctrine and the First Amendment, that PQA's intent or purpose in filing a meritorious petition is legally irrelevant. Paper 67, 22–23 (citing *Nader v. The Democratic Nat. Comm.*, 555 F. Supp. 2d 137, 156–57 (D.D.C. 2008); *Razorback Ready Mix Concrete Co., Inc. v. Weaver*, 761 F. 2d 484, 487 (8th Cir. 1985)). VLSI argues that the *Noerr-Pennington* doctrine protects against liability, but it does not shield litigants from sanctions. Paper 74, 23 (citing *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 537 (2002)). Intel argues that "[a]dopting VLSI's new intent-based requirement also would conflict with Supreme Court precedent holding that "'an objectively reasonable effort to litigate cannot be [a] sham regardless of subjective intent.'" Paper 78, 5–6 n.3 (quoting *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993); citing Paper 58, 5–6 (amicus CCIA: "[S]anctions are inappropriate—and barred by the First Amendment—with respect to the filing of a meritorious petition.")).

Here, sanctions are based on the authority granted to the Board after notice and comment rulemaking and are not part of a suit sounding in tort for an abuse of process. I consider sanctions here in the context of determining whether the IPR process itself is being abused, which involves evaluating the totality of evidence including, but not limited to, the circumstances surrounding the initial filing of the petition. Moreover, even putting aside PQA's act of filing an IPR petition, PQA's other conduct merits sanctions, as discussed below.

IPR2021-01229
Patent 7,523,373 B2

### B.    *PQA's Conduct*

The following summary is based on evidence provided by VLSI, which I hold as established facts in the absence of contrary evidence from PQA. *See Residential Funding Corp.*, 306 F.3d at 106 ("[I]f a party fails to obey a discovery order, the court 'may make such orders in regard to the failure as are just,' including, but not limited to, '[a]n order that . . . designated facts shall be taken as established for the purposes of the action in accordance with the claim of the party obtaining the order.'" (quoting Fed. R. Civ. P. 37(b)(2)(A))).  "Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that" the evidence would have exposed facts unfavorable to the non-disclosing party. *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995).

While PQA's Petition stressed that review was necessary to instill confidence in "the integrity of the patent system" and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents (Pet. 2–3), its subsequent conduct called that objective into question.

A month after PQA filed its Petition, VLSI contacted PQA to discuss the IPR proceeding, but PQA declined to engage in talks at that time. *See* Paper 68, 5.  PQA states that it discussed settlement only at VLSI's behest. Paper 77, 1.

42

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2



VLSI additionally alleges, and I find, that during this period, i.e.,

. Paper 50, 6 (citing, e.g., Exs. 2067, 2075, 2076).  Also,

. *Id.*  In the absence of an interrogatory response from PQA with respect to

.

VLSI also alleges, and I find, that

Paper 74, 8.  VLSI bases its allegation on the following email from PQA:

43

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2



*Id.* at 7–8 (citing Ex. 2069; Ex. 2076).  I find VLSI's allegation to be supported by the email it provided.  *See* Ex. 2069 (



).

It is undisputed that PQA has not accepted any settlement agreement and the parties have not settled.  *See id.* at 8.

Also, as discussed above, PQA represented in its Petition that it had "exclusively engaged" Dr. Singh (Pet. 4) (emphasis in brief), which was the basis for the Board's decision to deny institution in IPR2021-01056 involving Petitioner OpenSky.  *See* IPR2021-01056, Paper 18, 5–9.  PQA later attempted to qualify this representation.  *Compare* Pet. 4 ("In contrast, Petitioner exclusively engaged Dr. Singh and Dr. Hall-Ellis to challenge the '373 patent. Thus, OpenSky cannot present either expert for cross-examination as required."), *with* Paper 67, 18 ("Similarly, while PQA's engagement with Dr. Singh is 'exclusive,' that provision may be waived on request." Ex. 1034.)  Had PQA not made that false representation, OpenSky may have sought permission to engage the experts.  Further, there is no

44

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

evidence explaining why PQA retained the ability to prohibit Dr. Singh from working for other parties, including OpenSky. A reasonable and adverse inference would be that PQA did not believe review of the '373 patent was necessary to instill confidence in "the integrity of the patent system" and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents (Pet. 2–3) but instead sought to benefit monetarily from the petition by working to have OpenSky's petition denied so the PQA petition would be instituted.

I will analyze PQA's conduct in more detail in the following section.

### C.    Case-specific Considerations

#### 1.    Petitioner's interest in the proceeding

I am mindful that Congress did not itself include a standing requirement for IPRs. *See Cuozzo*, 579 U.S. at 279 ("Parties that initiate [IPRs] need not have a concrete stake in the outcome; indeed, they may lack constitutional standing."); Paper 77, 22; *see also* Engine, 13–14 ("Congress created IPR so that any 'person who is not the owner of a patent' may file an IPR petition . . . It would be improper for the PTO to supplant that choice.") (citations omitted). Instead, Congress left it to the USPTO to prescribe regulations, to "consider . . . the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings . . . ." 35 U.S.C. § 316(b).

The Office has repeatedly instituted IPRs where the petitioner has not been sued for infringement. *See, e.g., Athena Automation Ltd., v. Husky Injection Molding Systems Ltd.*, IPR2013-00290, Paper 18, 12–13 (PTAB Oct. 25, 2013) (precedential) (declining to deny a petition based on assignor

45

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

estoppel); *Fresenius Kabi USA, LLC v. Chugai Seiyaku Kabushiki Kaisha, Inc.*, IPR2021-01336, Paper 27, 48 (PTAB Feb. 23, 2022). In practice, however, there is commonly a high degree of interplay between IPR petitions/trials and Article III patent litigation. *See, e.g.*, *The Patent and Trial Appeal Board: Examining Proposals to Address Predictability, Certainty, and Fairness*, Hearing Before the S. Comm. on Intellectual Prop., 117th Cong. at 1:14:27-1:14:37 (June 22, 2022) (testimony of Tim Wilson, Head of Patents and Intellectual Property Litigation, SAS Institute, Inc., stating that IPR petitions are typically filed in response to a patent infringement lawsuit).

Barring evidence to the contrary, there is little need to question the motives of a party sued for infringement. However, where a petitioner has not been sued for infringement, and is a non-practicing entity, legitimate questions may exist regarding whether the petitioner filed the petition for an improper purpose or one that does not advance the goals of the AIA or this Office. For example, an amicus identifies a concern with petitioners who file "petitions, filed for the primary purpose of obtaining a cash settlement" from patent owners in order to settle and terminate the proceeding. *See* Naples, 2. Not only would such a purpose not advance legitimate goals, but the PTAB proceedings under the AIA are not intended to be a tool for patent owner harassment.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

To be clear, there is nothing *per se* improper[22] about a petitioner who is not a patent infringement defendant filing an IPR petition. For example, there may be circumstances in which a petitioner has not yet been sued, but believes it may be, or otherwise wants to make sure it has the freedom to operate. Alternatively, there may be circumstances in which a petitioner is planning to enter the field of technology that the patent protects and is trying to clear entry barriers or otherwise clarify whether they have freedom to operate. *See* Engine, 10–11. Or a petitioner may act on behalf of the public without having any research or commercial activities involving the challenged patent. *See Consumer Watchdog v. Wisconsin Alumni Rsch. Found.*, 753 F.3d 1258, 1260 (Fed. Cir. 2014).

Although it is not *per se* improper for a person not charged with infringement to file an IPR petition, the posture of a petitioner, in conjunction with other surrounding circumstances, could raise legitimate questions about whether the petition is reasonably designed to advance the beneficial aims of the AIA or this Office and whether, in addition, the filing amounts to an abuse of process.

So it is here. PQA has not been sued for infringing the '373 patent. *See* Pet. 75. When I asked whether PQA could be sued for infringement, PQA objected to the question and resisted answering, as detailed above. *See supra* § III.B.2; Paper 35, 8; Paper 67, 10–14. PQA has thus neither

---

[22] I address here only what conduct is improper and do not suggest that all conduct that is not improper warrants institution. Such decisions are better suited for guidelines and notice-and-comment rulemaking.

47

IPR2021-01229
Patent 7,523,373 B2

admitted that it infringes nor alleged that it does not infringe, despite my
Order providing it an opportunity to do so, and has not substantiated its
argument either way. PQA has stated that Intel has customers that might,
arguably, infringe (but without stating whether it is one of Intel's
customers), and PQA has not explained whether it is in the marketplace for
products covered by the '373 patent. The lack of evidence on this point is
directly attributable to PQA's failure to follow my Order and I draw
negative inferences from that failure. *See Residential Funding Corp.*, 306
F.3d at 110 (finding that intentional acts that hinder discovery support an
inference that the evidence was harmful to the non-producing party).
Accordingly, I find the fact established that PQA does not believe that it
may be sued for patent infringement in the future, and that fear of
infringement did not motivate PQA to file its Petition.

PQA maintains that its interest is in the integrity of the patent system.
Pet. 2–3. The record (and additional factors discussed below) belie that
representation. Indeed, I ordered PQA to produce documentation and
answer interrogatories related to its business purpose and membership, and it
has not done so. In its briefing, PQA responds by stating that its "initial
authorized business . . . is to challenge patent(s) to ensure patent quality,"
but PQA refuses to discloses its members, despite my Order to do so. Paper
67, 8. Again, the lack of evidence of PQA's business purpose and
membership is due to PQA's discovery misconduct and, therefore, I find the
fact established that PQA did not file this case for its alleged purpose of
testing patent quality or preserving the integrity of the patent system.
Further, if PQA's sole motivation were to challenge the validity of the '373

48

IPR2021-01229
Patent 7,523,373 B2

patent, it would not have represented that it had "*exclusively* engaged" Dr. Singh and stated that "[t]hus, OpenSky cannot present either expert for cross-examination as required." Pet. 4 (citing 37 C.F.R. 42.51(b)(1)) (emphasis in brief). To the contrary, a purpose of preserving the integrity of the patent system would have motivated PQA to make Dr. Singh available to any other party challenging the '373 patent. As noted above, this was the basis for the Board's decision to deny institution to Petitioner OpenSky in IPR2021-01056. *See* IPR2021-01056, Paper 18, 5–9. Indeed, based on the record and adverse inferences, I find that the sole reason PQA filed the Petition was for the improper purpose of extracting money from VLSI after VLSI's success before the jury.

### 2.    *Recent trial verdict awarding significant damages*

The mere existence of a trial verdict (whether by jury or from the bench) does not automatically make the filing of a subsequent IPR on the involved patent(s) an abuse of process. Indeed, patents are often asserted, either in demand letters or in litigation, against multiple entities in serial fashion. Both those entities subject to current or future assertions, or potential assertions, and the public, have a vested interest in canceling invalid patents.

That said, an entity filing an IPR on the heels of a large jury verdict may, when combined with other facts, raise legitimate questions regarding the motivation behind the petition. *See* USIJ, 15–16 (discussing petitions filed after infringement verdicts).

Such is the case here. As the parties and amici are well aware, a jury in the Western District of Texas rendered a verdict of more than $2 billion

49

IPR2021-01229
Patent 7,523,373 B2

against Intel for infringing two VLSI patents, including the '373 patent ($1.5 billion in damages). Ex. 1031, 6. PQA filed its petition shortly after the infringement verdict, and as noted in section IV(C)(1) of this opinion, without any established fear that it would be subject to a subsequent assertion. Together with the significant damages award, this suggests that the purpose of the IPR could be to extract a settlement from VLSI.

Notably, despite being given the opportunity, PQA has not provided adequate evidence that it had another purpose for filing this IPR. As explained previously, PQA flouted Mandated Discovery refusing to turn over or log internal communications that would have shed light on the "purpose" for which PQA was formed. Paper 68, 4. In addition, as discussed above, PQA failed to adequately respond to the interrogatories set forth in the Scheduling Order (Paper 35, 8–9). Accordingly, per the sanction for PQA's discovery misconduct, I find that it has been established that PQA filed its Petition for the purpose of extracting payment from VLSI.

### 3. *Proximity of petitioner's formation to jury award*

Large jury awards attract publicity and attention. When the evidence demonstrates that an IPR petitioner was formed from whole cloth soon after a damages award, and in particular a significant damages award, this suggests that the petitioner could be motivated to extract a financial windfall from the patent owner or the adjudicated infringer, rather than being motivated by any legitimate purpose.

Here, the evidence demonstrates that PQA was formed 15 weeks after a jury found that Intel infringed the '373 patent, and awarded VLSI $1.5 billion in damages. *Compare* Ex. 1027 (Jury Verdict Form dated March 2,

50

IPR2021-01229
Patent 7,523,373 B2

2021), *with* Ex. 1045 (PQA formation date of June 14, 2021). PQA then filed its Petition on July 7, 2021, three weeks after its formation. This timing, and the fact that PQA prevented OpenSky from also pursuing its proceeding to seek unpatentability of the '373 patent, in the absence of contrary evidence from PQA, supports the finding that PQA was formed in an attempt to capitalize on that verdict. Moreover, and as explained above, PQA has provided inadequate evidence that it was formed for another purpose, despite my Order giving it an opportunity to do so. Although PQA omits these details from its recitation of events, ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████. Ex. 2075, 2076. As a sanction for that discovery violation, I find that it has been established that PQA was formed for the express and sole purpose of extracting payment from VLSI.

4.  *Misleading arguments or misrepresentations of fact*

I find that PQA advanced a misleading or frivolous argument, misrepresented a fact, and/or otherwise engaged in an abuse of process, by representing in its Petition that it had exclusively engaged Dr. Singh, an expert who was relied on by another litigant in another proceeding, and later retracting this statement by stating that this was an exclusivity provision that could be waived upon request. *Compare* Pet. 4 ("In contrast, Petitioner exclusively engaged Dr. Singh and Dr. Hall-Ellis to challenge the '373 patent. Thus, OpenSky cannot present either expert for cross-examination as required."), *with* Paper 67, 18 ("Similarly, while PQA's engagement with Dr. Singh is 'exclusive,' that provision may be waived on request. Ex. 1034.

51

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

Since PQA's engagement of Dr. Singh, no party (including OpenSky) has ever sought to engage him in connection with the '373 patent, thus PQA has never declined any such request.").

The statement in the Petition that PQA had exclusively engaged Dr. Singh appears to have been a misstatement of the exclusivity arrangement that implied that Dr. Singh could have worked with another party with PQA's consent. *See* Ex. 1034, 2.

One might argue that PQA merely changed its mind about whether it would waive its exclusive arrangement with Dr. Singh, and that it is inherent in an exclusive arrangement that the exclusivity may be waived, e.g., where the arrangement states that Dr. Singh will not accept new consulting engagements related to the challenged patent without prior written consent. *See* Paper 67, 18; Ex. 1034, 2. Even if this is the case, it strains credulity that PQA now states that "no party (including OpenSky) has ever sought to engage [Dr. Singh] in connection with the '373 patent." Paper 67, 18. Indeed, PQA's express statement in the Petition that "OpenSky cannot present either expert for cross-examination" would have led OpenSky to reasonably conclude that it would have been fruitless to seek permission from PQA. *Compare* Pet. 4, *with* Paper 67, 18. In other words, even if PQA had not originally been misleading in the Petition, its later arguments regarding the lack of attempts to engage the expert are misleading at best, which, again, indicates an abuse of process.

Further, PQA also engaged in an abuse of process by establishing an exclusive arrangement with a witness relied on by another party in another proceeding and interfering with that proceeding by informing the Board that

52

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

the other party would be unable to cross-examine the witness. *See* Pet. 4.
The Board relied on the statement in the Petition to dismiss the other
proceeding. *See* IPR2021-01056, Paper 18, 9. This type of interference
with OpenSky's Petition, through the use of an exclusive arrangement in
combination with a purposeful statement in PQA's Petition that there was an
exclusive arrangement that prevented OpenSky from obtaining institution,
indicates an abuse of process. PQA made a point to state to the Board that
Dr. Singh cannot be cross-examined in another proceeding, and the Board
did not proceed with the IPR based on OpenSky's petition on this basis,
which further demonstrates that PQA intended to interfere with another IPR.
Pet. 4; IPR2021-01056 Paper 18, 9. The use of an exclusive arrangement
and the assertion of a purposeful and misleading statement before the Board
in order to favor its own petition over another one indicates an abuse of
process.[23]

### 5.    *Filing a copycat petition*

As my Scheduling Order notes, filing a "copycat" petition is not
inherently improper. Paper 35, 5 n.4. For example, under the current
joinder rules, a time-barred party may file a copycat petition when it is

---

[23] I recognize that in some cases a party may have a legitimate interest in
circumscribing an expert's work for another party, such as where the two
parties are competitors and providing that expert access to confidential or
privileged information may compromise that party's competitive position if
permitted to use it for the benefit of the other party. *See, e.g., Digital Equip.
Corp. v. Micro Tech., Inc.*, 142 F.R.D. 488, 492 (D. Colo. 1992)
(acknowledging the risks inherent in allowing an expert to work for both
sides). This is not such a case.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

seeking joinder as provided by the AIA.  *See* 35 U.S.C. § 315(c); 37 C.F.R.
§§ 42.122(b), 42.101(b).  There may be circumstances, however, in which
the filing of a petition that copies a previously denied petition may suggest
an abuse of process.

The present case provides an example as it relates to PQA.  In
addition to PQA filing what was essentially a copy of Intel's IPR petition,
which had previously been denied based on the *Fintiv* factors, PQA filed a
copy of Intel's expert declaration. Ex. 2016; Ex. 2022.  On these facts, this
conduct suggests that PQA was attempting to file a petition with the lowest
possible cost in an effort to generate leverage against VLSI.

*D.    Conclusion*

Viewed as a whole, PQA's conduct has been an abuse of the IPR
process, the patent system, and the Office.  The totality of PQA's conduct
evinces a singular focus on using an AIA proceeding to extort money.
Despite being given the opportunity, PQA failed to offer a verifiable,
legitimate basis for filing its IPR Petition, which was filed only after a
district court awarded large monetary damages keyed to the subject '373
patent.  PQA also made material misrepresentations in order to ensure that
OpenSky's Petition would be denied so that PQA's Petition could proceed.
And the Petition it filed was not generated by PQA, but was a copy of Intel's
earlier petition.  Further, ████████████████████████████████
█████████████████████████████████████████████████████████
████████████      *See* Ex. 2076.

Seeking an AIA trial for the primary purpose of extorting money, and
representing that a party has an exclusive engagement with a witness relied

54

IPR2021-01229
Patent 7,523,373 B2

on by another litigant do not comport with the purpose and legitimate goals of the AIA and are abuses of process. Further, PQA has made misrepresentations of fact and/or misleading arguments regarding the nature of this exclusivity. Opportunistic uses of AIA proceedings harm the IPR process, patent owners, the Office and the public. Naples, 2; USIJ, 4.[24] To safeguard the proper functioning of the patent system, and the confidence therein, it is incumbent on me and the USPTO to protect against that harm.

## V.    REMEDY FOR ABUSE OF PROCESS AND OTHER SANCTIONABLE CONDUCT

The AIA granted the Office broad authority to prescribe regulations aimed at sanctioning the "abuse of process, or any other improper use of the proceeding." 35 U.S.C. § 316(a)(6). Our existing regulations take full advantage of that authority and provide a broad range of potential sanctions to address such abuse and other sanctionable conduct, ranging from awarding "compensatory expenses" to "[j]udgment in the trial." 37 C.F.R. § 42.12(a)(2), (3), (6), (b). These enumerated sanctions are not exclusive. The Federal Circuit has held that § 42.12(b) "allows the Board to issue sanctions not explicitly provided in the regulation." *Voip-Pal.com, Inc.*, 976 F.3d at 1323. Accordingly, the Office has robust powers to sanction abuse of process and other sanctionable conduct where it occurs and to deter

---

[24] This situation thus meaningfully differs from others in which a "profit motive" was arguably present but there was not otherwise other evidence of improper conduct. *See, e.g., Coalition for Affordable Drugs VI, LLC v. Celgene Corp.*, Case IPR2015-01092, Paper 19 (PTAB Sept. 25, 2015) (denying motions for sanctions for abuse of process).

55

IPR2021-01229
Patent 7,523,373 B2

similar abuse. The Director will ensure that the remedy suits the
wrongdoing, both in this specific case and more generally when faced with
evidence of an abuse of process or other conduct that thwarts, rather than
advances, the goals of the Office and the AIA.

Here, in addition to any monetary sanctions I may levy (*see* below
section VII), I must decide whether to maintain or dismiss the underlying
proceeding.

### A.    Whether Dismissal is Appropriate

VLSI contends that the remedy for PQA's abuse should be
termination of this IPR. Paper 68, 2, 10–11. VLSI also argues that Intel
should not be "allowed to take advantage of PQA's misconduct at VLSI's
expense." Paper 68, 24. VLSI asserts that Intel was a time-barred party, and
that the Board has previously terminated joined time-barred parties when
finding that an IPR was improperly instituted. *See id.* at 24–25 (citing *I.M.L.
SLU v. WAG Acquisition, LLC*, IPR2016-01658, Paper 46, 3, 5 (PTAB Feb.
27, 2018); *Mylan Pharma Inc. v. Horizon Pharma USA, Inc.*, IPR2017-
01995, Paper 71, 12–13 (PTAB Mar. 17, 2019); *Intel Corp., v. Alacritech,
Inc.*, IPR2018-00234, Paper 66, 23 (PTAB June 4, 2019); *Sling TV, LLC v.
Realtime Adaptive Streaming, LLC*, IPR2018-01331, Paper 39, 8 (PTAB
Jan. 17, 2020)).

Intel responds that, in "VLSI's cited cases, the IPRs were terminated
because the ***original*** petitioner was ***statutorily barred*** from bringing the
petition in the first instance," so the petition was void *ab initio*. *See*
Paper 78, 12 (emphasis in original). That reasoning, however, does not
apply to the current proceeding. As Intel correctly points out, in other cases,

56

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

the Board has allowed a joined petitioner to step into an active role after the original petitioner was terminated from the proceeding. *See id.* at 12–13 (citing *Apple Inc. v. Traxcell Techs., LLC*, IPR2021-01552, Paper 19, 2 (PTAB May 26, 2022); *AT&T Servs., Inc. v. Convergent Media Sols., LLC*, IPR2017-01237, Paper 11, 26–28 (PTAB May 10, 2017); *Qualcomm Inc. v. Bandspeed, Inc.*, IPR2015-01577, Paper 12 at 2–3, 6, 8 (PTAB Nov. 16, 2015)).

Amici recognize that I must "weigh the policy goals of the Office and the AIA" when facing abusive behavior because "the public has a clear interest in discouraging conduct that is abusive or otherwise thwarts Congress's goals in passing the AIA and the Office's goals in overseeing post-grant proceedings." AIPLA 5–6. Many amici have pointed out that "[o]ur patent system is rooted in the fact that valid claims . . . support innovation, progress, and the public's interests" (Engine 3) while "[i]nvalid patents unduly restrict innovation, competition, and access to knowledge" (PIPLI 2). *See* CCIA, 2; HTIA, 7; BSA, 10. Accordingly, "ensuring that invalid patents do not remain in force [is] one of the core missions of the PTAB" (CCIA 2) and "AIA trials thus broadly aim to 'protect the public's 'paramount interest in seeing that patent [rights] are kept within their legitimate scope'" (HTIA, 5 (quoting *Cuozzo*, 579 U.S. at 279–80) (internal citations omitted)). *See* Unified, 5–6, Engine, 7–8. On the other hand, other amici highlight that "the patent system incentivizes inventors to publicly disclose innovations that advantage the public by granting an inventor a patent, upon which an 'exclusive enjoyment is guaranteed.'" Centripetal, 14; USIJ, 15; Maalouf, 6. Those amici point out that the legislative history

57

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

of the AIA shows Congress recognized the importance of reliable patent rights. Maalouf, 6–7 (citing H.R. Rep. No. 112-98 pt. 1, at 48 (2011)); Centripetal, 13; USIJ, 15.

Going back to first principles, to further the objectives of this Office in promoting and protecting innovation for the greater good of the public, I must advance the need for reliable patent rights and the benefits of removing patents that do not support innovation. *See* Lamar Smith, *Don't Weaken the Leahy-Smith America Invents Act*, BLOOMBERG LAW (Mar. 30, 2022), at 3 ("In the committee report on the AIA, we wrote about the importance to inventors of having 'quiet title'— clear ownership that can't be challenged."); H.R. Rep. No. 112-98, pt. 1, at 40 (2011), 2011 U.S.C.C.A.N. 67, 69; S. Rep. No. 110-259, at 20 (2008) (the congressional intent behind the AIA was "to establish a more efficient and streamlined patent system that will improve patent quality and limit unnecessary and counterproductive litigation costs.").

I recognize that PQA should not benefit from its abusive use of the IPR process. Accordingly, due to PQA's abuse of the process and misrepresentation of fact or misleading argument, I dismiss PQA from this the proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions. *See* 37 C.F.R. § 42.12(b)(6), (8). Intel remains in this proceeding as the sole Petitioner.

On the issue of whether to terminate the proceeding, the unique dynamics of this case, coupled with the public interest in evaluating patent challenges with compelling merits, counsels that I permit this IPR to continue only if the unpatentability merits were compelling as of the time of

58

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

institution and on the record as it existed at that time.[25]  Predicating
dismissal on the application of the compelling-merits standard best serves
the competing interests here.[26]

### B.    *Compelling Merits Analysis*

As I have stated previously, "[c]ompelling, meritorious challenges are
those in which the evidence, if unrebutted at trial, would plainly lead to a
conclusion that one or more claims are unpatentable by a preponderance of
the evidence."  Memorandum at 4.  A compelling merits challenge is a
higher standard than the reasonable likelihood required for the institution of
an IPR under 35 U.S.C. § 314(a).  A challenge can only "plainly lead to a
conclusion that one or more claims are unpatentable" (*id.*) if it is highly
likely that the petitioner would prevail with respect to at least one challenged
claim.

---

[25] My decision to conduct a compelling-merits determination here, per the
Memorandum, is limited to the facts of this case and should not be treated as
an endorsement of retroactive application of that memorandum to institution
decisions made before it issued.

[26] The circumstances of this particular case are unusual and are not likely to
reoccur. Apart from the Memorandum that will require an earlier
determination of compelling merits in future cases with similar fact patterns,
the Board issued its Decision several months before *Sotera* was designated
precedential.  *See Sotera Wireless, Inc. v. Masimo Corp.*, IPR2020-01019,
Paper 12 (issued Dec. 1, 2020, designated precedential Dec. 17, 2020)
(applying *Fintiv* and instituting review after the Petitioner filed a broad
stipulation to limit grounds in district court, addressing factor 4 in *Fintiv*).
Further, the USPTO is working on policy-making that will address some of
the facts raised in this case.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

In assessing compelling merits, I analyze the evidence and the parties' arguments as they existed at the date of institution. PQA filed a Petition (Paper 1) requesting institution of an *inter partes* review of claims 1–16 (all claims) of the '373 patent. In its Petition, PQA relies on three grounds. *Id.* at 2. For all independent claims, 1, 9 and 16, and for dependent claims, 2–7, 10, 11, and 13–15, PQA contends the claims are obvious in view of three references: Harris (US 5,867,719), Abadeer (US 2006/0259840 A1) and Zhang (US 2003/0122429 A1). *Id.* For dependent claims, 2, 8, 11 and 12, PQA relies on the combination of Harris, Abadeer, and Zhang, also combined with additional art. *Id.* VLSI filed a Preliminary Response. Paper 7. As authorized, PQA filed a Preliminary Reply (Paper 8), and VLSI filed a Preliminary Sur-Reply (Paper 9). The Board, in its Institution Decision, concluded that PQA's Petition showed a reasonable likelihood that it would prevail in establishing the unpatentability of at least one challenged claim, and instituted *inter partes* review. Paper 10, 24. The Board's Institution Decision fully describes the '373 patent and relevant prior art disclosures. *See generally id.* I will not repeat that analysis here, except to the extent necessary to inform my compelling merits determination.

As noted in the Institution Decision, PQA "relies on Harris for a system including switchable voltages provided to memory and other system[s] in an integrated circuit." Paper 10, 13. The Institution Decision further notes that PQA relies on both Harris's "failure mode" as well as its "low power feature" to teach the claimed "requirement of providing different voltages to the memory circuit depending on the levels of the two voltages." *Id.* at 16 (quoting Pet. 44–46). The Board, applying the

60

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

reasonable likelihood standard for institution, concluded that "Harris's low power feature discloses the claimed switching." *Id.* at 18; *see id.* at 24. Based on that conclusion, the Board declined to resolve the parties' dispute on whether the failure mode also met the limitation. VLSI filed for rehearing but did not challenge the Board's merits, focusing only on the Board's discretion. Paper 13.

I have considered the record as well as each of VLSI's arguments and I find that the Petition presented compelling merits at the time of institution based on the rationale set forth in the Institution Decision as well as my own analysis of the record at institution. I first note that VLSI's Preliminary Response focuses much of its argument on Harris's teachings alone, misapprehending Harris's various modes (e.g., normal mode, testing mode, failure mode, and low power feature) as wholly independent systems, rather than features provided by the same computing hardware system. *See e.g.,* Prelim. Resp. 34, 36–37; *see generally id.* at 31–55. As the Board explains, and as Harris supports, those modes are situationally-dependent modes implemented by the same underlying hardware system. Institution Decision 20–21. For example, in "a normal mode of operation," Harris's memory array "would be powered by a supply voltage applied to VDD terminal 132." Ex. 1003, 3:1–2; *see id.* 3:15–18, Fig. 1. And, where Harris's "test mode . . . [is] used as a low power feature, the second power supply voltage (Vstby or Vdd) is provided to the at least one memory array while the first power supply voltage (Vdd or Vstby) which is being supplied to the CPU is lowered so that lower power is consumed in the data processor while data within the at least one memory array is maintained." *Id.* at 4:65–5:4.

61

## PUBLIC VERSION

IPR2021-01229
Patent 7,523,373 B2

Further, VLSI's general assertion that Harris fails to teach "switching" voltages does little to support its position, as VLSI does not specifically identify any limitations it asserts Harris's modes fail to teach, suggest, or render obvious.

Although VLSI's Preliminary Response also takes issue with the compatibility of the Harris and Zhang combination (Prelim. Resp. 38–40), those arguments also do not persuade me that the Petition fails to present compelling merits at the institution stage. VLSI's argument that "Zhang never teaches switching between separate regulated voltages" (Prelim. Resp. 37–39) is based on features in Zhang that are not relied upon in, or needed by, Petitioner's combination. Instead of relying on Zhang to teach switching voltages, at the institution stage Petitioner presents a compelling case that a POSITA would have been motivated to use "regulated" voltages in Harris, as taught in Zhang, and provides three independent rationales to support its combination. Pet. 37–39. VLSI's Preliminary Response does not adequately address those proffered rationales, instead, arguing again about switching. *See* Prelim. Resp. 38–40. I also note that VLSI makes no argument with respect to Abadeer's teaching on determining the minimum operating voltage and storing that voltage in non-volatile memory or whether it would be obvious to combine Abadeer's teaching with Harris and Zhang. Nor does Patent Owner contest Petitioner's three proffered rationales for combining Harris and Abadeer. Pet. 30–33. Accordingly, I determine that the record, as it existed at the time of institution, presented compelling merits.

62

IPR2021-01229
Patent 7,523,373 B2

My determination of compelling merits here is based only on the record as it existed at institution, and I recognize that all relevant evidence likely will not have been adduced at that point in time. The record as developed during trial may have adduced additional evidence that may support a different determination. Thus, the merits of the Petition may be rebutted at trial, and, accordingly, a determination of compelling merits should not be taken as a signal to the ultimate conclusion after trial.

I therefore lift the stay in the underlying proceeding. The parties will have an additional opportunity to seek Director review of the Final Written Decision.

## VI.    REQUESTS FOR IN CAMERA REVIEW

VLSI requested that I review in camera documents of PQA. *See, e.g.*, Paper 43. ██████████████████████████████████████████ ████████████. Paper 44. No other parties request in camera review. For the reasons explained above, however, the evidence exchanged as Mandated Discovery is sufficient to resolve this Director review without resorting to in camera review. Accordingly, the request for in camera review is denied.

## VII.    SHOW CAUSE

Finally, for all the reasons discussed above, PQA also is ordered to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process and misrepresentation of fact or misleading argument. 37 C.F.R. § 42.12(b)(6). Within 30 days of this Decision, PQA and VLSI shall each file a 25-page brief addressing whether an award of attorney fees is

63

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

appropriate, and if so, how such fees should be determined, e.g., the appropriate time frame for which fees should be assessed. PQA and VLSI may each file a 10-page responsive brief, due two weeks from the date the initial briefs responding to the show cause order are filed.

## VIII. MOTIONS TO SEAL

PQA has also filed three motions to seal, i.e., relating to an agreement between PQA and VLSI to keep certain discussions confidential. Paper 49; Paper 75; Paper 79. VLSI also filed a motion to seal. Paper 66. Intel also filed a motion to seal. Paper 72.

In Paper 49, PQA moves to file under seal Exhibits 1046 and 1047, as well as portions of its Opening Brief in Response to Director Review that quote or describe those documents and/or communications related to those documents. Paper 49, 1.

In Paper 75, PQA states that it "moves to file under seal Patent Owner's Exhibits 2029, 2064–2080 and 2084–2087 and portions of Papers 50, 51, and 65 that quote or describe those confidential exhibits. PQA also moves to file under seal Petitioner's Exhibits 1054–1061 and portions of Paper 71 that quote or describe those confidential exhibits." Paper 75, 1.

In Paper 79, PQA states that it "moves to file under seal portions of Patent Owner's Responsive Brief Paper 74 that quote or describe confidential exhibits. . . . The arguments presented here track those made in Paper 75." Paper 79, 1.

VLSI counters that " ██████████████████████████ ██████████████████████████████████ " Paper 83, 2. VLSI

64

IPR2021-01229
Patent 7,523,373 B2

states that "  " *Id.* at 5–6 (

). VLSI also argues that

. *Id.* at 7–8.

VLSI further argues that

. *Id.* at 8–9.  Additionally, VLSI argues that

. *Id.* at 9–10.  VLSI makes similar arguments

in its oppositions to Papers 49 and 79.  *See* Papers 82 and 84.

PQA replies that VLSI has not established a crime or fraud.  *See* Paper 86, 2; *see also* Papers 85 and 87.

VLSI moves to seal Exhibits 2080, 2086, 2088, and 2089 relating to privilege logs, and certain portions of VLSI's brief relating to these exhibits. See Paper 66, 1.

Intel moves to seal portions of its responsive brief because it contains information that VLSI and PQA have identified as confidential.  See Paper 72, 1.

Although I find an abuse of process, I find that public policy favors allowing parties to discuss settlement in a confidential setting if they so agree, and I do not find that VLSI has established a sufficient exception to that policy on this record.  Further, I find that public policy favors allowing the privilege logs to remain confidential.  Accordingly, I grant the motions to seal.

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

## IX.   ORDER

For the foregoing reasons, it is hereby:

ORDERED that PQA is dismissed from the proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issue of sanctions;

FURTHER ORDERED that Intel remains the lead petitioner in this proceeding;

FUTHER ORDERED that the stay of the underlying proceeding is lifted;

FURTHER ORDERED that PQA and VLSI shall file a brief responding to the show cause order for PQA, addressing whether compensatory expenses should be ordered as a further sanction for PQA's abuse of process.  Briefing shall be filed within 30 calendar days of this decision and shall be limited to 25 pages;

FURTHER ORDERED that PQA and VLSI may each file a 10-page responsive brief, due two weeks from the date the initial briefs responding to the show cause order are filed; and

FURTHER ORDERED that PQA's, VLSI's, and Intel's motions to seal (Papers 49, 66, 72, 75, and 79) are granted.

66

*PUBLIC VERSION*

IPR2021-01229
Patent 7,523,373 B2

PETITIONER:

Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com

Bruce Slayden
Tecuan Flores
Truman Fenton
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tflores@sgbfirm.com
tfenton@sgbfirm.com

PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Parham Hendifar
Patrick Maloney
Jason Linger
LOWENSTEIN & WEATHERWAX LLP

67

Director_PTABDecision_Review@uspto.gov                Paper 35
571-272-7822                                          Dated: July 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE

———————

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————

IPR2021-01229[1]
Patent 7,523,373 B2

———————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER
*Setting Schedule for Director Review*

———————

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00479, has been joined as a party to this proceeding.  Paper 30.

IPR2021-01229
Patent 7,523,373 B2

## I.    INTRODUCTION

On January 26, 2022, the Patent Trial and Appeal Board ("Board") issued a Decision granting institution of an *inter partes* review of claims 1–16 ("challenged claims") of U.S. Patent No. 7,523,373 B2 ("the '373 patent"), as Patent Quality Assurance, LLC ("PQA") requested.  Paper 10 ("Institution Decision").  VLSI Technology LLC ("Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 13 ("Req. Reh'g"); Ex. 3001.  On June 6, 2022, the Board joined Intel as a Petitioner in this case.  Paper 30.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 31.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests.  Paper 32.

In accordance with United States Patent and Trademark ("USPTO" or "Office") policies, this Order identifies the issues subject to review and sets forth the schedule for the Director review process.  *See* Paper 31; *Interim process for Director review*[2] §§10 (encouraging focused issues), 11 ("Responsive or amicus briefing may only be submitted if requested by the Director."), 22 ("If Director review of an institution decision is initiated sua sponte by the Director, the parties to the proceeding will be given notice and may be given an opportunity for briefing.  The public also will be notified and the Director may request amicus briefing.").

## II.    BACKGROUND

In November 2019, Intel filed a petition for *inter partes* review challenging claims of the '373 patent in IPR2020-00158.  IPR2020-00158, Paper 3.

---

[2] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

IPR2021-01229
Patent 7,523,373 B2

Considering the factors set forth in the Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised discretion to deny institution of the proceeding, based on the advanced state of litigation concerning the '373 patent, then pending in the United States District Court for the Western District of Texas. IPR2020-00158, Paper 16. Intel requested POP review of the Board's decision, which was denied. IPR2020-00158, Papers 18, 19. The district court cases concluded on March 2, 2021, with a jury verdict finding Intel infringed the '373 patent and U.S. Patent No. 7,725,759 B2 ("the '759 patent"). Paper 7, 5. The jury awarded Patent Owner $2.175 billion in damages, $1.5 billion of which was attributable to infringement of the '373 patent. Ex. 1031, 6; *VLSI Tech. LLC v. Intel Corp.*, Case No. 6:19-cv-00254-ADA (consolidated as 19-cv-00977) (W.D. Tex.). *Id.*

On June 7, 2021, OpenSky Industries, LLC ("OpenSky") filed a petition for *inter partes* review challenging claims of the '373 patent in IPR2021-01056. IPR2021-01056, Paper 2. The petition in IPR2021-01056 was supported by the declaration of Dr. Adit Singh. *See id.* at 5–6, 22. In determining whether to institute the proceeding, the Board found that Dr. Singh was not available for cross-examination because of an exclusive arrangement between Dr. Singh and PQA. IPR2021-01056, Paper 18, 5 (citing IPR2021-01229, Paper 1, 4–5; Ex. 1034). The Board determined that because Dr. Singh was unavailable for cross-examination, Dr. Singh's declaration was likely to be excluded as hearsay. *See id.* at 4–9. Without Dr. Singh's testimony, the Board determined that OpenSky was unlikely to meet its burden to show unpatentability of at least one challenged claim. *See id.* at 6–7, 9. Consequently, the Board denied institution of the petition in IPR2021-01056. *Id.* at 9–10.

3

IPR2021-01229
Patent 7,523,373 B2

On July 7, 2021, PQA filed the Petition for *inter partes* review in this proceeding, challenging claims 1–16 of the '373 patent. Paper 1 ("Petition" or "Pet.").[3] In its Petition, PQA argued that the Board should not exercise discretion to deny institution under 35 U.S.C. §§ 314(a) or 325(d). Pet. 2–50. In addressing discretionary denial, PQA argued that:

> [b]ecause no examiner, court, or other tribunal has evaluated the '373 patent's validity in view of the grounds presented herein, review is necessary to instill confidence in the integrity of the patent system and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents.

*Id*. at 2–3; *see also* Paper 8 (Prelim. Reply), 3 ("*Fintiv* is relevant when another proceeding has determined, or may determine, invalidity issues impacting the IPR. No invalidity issue was (or can now be) determined in *VLSI*, so there is no other relevant proceeding. PO identifies no institution denial based on a different proceeding in which ***no*** invalidity issue was adjudicated or pending at the time of denial. The complete absence of overlap between this Petition and the *VLSI* case warrants rejection of PO's *NHK/Fintiv*-based arguments.").

Patent Owner filed a Preliminary Response on October 27, 2021, explaining that this was the third *inter partes* review petition filed against the '373 patent. Paper 7, 1 (noting discretionary denial of Intel's petition in IPR2020-00158 and OpenSky's filing of the petition in IPR2021-01056). Patent Owner argued that this Petition should be denied, alleging that after the widely-reported verdict finding that Intel infringed the '759 and '373 patents, PQA "formed in South Dakota to file the present petition." *Id*. at 1 (citation omitted). Patent Owner argued that "PQA's

---

[3] PQA also filed a petition for *inter partes* review in IPR2022-00480, challenging claims 1, 14, 17, 18, 21, 22, and 24 of the '759 patent and seeking joinder to instituted IPR2021-01064. IPR2022-00480, Papers 2, 3.

IPR2021-01229
Patent 7,523,373 B2

only apparent activity to date is filing an IPR against VLSI." *Id.* at 6.  Patent
Owner also noted that "PQA's petition copies the Intel Petition (and, thus, its
petition is substantially identical to OpenSky's as well) and relies on declarations
from Intel declarants Dr. Singh and Dr. Hall-Ellis."[4] *Id.*

In this proceeding, the Board reviewed the evidence and arguments in the
Petition, Preliminary Response, Preliminary Reply, and Preliminary Sur-reply, and
instituted the requested *inter partes* review.  Institution Decision 24.  Specifically,
the Board found that the *Fintiv* factors did not weigh in favor of discretionary
denial in large part because the district court jury trial did not resolve the issues
presented in this proceeding. *Id.* at 6–7.  The Board was not persuaded that
"prevailing in litigation against one party should insulate a patent owner from
challenge by a different party based on grounds that were not resolved in the
litigation." *Id.* at 7.  The Board also disagreed with Patent Owner's arguments that
institution should be denied because the Petition presents the same challenges as
the prior Intel petition, namely, because the Board did not reach the merits of the
prior Intel petition. *Id.* at 7, 9–10 (relying on factors set forth in *General Plastic
Industrial Co., Ltd. v. Canon Kabushiki Kaisha*, IPR2016-01357, Paper 19
(Sept. 6, 2017) (precedential) ("the *General Plastic*" factors).

Following the Board's Institution Decision in this case, Patent Owner filed a
request for rehearing and for POP review.  In the rehearing request, Patent Owner
argued that "[t]he Board should not permit entities formed after the verdict and
facing no infringement threat to treat these proceedings as leverage to extract

---

[4] Such practice has become known as "copycat" petition practice and, to date, has
not been held to be improper any more than copying claims to invoke interference
proceedings.

5

IPR2021-01229
Patent 7,523,373 B2

ransom payments in exchange for withdrawing abusive attacks." Req. Reh'g 1, 6–8. Patent Owner argued that such a proceeding advances no valid public interest and "fail[s] to weigh the overarching interests of fairness to the parties and the integrity of the patent system." *Id.* at 2, 9–10.

As noted above, I initiated Director review of the Board's Institution Decision on June 7, 2022. Paper 31. Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 32. On June 6, 2022, the Board joined Intel as a Petitioner in this case. Paper 30.

III.    DISCUSSION

A. The Board's Institution Decision

On this record, I discern no error in the Board's decision to institute review of a meritorious Petition where the challenged patent was previously litigated in district court and was the subject of previous *inter partes* review proceedings, which were not instituted based on *Fintiv*.[5] As the Institution Decision explains, the challenges presented here have not yet been adjudicated, either by the Board or in district court. Institution Decision 6–11.

In the Leahy-Smith America Invents Act ("AIA"), Congress established post-grant proceedings, including *inter partes* review, post-grant review, and covered business method review proceedings, to improve and ensure patent quality by providing "quick and cost-effective alternatives to litigation" for challenging issued patents. H.R. Rep. No. 112–98, pt. 1, at 48 (2011); *see also* S. Rep. No. 110–259, at 20 (2011) (explaining that the "post-grant review system . . . will

---

[5] I have reviewed the parties' pre-institution papers concerning the merits and I agree with the Board's determination that PQA demonstrated a reasonable likelihood of prevailing as to at least one challenged claim. Institution Decision 13–24.

IPR2021-01229
Patent 7,523,373 B2

give third parties a quick, inexpensive, and reliable alternative to district court litigation to resolve questions of patent validity"). Congress granted the Office "significant power to revisit and revise earlier patent grants" as a mechanism "to improve patent quality and restore confidence in the presumption of validity that comes with issued patents." *Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261, 272 (2016) (quoting H.R. Rep. No. 112-98, pt. 1, at 45, 48). Given those objectives, compelling, meritorious challenges will proceed at the Board even where district court litigation is proceeding in parallel. *See Discretionary Denial Guidance* 3–5.

I further discern no error in the Board's findings and determinations with respect to its analysis of the *Fintiv* or *General Plastic* factors. Institution Decision 5–11. Accordingly, in this Director review proceeding, no further briefing is permitted as to the merits of the unpatentability challenges as it pertains to institution, or the *Fintiv* or *General Plastic* factors.

### B. Issues of First Impression

When abuse has been demonstrated, the Board retains discretion to, *inter alia*, deny institution of AIA proceedings or terminate instituted trials. Although I agree with the Board that the Petition should not have been discretionarily denied under the Board's currently established discretionary policies, that leaves questions of first impression as to what action the Director, and by delegation the Board, should take when addressing allegations of abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA.

### C. Scope of Director Review

As noted above, this proceeding presents issues of first impression. It also involves issues of particular importance to the Office, the United States innovation economy, and the patent community. In particular, the following issues are relevant:

7

IPR2021-01229
Patent 7,523,373 B2

1. What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA; and

2. How the Director, and by delegation the Board, should assess conduct to determine if it constitutes an abuse of process or if it thwarts, as opposed to advances, the goals of the Office and/or the AIA, and what conduct should be considered as such.

Because of the importance of these issues to the Office in fulfilling its mission, which includes curbing behavior that may thwart that mission, and because of the importance to the patent community at large, the parties shall address these issues in their briefing, including through new arguments and non-declaratory evidence. Additionally, *amici curiae* are permitted and encouraged to submit briefing on these issues, as set forth below. Any briefing by *amici curiae* in this case will be considered submitted in IPR2021-01064.

In addition, the parties' briefing shall address the following additional interrogatories and shall cite supporting documentary evidence:

a. When was PQA formed? For what purpose? What is the business of PQA? Who are members of PQA? Which other persons or entities have an interest in PQA or any of its activities including this proceeding? Explain.

b. What is the relationship between PQA and each of the other parties? Other than communications already in the record, what communications have taken place between PQA and each of the other parties?

c. Could PQA be subject to claims of infringement of the '373 patent? Does PQA have development plans to create a product that could arguably infringe the '373 patent? Does PQA have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers? Explain.

d. Does the evidence in this proceeding demonstrate an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the

8

IPR2021-01229
Patent 7,523,373 B2

Office and/or the AIA and, if so, which evidence and how should that evidence be weighted and addressed?

e. What is the basis for concluding that there are no other real parties in interest, beyond PQA (*see* Pet. 75)? Are there additional people or entities that should be considered as potential real parties in interest? Explain.

f. Did PQA ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on payment or other consideration by Patent Owner or anyone else? Explain.

The parties are instructed that sanctions may be considered for any misrepresentation, exaggeration, or over-statement as to the facts or law made in the parties' briefing. *See, e.g.*, 37 C.F.R. §§ 11.19(a), 11.101 *et seq.*, 42.11.

## IV.    MANDATED DISCOVERY

In order to allow all parties to answer the questions set forth above, the parties shall exchange the following information, including electronically stored information, by July 21, 2022. Any exchanged information may be relied upon in the parties' briefs, and only information that is relied upon may be filed as an exhibit along with the party's brief.

PQA shall provide to other parties to this proceeding:

i.   all documents filed with state, federal, and/or other governmental regulatory entities related to the formation of PQA and any communications related to the same or to the formation of PQA;

ii.   all documents relating to PQA's business plan including its funding, its potential revenue, and the future allocation of any of its profits;

iii.   all documents and communications relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding, not already of record in the proceeding;

iv.   all documents and communications relating to the filing, settlement,

9

IPR2021-01229
Patent 7,523,373 B2

or termination of any other *inter partes* review proceeding concerning the '373 patent, not already of record in the proceeding;

v.   all documents and communications with Dr. Adit Singh relating to his retention by PQA, including any agreements with him;

vi.  all documents and communications relating to any real party in interest and decisions made to list or not list any person or entity as a real party in interest; and

vii. all communications with any named party relating to the filing, settlement, or potential termination of this proceeding.

Patent Owner also shall provide to other parties to this proceeding all documents responsive or relevant to i–vii above.

Likewise, Intel shall provide to other parties to this proceeding all documents responsive or relevant to i–vii above.  Intel also shall provide all communications with PQA (including its attorneys or agents) relating to this or any other *inter partes* review of or litigation related to the '373 patent, created or exchanged prior to the January 26, 2022 institution date of this proceeding.

These obligations extend to all documents within the possession, custody, or control of PQA, Intel, and Patent Owner, including without limitation documents maintained by officers, directors, employees, agents, experts, consultants, or outside counsel.  The requests above shall be interpreted inclusively and broadly to include text messages, voice mail messages, calendar entries, and any other communications or documents.  Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable.

The parties shall exchange the aforementioned evidence with all other parties, subject to the Modified Default Protective Order in this proceeding, unless a good faith claim of attorney-client privilege, work product doctrine, or any other

10

IPR2021-01229
Patent 7,523,373 B2

applicable privilege or immunity exists in which case the evidence may be withheld from production. *See* Paper 36. Documents should not be excluded on the basis that they were created during the course of district court litigation or Board proceedings. If evidence is withheld, that party shall maintain a privilege log of any responsive evidence that is withheld as privileged and shall exchange that privilege log on the date the documents are to be exchanged.

Within one week of receiving a privilege log, a receiving party may identify any documents they believe the Director should review in camera. Within one week of such identification, the party providing the privilege log must file those documents to the Office, submitted as "Board Only" within the PTAB E2E system.[6]

## V.    BRIEFING AND SCHEDULE

Any evidence cited in a party's brief shall be referenced by existing exhibit number or shall be entered into the record. *See Interim process for Director review* § 7 ("The Director will not consider new evidence or arguments not part of the official record. Parties should also generally avoid citing cases not cited in the official record. Exceptions are issues of first impression or issues involving intervening changes in the law or USPTO procedures, guidance, or decisions."). Only evidence that is relied upon may be filed as an exhibit along with a party's brief.

New declaratory evidence is not permitted. The parties may submit evidence under seal if necessary. The parties shall file a motion to seal accompanied by the Modified Default Protective Order as necessary. *See*

---

[6] The Office does not consider a party to waive any applicable privilege by providing allegedly privileged documents to the Office for in camera review, when filed as "Board Only."

11

IPR2021-01229
Patent 7,523,373 B2

Paper 36.

PQA, Intel, and Patent Owner are authorized to submit initial briefing, limited to the policy issues and questions identified above, of no more than twenty-five (25) pages, due on August 4, 2022.

Additionally, *amici curiae* are authorized to submit a brief to Director_PTABDecision_Review@uspto.gov, limited to the policy issues identified above, of no more than twenty-five (25) pages and due on August 4, 2022. Amici are not authorized to submit evidence. The Board will enter the *amicus curiae* briefs into the record.

PQA, Intel, and Patent Owner are further authorized to file responsive briefing of no more than twenty-five (25) pages, due on August 18, 2022. The parties also may respond to the *amicus curiae* briefing in their responsive briefs.

No further briefing is authorized at this time.

Oral argument may be authorized for this proceeding. If so, I will issue a Hearing Order in due course setting forth the date, time, and location for an oral hearing.

As noted in the Order initiating Director review, the *inter partes* review is not stayed and will proceed according to the schedule stipulated to by the parties. *See* Paper 31, 3.

## VI.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that the Board's Decision Instituting *Inter Partes* Review (Paper 10) is submitted for Director review on the policy issues, interrogatories, and schedule identified above;

FURTHER ORDERED that PQA, Intel, and Patent Owner shall exchange evidence as identified above and on the schedule identified above; and

12

IPR2021-01229
Patent 7,523,373 B2

FURTHER ORDERED that, if a party must contact the Office related to this Director review proceeding, they do so by email to Director_PTABDecision_Review@uspto.gov.

For PETITIONER:

Bruce Slayden
Truman Fenton
Tecuan Flores
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tfenton@sgbfirm.com
tflores@sgbfirm.com

Benjamin S. Fernandez
David L. Cavanaugh
Yvonne S. Lee
Steven J. Horn
WILMER CUTLER PICKERING HALE and DORR LLP
Ben.fernandez@wilmerhale.com
David.cavanaugh@wilmerhale.com
Yvonne.lee@wilmerhale.com
Steven.horn@wilmerhale,com

For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney

13

IPR2021-01229
Patent 7,523,373 B2

Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

14

Director_PTABDecision_Review@uspto.gov                    Paper 39
571-272-7822                                        Dated: July 29, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR OF
THE UNITED STATES PATENT AND TRADEMARK OFFICE

———————

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————

IPR2021-01229[1]
Patent 7,523,373 B2

———————

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.*

ORDER
*Addressing Scope of Mandated Discovery*

---

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00479, has been joined as a party to this proceeding.  Paper 30.

IPR2021-01229
Patent 7,523,373 B2

## I.    INTRODUCTION

On January 26, 2022, the Patent Trial and Appeal Board ("Board") issued a Decision granting institution of an *inter partes* review of claims 1–16 ("challenged claims") of U.S. Patent No. 7,523,373 B2 ("the '373 patent"), as Patent Quality Assurance, LLC ("PQA") requested.  Paper 10 ("Institution Decision").  VLSI Technology LLC ("Patent Owner" or "VLSI") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 13 ("Req. Reh'g"); Ex. 3001.  On June 6, 2022, the Board joined Intel as a Petitioner in this case.  Paper 30.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 31.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests.  Paper 32.

On July 7, 2022, I issued a Scheduling Order in this proceeding.  Paper 35.  In the Scheduling Order I instructed, *inter alia*, the parties to exchange certain categories of information as Mandated Discovery by July 21, 2022.  Paper 35, 9–11.  In a subsequent Order issued on July 21, 2022, I extended the deadline for the Mandated Discovery exchange to August 4, 2022.  Paper 37.

On July 20, 2022, counsel for PQA sent an email to the Director review mailbox.  *See* Ex. 3004.  PQA argued, *inter alia*, that:

> PQA objects to the ordered discovery because the Order issued without citation to a statute or regulation authorizing the Order or requested discovery, and PQA is unaware of any authority under which the Order and requested discovery may issue.  The Order exceeds the authority given by Congress and is inconsistent with the purposes of the AIA; is inconsistent with the governing statutes, regulations, Office standards and procedures, and the Interim Process for Director Review; violates PQA's constitutional rights; and would require PQA to waive attorney-client privilege and work product protection on otherwise responsive documents and information.

*Id.* (citations omitted).

IPR2021-01229
Patent 7,523,373 B2

PQA also stated that it "is willing to produce responsive third-party communications in its possession, custody, and control between PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh . . . if the Office provides written confirmation the Office will not consider PQA's act of producing the Third-Party Documents as waiver of PQA's objections to the Order." *Id.* (emphasis omitted). PQA's email concluded with a listing of its preliminary objections regarding the interrogatories and discovery required in the Scheduling Order. *Id.*

> VLSI responded to PQA's email arguing, in part:

> PQA suggests that it will only be producing selected "third-party documents," and only those exchanged with particular, identified third parties at that, apparently intending to exclude multiple categories of responsive documents from its production. . . . Similarly, the last line of PQA's email suggests that PQA does not intend to log communications it is withholding under claim of privilege. . . . VLSI respectfully submits that PQA must fully and timely comply with the Director's Order, and failure to do so should be a basis for the Director to enter sanctions.

Ex. 3005.

PQA's objections to the production of documents has been noted. I confirm that a party's production of documents as required by the Scheduling Order will not constitute a waiver of that party's objections. The parties, however, are reminded that they are required to comply with the full scope of the Scheduling Order, including its Mandated Discovery provisions, now due to be exchanged by August 4, 2022. Papers 35, 37. As highlighted in the Scheduling Order, failure to comply with my Order may be sanctionable. Paper 35, 10 ("Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable"). For example, and without

3

IPR2021-01229
Patent 7,523,373 B2

limitation, sanctions may include "[a]n order holding facts to have been established in the proceeding." 37 C.F.R. § 42.12.[2]

Moreover, the parties are reminded that legitimate, lawful grounds for withholding documents may be lodged and, if so, the party shall maintain a privilege log of documents withheld. *See* Paper 35, 10–11. No responsive document may be withheld without being included in such a privilege log.

## II.    ORDER

Accordingly, based on the foregoing, it is:

ORDERED that a party's production of documents will not constitute a waiver of that party's objections; and

FURTHER ORDERED that all other provisions and instructions identified in the July 7, 2022, Scheduling Order (Paper 35) and in the July 21, 2022 Order (Paper 37) remain in effect.

---

[2] The Federal Circuit has held that § 42.12(b) also "allows the Board to issue sanctions not explicitly provided in the regulation." *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020).

IPR2021-01229
Patent 7,523,373 B2

For PETITIONER:

Bruce Slayden
Truman Fenton
Tecuan Flores
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tfenton@sgbfirm.com
tflores@sgbfirm.com


Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com


For PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com


Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com

5

IPR2021-01229
Patent 7,523,373 B2

rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

6

Director_PTABDecision_Review@uspto.gov

571-272-7822

Paper No. 100

Date: December 15, 2022

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

## BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

_____

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01229[1]
Patent 7,523,373 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*.

ORDER
Staying the Proceeding

_____

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00479, has been joined as a party to this proceeding. Paper 30.

IPR2021-01229
Patent 7,523,373 B2

On January 26, 2022, the Patent Trial and Appeal Board ( "Board") issued a Decision instituting an *inter partes* review ("IPR") of claims 1–16 ("challenged claims") of U.S. Patent No. 7,523,373 B2 ("the '373 patent"), based on a Petition filed by Patent Quality Assurance, LLC ("PQA"). Paper 10 ("Institution Decision").  VLSI Technology LLC ("VLSI" or "Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 13 ("Req. Reh'g"); Ex. 3001.  On June 6, 2022, the Board joined Intel as a Petitioner in this case.  Paper 30.

I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 31.  My Order initiating Director review did not stay the *inter partes* review, which has been underway, with an oral hearing held on October 26, 2022.  *Id.* at 3; Paper 92.  Concurrent with my Order initiating Director review, the POP dismissed the rehearing and POP review requests.  Paper 32.  I also ordered the parties to provide briefing to assist me with my review, and to respond to interrogatories and to exchange information to assist me in evaluating questions of first impression.  Paper 35, 7–11.  My review of the Board's Institution Decision remains pending.

Due to the importance of the issues to the Office in fulfilling its mission, the underlying proceeding before the Board is stayed while I complete my review.

For the foregoing reasons, it is hereby:

ORDERED that the underlying proceeding is stayed pending my decision on Director review.

2

IPR2021-01229
Patent 7,523,373 B2

PETITIONER:

Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com

Bruce Slayden
Tecuan Flores
Truman Fenton
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tflores@sgbfirm.com
tfenton@sgbfirm.com

PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Parham Hendifar
Patrick Maloney
Jason Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com

3

IPR2021-01229
Patent 7,523,373 B2

rose@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

4

Director_PTABDecision_Review@uspto.gov          Paper No. 106
571-272-7822                                     Date: January 18, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

INTEL CORPORATION[1],
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01229[2]
Patent 7,523,373 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*

ORDER
*Granting Additional Briefing; Staying the Proceeding*
*37 C.F.R. §§ 42.5, 42.11(d)(3)*

_____

[1] Petitioner Patent Quality Assurance, LLC was dismissed from this
proceeding, subject to the Director, Board, and USPTO retaining jurisdiction
over the issuance of sanctions.  Paper 101, 4.
[2] Intel Corporation, which filed a petition in IPR2022-00479, was joined as a
party to this proceeding.  Paper 30.

IPR2021-01229
Patent 7,523,373 B2

On June 7, 2022, I ordered a *sua sponte* Director review of the Board's institution decision in this proceeding.  Paper 31.  On July 7, 2022, I issued a Scheduling Order for the Director review.  Paper 35.  The Scheduling Order set forth the scope of my review, provided for mandated discovery and interrogatories, and provided an opportunity for briefing.  *Id.*  In a subsequent Order on July 29, 2022, I stated that "[a]s highlighted in the Scheduling Order, failure to comply with my Order may be sanctionable. . . . For example, and without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding.'" Paper 39, 3–4 (citing 37 C.F.R. § 42.12), 4 n.2 (citing *Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020) (holding that § 42.12(b) also "allows the Board to issue sanctions not explicitly provided in the regulation")).

On December 22, 2022, in my Decision on Director Review, I imposed sanctions against Petitioner Patent Quality Assurance, LLC ("PQA") for its abuse of the *inter partes* review process.  Specifically, I applied certain negative inferences and held facts to have been established adverse to PQA.  Paper 101 ("Dec." or "Decision"), 2.  I also dismissed PQA from this proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions.  *Id.* at 4.  Finally, I ordered PQA "to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process and misrepresentation of fact or misleading argument."  Dec. 62; 37 C.F.R. § 42.12(b)(6).

On January 10, 2023, upon PQA's request, I issued an Order granting PQA an extension of time to file its rehearing request until January 19, 2023.  Paper 104. On January 11, 2023, PQA filed a rehearing request, styled as a motion for reconsideration, arguing that when assessing sanctions, the Decision identifies for the first time the allegedly violative conduct of exclusively engaging an expert

2

IPR2021-01229
Patent 7,523,373 B2

witness and allegedly misrepresenting the nature of PQA's exclusive engagement.
Paper 105 ("Motion" or "Mot."), 2.  PQA also argues that the Decision identifies
for the first time that the specific sanctions of dismissal and certain specific
adverse inferences could be imposed.  *Id.*  PQA argues that it should have been
afforded an order to show cause describing the specific violative conduct and
specific sanctions, and should have been given an opportunity for briefing to show
why the specific sanctions should not be imposed.  *See id.* at 1–2 (citing 37 C.F.R.
§ 42.11(d)(3)).  PQA also requests that I withdraw the sanctions assessed in the
Decision.  *Id.* at 3.

> **On the Board's initiative.** On its own, the Board may order an
> attorney, registered practitioner, or party to show cause why
> conduct specifically described in the order has not violated
> paragraph (c) of this section and why a specific sanction
> authorized by the Board should not be imposed.

37 C.F.R. § 42.11(d)(3).

I note that I previously afforded PQA an opportunity for briefing in
the Scheduling Order and put PQA on notice that I might draw adverse
inferences as a sanction.  PQA's contradiction of its earlier representation
regarding engagement of the expert was found in its briefing on Director
Review (*see* Paper 104, 50), and therefore would not readily have been the
subject of a previous round of briefing.  Nevertheless, out of an abundance
of caution, I grant the motion to the extent that I now provide PQA with an
opportunity to brief the subject of its rehearing request on the merits and to
show cause why sanctions should not be imposed on the argued bases.
Further, I stay the underlying proceeding pending the disposition of the
rehearing; the panel should not issue a final written decision until the

3

IPR2021-01229
Patent 7,523,373 B2

resolution of this request for rehearing.  In accordance with 37 C.F.R.

§ 42.100(c), I hereby adjust the time period for a final determination in this

proceeding, which involves joinder to permit consideration of the pending

issues.

      For the foregoing reasons, it is hereby:

      ORDERED that PQA may submit the requested briefing, which shall be

filed within 7 days of this Order and shall be limited to 10 pages; and

      FURTHER ORDERED that the underlying proceeding is stayed.

4

IPR2021-01229
Patent 7,523,373 B2

PETITIONER:

Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com

Bruce Slayden
Tecuan Flores
Truman Fenton
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tflores@sgbfirm.com
tfenton@sgbfirm.com

PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Parham Hendifar
Patrick Maloney
Jason Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com

5

IPR2021-01229
Patent 7,523,373 B2

hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

6



Truman H. Fenton
Shareholder
tfenton@sgbfirm.com
[O] 512.402.3572
[C] 512.468.7623

***Via Electronic Mail to adit.deva.singh@gmail.com***

June 10, 2021

Adit Singh, Ph.D.
1979 Stoneridge Drive
Auburn, Alabama 36830

    **RE:**    Expert Engagement Proposal
              *Inter Partes* Review of a patent assigned to VLSI Technology, LLC

Dear Dr. Singh:

I am pleased you will be able to assist us as an independent expert in the above-referenced matter. I am outside counsel for Petitioner in this matter, and I and other members of my firm will be managing this action. Please contact me at the email address or telephone number shown in this letterhead for all correspondence related to this action.

The scope of work for which you are being retained relates generally to providing analysis and potential testimony (written and at trial) related to the technology of Russell et al., U.S. Patent No. 7,523,373 entitled "Minimum Memory Operating Voltage Technique" (the Challenged Patent). Such analysis and testimony may be at the Patent Trial & Appeals Board of the United States Patent Office. This scope of work may change as the matter proceeds subject to the needs and requests of Petitioner. The Duration of this matter shall last at least eighteen months but may extend past eighteen months if the IPR and any appeals of the IPR remain pending.

Petitioner agrees to compensate you at your normal rate of $500/hour and to reimburse you for all out-of-pocket expenses you incur related to your work in this matter. All invoices should be submitted to tfenton@sgbfirm.com with a copy to bbanner@sgbfirm.com. Invoices will be paid directly by Petitioner within 60 days from the date of receipt by Petitioner.

Petitioner and the firm agree to pay you a minimum fee of $25,000 including $10,000 in the first month. Eighteen months after this agreement is executed you may submit an invoice for any remainder of the minimum fee not yet billed.

Petitioner expects you to proactively identify and capitalize on opportunities for efficiency and exercise good judgment to minimize costs associated with the handling of this matter. Any travel must be approved in advance by me. Petitioners will not reimburse airfares that exceed the standard coach fare. It is expected that you will take advantage of available discounts during your travel. It is also expected that meals necessitated by travel be reasonable and not exceed $100 per day.

In the course of your retention, we may call upon you to provide information, prepare studies or reports, participate in meetings, review materials, and undertake other tasks. Your work, opinions, conclusions and communications on this matter must be maintained strictly confidential, as they are covered by the attorney-client privilege and attorney-work-product immunity to the extent provided by law. By signing this agreement, you agree to do all things necessary to preserve the confidentiality of your work for Petitioners. You agree that any and all materials, documents, and information of any kind, in whole or in part, that you (or anyone assisting you) acquire, prepare, or to which you are granted access in connection with your work for Petitioners ("Confidential Materials") will be maintained in strict confidence.

Such materials, documentation, and information must not be disclosed to any other person or party without our prior written consent and must be used only by you and only in furtherance of your assistance to Petitioners and their counsel in this litigation. All tangible versions of such materials, documentation, and information, together with all copies thereof, must be returned immediately upon our request. All such materials, documentation, and information in electronic form must be permanently erased and certification thereof provided to us upon our request. In addition, any activities that you perform under this agreement and any conclusions or judgments that you reach or have reached must be maintained as confidential in the same way. You understand that these restrictions will continue even after the conclusion of your consulting work for us, any termination of our relationship and after the termination of the matter. If you are requested to disclose any such materials, documentation, or information pursuant to a legally issued subpoena, you agree to provide us with immediate notice and opportunity to oppose the subpoena.

You agree not to consult with, or engage the services of, any other person or entity to assist you with your assignments under this agreement without our prior written consent.

***You agree that for the Duration of this matter, neither you nor anyone who assists you in this matter will accept any work from i) VLSI Technology, LLC or its subsidiaries, parents, or affiliates, or ii) for the Irell & Manella LLP law firm, the Mann Tindel | Thompson law firm, or the Haley & Olson, P.C. law firm. Also for the Duration of this matter, you further agree you will not accept new consulting engagements related to the Challenged Patent without prior written consent.***

If you include pre-existing materials created by or for you in your work on this matter, you hereby grant Slayden Grubert Beard PLLC and Petitioner a non-exclusive, fully paid-up and

A.W. Singh    6/10/21

IN THE

**UNITED STATES PATENT AND TRADEMARK OFFICE**

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PATENT QUALITY ASSURANCE, LLC
Petitioner

v.

VLSI Technology LLC
Patent Owner

_____

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

_____

**PETITIONER'S OBJECTIONS TO DIRECTOR'S ORDERS**

_____

Patent Quality Assurance, LLC
Exhibit 1039
Patent Quality Assurance, LLC
v. VLSI Technology LLC
Case No. IPR2021-01229

The evidence of record, combined with PQA's concurrent production, demonstrates that PQA has acted with integrity and that VLSI is undercutting the Office's mission to ensure patent quality. The Office's review of the '373 patent should proceed to a Final Written Decision.

## I.    PQA's Production

Based on the Director's representation that no PQA objection will be deemed waived by production of information pursuant to the Order (*see* Paper 39 at 3), PQA hereby makes a good faith production (or log) of all responsive documents/communications between PQA and any third party. This includes documents/communications between PQA and OpenSky, VLSI, governmental entities, and Dr. Singh.  PQA has redacted and logged work product materials in the documents/communications between PQA and Dr. Singh. PQA is also logging, but not producing, certain documents/communications based on an objection PQA noted to the POP panel (before this *sua sponte* Director Review) and will reiterate to the Director under separate cover.  PQA has not withheld any other responsive documents/communications between PQA and any third party (excluding privileged communications with its attorneys). For clarity, there are no documents/communications between PQA and Intel relating to categories i–vii of the Director's Order (Paper 35 at 9–10). Thus, in this adversarial process, VLSI now

1

Exhibit 1039

has access to all responsive documents/communications between PQA and any third party (excluding privileged communications with its attorneys).

PQA is not withholding (i) any responsive documents or communications within the scope of Request Nos. iv-vii; (ii) any responsive documents filed with state, federal, and/or other governmental regulatory entities or third-party communications relating to the same or to the formation of PQA (Request No. i); or any responsive third-party communications "relating to the filing, settlement, or potential termination of this proceeding, or experts in this proceeding" (Request No. iii).

Based on the objections set forth below, PQA objects to the Mandated Discovery to the extent it requires production or logging of documents and communications responsive to Request Nos. i-iii beyond those being produced. Additionally, PQA has withheld documents/communications between PQA and its attorneys based on Attorney-Client Privilege and the Attorney Work-Product doctrine, and has withheld documents/communications solely among PQA's attorneys based on Attorney Work-Product protection.

2

Exhibit 1039

## II.     Objection: This Director Review is Constitutionally and Statutorily Prohibited.

PQA respectfully submits this Director Review exceeds the Director's authority and violates PQA's due process rights. The Director does not have authority to unilaterally review a panel institution decision. Any rehearing of a panel's institution decision must be conducted by a panel of three PTAB members (e.g., the POP panel). *See* 35 U.S.C. § 6(c) ("Only the Patent Trial and Appeal Board may grant rehearings.").

The Supreme Court in *Arthrex* modified 35 U.S.C. § 6(c) to the extent it precluded Director review of **final** Board decisions, but neither § 6(c) nor *Arthrex* permits the Director's unilateral review of a panel's **institution** decision. *See United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021) ("We conclude that a tailored approach is the appropriate one: Section 6(c) cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing **final decisions** rendered by APJs.").

While Congress committed the decision to institute *inter partes* review to the Director's unreviewable discretion, "the Director has delegated this authority to the PTAB itself." *Id.* at 1977 (citing 37 CFR § 42.4(a) (2020)). In this proceeding, the Board instituted trial on the merits on behalf of the Director. By statute, therefore, any rehearing or reconsideration of the panel's institution decision must be

3

Exhibit 1039

conducted by a three-member panel. The Supreme Court rejected the Government's argument in *Arthrex*—which may be the Director's contention here—that the Director retains "authority to take control" of an IPR proceeding under existing law. *See id.* at 1987.

PQA's understanding of the law is confirmed by the Patent Office's *Arthrex*-based policies before the current Director assumed office. The Director assumed office on or about **April 13, 2022**—approximately three months *after* the panel's merits-based institution decision in this proceeding. The Office's Interim Process for Director Review at that time (promulgated by the previous Director) only authorized review of Final Written Decisions—consistent with § 6(c), *Arthrex*, and PQA's position here. *See* https://www.uspto.gov/patents/patent-trial-and-appeal-board/procedures/arthrex-qas. But after the current Director assumed office, the Office modified its Director Review process to include a new Question 22 asserting that "the Director has always retained and continues to retain the authority to review [institution] decisions *sua sponte* after issuance." *See* https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review. The Order Instituting Director Review (Paper 31) cites only this amended Interim Process as purported authority for this Review.

4

Exhibit 1039

The panel in this case found PQA's petition demonstrates that the '373 patent is likely invalid, which the Director confirmed. Paper 35 at 6–7. The Director "further discern[ed] no error in the Board's findings and determinations with respect to its analysis of the *Fintiv* or *General Plastic* factors." Paper 35 at 7. PQA thus demonstrated a likelihood of prevailing with respect to at least one challenged claim, and both the panel and Director confirmed discretionary denial is unwarranted under existing law. Retroactively applying unidentified and unforeseeable substantive and procedural rules to this first-ever, *ultra vires* Director review of an institution decision violates PQA's due process rights.

The logic behind requiring a three-member panel to reconsider a panel's institution decision is sound and is particularly warranted here where meritorious petitions challenging the '373 patent were denied (Intel) or are subject to an *ultra vires* review of an institution decision twice confirmed on the merits (PQA). As to Intel's petition, the Office designated *Fintiv* as precedential on May 5, 2020. Within the first month of the Office's precedential designation, **seven** Intel petitions challenging VLSI patents were denied under *Fintiv*, including Intel's petition

5

Exhibit 1039

challenging the '373 patent.[1]    A total of **twelve** Intel petitions challenging VLSI

patents were denied under *Fintiv* within five months of the Office's designation.[2]

PQA's petition calls attention to the real-world detrimental impact of the

Office's *Fintiv* policy on American companies and American consumers.    The

decision to designate *Fintiv* as precedential precluded Intel from challenging

invalidity of twelve asserted VLSI patents via IPR, including the '373 patent. The

obvious harm to the public interest—directly stemming from the Office's newly-

minted *Fintiv* policy—was that grounds demonstrating unpatentability of claims

underlying a $1.5 billion damages verdict were in the public domain, but the Office

had declined to review them. Under existing law, the Director cannot, and should

not, unilaterally terminate or delay a proceeding of such significant public interest

---

[1] *See Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00106, Paper 17 (May 5, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00114, Paper 15 (May 19, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00113, Paper 15 (May 19, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00112, Paper 15 (May 19, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00158, Paper 16 (May 20, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00142, Paper 17 (June 4, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00141, Paper 16 (June 4, 2020).

[2] *See Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00583, Paper 22 (Oct. 5, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00582, Paper 19 (Oct. 1, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00526, Paper 16 (Aug. 18, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00527, Paper 18 (Aug. 18, 2020); *Intel Corporation v. VLSI Technology LLC*, PTAB-IPR2020-00498, Paper 16 (Aug. 19, 2020).

6

Exhibit 1039

based on VLSI's unsupported allegations or based on PQA's legitimate, lawful objections to the Director's orders.

PQA also objects to the Director's *ultra vires* orders as they subject PQA to undisclosed substantive and procedural standards and procedures under the threat of sanctions. PQA has done nothing to warrant such action, as VLSI's allegations are unsupported by any evidence, PQA is producing all responsive third-party communications, and PQA provided preliminary objections two weeks ago and the Director has not ruled on any of them. It is conceivable the Director could ignore PQA's objections and sanction PQA in a manner that would allow VLSI to escape merits review of the '373 patent for a second time under these circumstances. Alternatively, the Director Review could delay the underlying proceeding such that the Office does not reach a final decision on patentability until after VLSI collects $1.5 billion on a likely invalid patent. Either result would be a miscarriage of justice, directly contrary to the purposes of the AIA, and wholly unjustified by evidence and the circumstances of this proceeding.

PQA respectfully submits this *ultra vires* Director Review of an institution decision, including ordering costly, disproportionate, and overly burdensome Mandated Discovery far exceeding statutory, regulatory, and precedential authority

7

Exhibit 1039

for IPR discovery, shocks the conscience and will discourage future petitioners from filing meritorious petitions.

### III.    Objection: The Mandated Discovery is Statutorily and Constitutionally Prohibited.

Paper 35 and Paper 39 suggest sanctions will be imposed for failing to comply with the ordered "Mandated Discovery." PQA respectfully submits that a *sua sponte* order subjecting a party to inquisition and imposing sanctions for anything less than full compliance must be consistent with the laws, regulations, and precedent applied in every other IPR. The Office cannot, and should not, impose new and different rules when VLSI patents are challenged.

The Mandated Discovery appears to be a one-sided fishing expedition against petitioners challenging VLSI's patents to see if any relevant evidence might be uncovered rather than, as the law and precedent require, limited discovery that is "necessary in the interests of justice," not overly burdensome, and based on more than mere allegation. The Mandated Discovery violates PQA's procedural due process rights by ordering discovery based on unknown facts, evidence, and standards untethered from 35 U.S.C. § 316(a)(5), 37 C.F.R. § 42.5, and Office precedent—and without providing PQA an opportunity to oppose or object to such requests.

8

Exhibit 1039

The Mandated Discovery is one-sided because, for example, Paper 35 requires "Patent Owner [to] provide to other parties to this proceeding all documents responsive or relevant to i–vii above" (Paper 35 at 10), but many of those categories are PQA-specific such that VLSI would not possess responsive documents. For example, category (i) effectively orders production of all documents and communications related to the formation of PQA, and category (ii) orders production of documents relating to PQA's business plan, funding, potential revenue, and future allocation of profits. There is no similar requirement for VLSI, which is currently resisting disclosing the identity of its owners and investors in one of its ongoing lawsuits against Intel. *See VLSI Tech. LLC v. Intel Corp.*, No. 18-966-CFC-CJB, Memorandum Order (D.I. 975), slip op. at 3 (D. Del. Aug. 1, 2022) (Delaware Chief Judge Connolly staying case "until VLSI complies with" standing order related to corporate disclosures) (available at https://assets.law360news.com/1517000/1517518/order.pdf).

In a Director Review potentially determinative of whether the merits-based institution decision in this proceeding will be reversed, resulting in a second discretionary denial of a meritorious petition challenging the '373 patent, the public interest demands proportionate discovery of VLSI. Such discovery from VLSI would shed light on (i) VLSI's purpose (whether it has any purpose other than

Exhibit 1039

monetizing patents it purchased from others by suing American companies), (ii) who will ultimately benefit financially from the Office's delay or termination of this proceeding, and (iii) whether VLSI, its affiliates, and/or its investors sought to influence (e.g., via lobbying or campaign contributions) the unprecedented Senator intervention in this ongoing Office proceeding.

For completeness, PQA reiterates its objections to the Director's discovery requests as set forth in its July 20, 2020 email. Ex. 3004. While the Director "noted" PQA's objections, the Director has not addressed or resolved any of them.

Papers 31 and 35 issued without citation to a statute or regulation authorizing this Review or requested discovery therein, and PQA is unaware of any authority under which this Review may be conducted and discovery ordered. The Orders exceed the authority given to the Director by Congress and are inconsistent with the purposes of the AIA; are inconsistent with the governing statutes, regulations, Office standards and procedures, and the Interim Process for Director Review; violate PQA's constitutional rights; and would require PQA to waive attorney-client privilege and work product protection on otherwise responsive documents and information. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1921(2020) ("An agency literally has no power to act . . . unless and until Congress confers power upon it."). PQA's objections are provided below. PQA

10

Exhibit 1039

therefore faces a "dilemma of having to choose between complying with allegedly ultra vires discovery orders … and flouting the orders and facing the consequences." *See Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 795 (D.C. Cir. 1984).

PQA respectfully objects to searching for, reviewing, producing, and logging documents, communications, electronically stored information, emails, and any other responsive information beyond that being produced (and answering interrogatories seeking such information) for the following reasons:

**The Order Exceeds the Office's Statutory and Regulatory Authority:** The Order exceeds the Office's statutory authority at least because: (1) the Order is contrary to 35 U.S.C. § 6(c) for the reasons explained above; and (2) the Order's "Mandated Discovery" exceeds discovery permitted under 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51.

**The Order is Inconsistent with Office Standards and Procedures:** The Order does not comply with the Board's precedential decision in *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, Case IPR2012-00001 (PTAB Mar. 5, 2013) (Paper 26) (precedential), which—like 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51—requires a showing that non-routine discovery is "necessary in the interests of justice." The Order fails to make the requisite showing at least with respect to *Garmin* factors 1, 4, and 5, as explained in the Office's Trial Practice Guide.

11

Exhibit 1039

For example, under *Garmin* factor 1 the party requesting discovery should already be in possession of evidence or reasoning "tending to show beyond speculation that in fact something useful will be uncovered." *Garmin*, 6. The Order does not identify what allegedly useful evidence the Director's discovery is designed to elicit or the evidence or reasoning supporting a finding that *Garmin* factor 1 could be satisfied—particularly as to the subset of documents and communications responsive to Request Nos. i-iii PQA is not producing or logging concurrently. Paper 35 does not articulate a theory of abuse of process as to PQA or identify supporting evidence and thus fails to justify the Mandated Discovery based on anything more than mere allegation that something useful might be found to support an as-yet unidentified theory of abuse of process based on unknown evidence and unknown standards.

As to the identities of other potential real parties in interest ("RPI"), PQA submitted a sworn declaration establishing PQA (and its members) have no relevant connection to Intel, VLSI, or OpenSky. Ex. 1032. VLSI has not contested the accuracy of the statements in this declaration, and there is no evidence the declarant perjured himself. Similarly, VLSI has not challenged RPI in this IPR, the accuracy or completeness of PQA's mandatory notices under 37 C.F.R. § 42.8, or even requested additional discovery in the underlying proceeding (likely because it knows

12

Exhibit 1039

any such discovery is unjustified under current law). Thus, there is no "show[ing] beyond speculation that in fact something useful will be uncovered" and discovery into PQA members' identities is unwarranted under 35 U.S.C. § 316(a)(5), 37 C.F.R. § 42.51, and the Office's standards and procedures. *See Ashworth Bros., Inc. v. Laitram, L.L.C.*, No. IPR2020-00593, 2020 WL 6324716, at *2 (Patent Tr. & App. Bd. Oct. 28, 2020) (denying request for discovery because Patent Owner "does not identify any evidence 'tending to show beyond speculation'"); *Zodiac Pool Sys., Inc. Petitioner v. Aqua Products, Inc.*, No. IPR2013-00159, 2013 WL 6514060, at *2 (Patent Tr. & App. Bd. Oct. 18, 2013) ("Patent Owner has not established more than the mere possibility of finding something useful, and the mere allegation that something useful will be found is insufficient basis for granting Patent Owner's motion").

As an additional example, *Garmin* factor 4 requires discovery requests be easily understandable. *Garmin*, 6. The Order references "electronically stored information" but does not supply an ESI order and it is unclear whether the Order incorporates the Office's Model Order Regarding E-Discovery (Appendix C to the Trial Practice Guide).

As a final example, *Garmin* factor 5 demands any discovery requests must not be overly burdensome to answer, but the Order's discovery is overly burdensome

13

Exhibit 1039

under existing law and Office standards and procedures. The ordered discovery is not "reasonably tailored to a genuine need" at least for the reasons described above for *Garmin* factor 1. Specifically, Request No. i purports to seek "any communications related to . . . the formation of PQA" without identifying evidence "tending to show beyond speculation that in fact something useful will be uncovered" or to what genuine need the request is tailored. Request No. iii requests "all documents relating to the filing, settlement, or potential termination of this proceeding" without explaining how anything other than PQA's actual actions taken (i.e., as revealed through communications between PQA and third parties and PQA's filings in this proceeding) could bear on the issues under review. The discovery requests in the Order are overly burdensome because the scope undoubtedly encompasses documents that have no relevance to this proceeding or the limited scope of the Director's review and would impose substantial unjustified cost on PQA to search for, review, and produce/log all documents/communications in response to Request Nos. i-iii beyond those being produced concurrently. *See Mitek Sys., Inc. v. United Services Auto. Ass'n*, No. IPR2020-00882, 2020 WL 4375112, at *5 (Patent Tr. & App. Bd. July 30, 2020).

For at least the foregoing reasons, PQA respectfully contends Paper 35 improperly imposes new, burdensome, costly, unidentified discovery standards and

14

Exhibit 1039

procedures in violation of PQA's due process rights and 35 U.S.C. § 316(a)(5), 37 C.F.R. § 42.51, and the Administrative Procedure Act.

**The Order Violates PQA's and Its Members' Constitutional Rights:** As noted above, this Review and Mandated Discovery violate PQA's due process rights. Additionally, the Order's requirement that PQA disclose its members' identities (via interrogatory response, privilege log, or other documents) will subject them to harassment by VLSI, its attorney, and potentially others. As the documents will confirm, PQA has reason to distrust that VLSI and its attorneys will abide by contractual, legal, or ethical obligations (including the Protective Order in this proceeding). Moreover, VLSI's attorneys informed PQA by letter they are contemplating legal action against OpenSky and its members without identifying to PQA any legal basis for such a suit. Under these circumstances, where PQA challenges a patent of significant public interest and raises awareness of the negative impacts of the Office's *Fintiv* policy, compelling PQA members to disclose their identities without evidence of wrongdoing or inaccurate mandatory notices would violate their First Amendment right to freedom of association and Fourteenth Amendment right to due process of law.

**The Order is Inconsistent with the Purposes of the AIA:** Congress intended discovery in *inter partes* review proceedings to be limited in scope and expense. The

15

Exhibit 1039

Order contravenes Congressional intent by demanding production of formation documents, business plans and funding records, settlement discussions, and protected communications between a party and its lawyers and experts. These requests effectively require PQA to produce or log every document related to its existence without any evidence of wrongdoing, without regard for the Office's policy promoting settlement, and without adherence to the Office's statutory, regulatory, and precedential authority.

**The Order is Inconsistent with the Interim Guidelines for Director Review:** The Interim Guidelines (which do not have the force of law) foreclose new arguments or evidence in a Director Review except for issues of first impression, and the Order does not identify any issue of first impression. If the issue is abuse of process, the Order does not identify any evidence on which to base such a finding or articulate an alleged theory of abuse as to PQA. If the issue is one of standing, the Supreme Court has already determined that "[a]ny person—other than the patent owner himself—can file a petition to institute *inter partes* review of a patent." *Arthrex*, 141 S. Ct. at 1977.  If the issue is about RPI, the Office has established regulations and procedures for allowing parties to seek non-routine RPI discovery, provided they satisfy the precedential *Garmin* factors. Notably, VLSI could have asked—but did not ask—for any RPI discovery in this proceeding.

16

Exhibit 1039

**The Order Would Unfairly Require PQA to Waive Privilege Objections:**

Federal Courts throughout the United States "almost unanimously" find waiver of the attorney-client and work product privilege when a party discloses privileged documents to a federal agency. *In re Quest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006). Thus, PQA is not protected by the Office's assurance that it "does not consider a party to waive any applicable privilege by providing allegedly privileged documents to the Office for in camera review." Paper 35 at 11 n.6. PQA thus objects to logging privileged and work-product materials beyond those currently logged for the sole purpose of potential Director in camera review, which would likely result in PQA's waiver of attorney-client privilege and work-product protections as to any such documents (and potentially broader subject-matter waiver) in other proceedings.

August 4, 2022                    */s/ Bruce W. Slayden II*
                                  Bruce W. Slayden II (Reg. 33,790)
                                  Truman H. Fenton (Reg. 64,766)
                                  Brian C. Banner (*Pro Hac Vice*)
                                  Tecuan Flores (Reg. 77,668)

                                  Slayden Grubert Beard PLLC
                                  401 Congress Avenue, Suite 1650
                                  Austin, Texas 78701
                                  Attorneys for Petitioner, Patent Quality
                                  Assurance LLC

                                      17

                                            Exhibit 1039

## CERTIFICATE OF SERVICE

I hereby certify that on August 4, 2022, I caused a true and correct copy of Petitioner's Objections to Director's Order to be served via electronic mail on the following attorneys of record for Patent Owner and joined Petitioner Intel:

Babak Redjaian (bredjaian@irell.com)

Kenneth J. Weatherwax (weatherwax@lowensteinweatherwax.com)

VLSI_IPRs@lowensteinweatherwax.com

Ben Fernandez (ben.fernandez@wilmerhale.com)

David Cavanaugh (david.cavanaugh@wilmerhale.com)

Yvonn Lee (yvonne.lee@wilmerhale.com)

Steven Horn (steven.horn@wilmerhale.com)


Respectfully submitted,

*/s/ Bruce W. Slayden II*
Bruce W. Slayden (Reg. 33,790)


18

Exhibit 1039

| | |
|---|---|
| **From:** | Truman Fenton |
| **To:** | Director_PTABDecision_Review |
| **Cc:** | Andrew Oliver (aoliver@atwiplaw.com); vjoshi@atwiplaw.com; Redjaian, Babak; Nathan Lowenstein; "aheinrich@irell.com"; VLSI_IPRs@lowensteinweatherwax.com; Fernandez, Ben; Cavanaugh, David; Horn, Steven J; Bruce Slayden; Brian Banner; SGB Litigation |
| **Subject:** | IPR2021-01229: Request for assurance to avoid waiver of discovery objections |
| **Date:** | Wednesday, July 20, 2022 8:12:05 PM |

CAUTION: This email has originated from a source outside of USPTO. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Dear Director Vidal,

I write on behalf of Petitioner PQA regarding the Order Setting Schedule for Director Review (Paper 35) ("Order"). This email is sent pursuant to the authorization provided in the Order. *See* Order at 13.

The Order requires PQA to exchange evidence tomorrow (July 21, 2022). PQA objects to the ordered discovery because the Order issued without citation to a statute or regulation authorizing the Order or requested discovery, and PQA is unaware of any authority under which the Order and requested discovery may issue. The Order exceeds the authority given by Congress and is inconsistent with the purposes of the AIA; is inconsistent with the governing statutes, regulations, Office standards and procedures, and the Interim Process for Director Review; violates PQA's constitutional rights; and would require PQA to waive attorney-client privilege and work product protection on otherwise responsive documents and information. *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1921(2020) ("An agency literally has no power to act ... unless and until Congress confers power upon it."). PQA's objections are provided in the section titled "OBJECTIONS" below. PQA therefore faces a "dilemma of having to choose between complying with allegedly ultra vires discovery orders … and flouting the orders and facing the consequences." *See Atl. Richfield Co. v. U.S. Dep't of Energy*, 769 F.2d 771, 795 (D.C. Cir. 1984).

***Despite PQA's objections and in the interest of justice, PQA is willing to produce responsive third-party communications in its possession, custody, and control between PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh ("Third-Party Documents") if the Office provides written confirmation the Office will not consider PQA's act of producing the Third-Party Documents as waiver of PQA's objections to the Order.*** Without this assurance, PQA may be found to have waived its objections. *See, e.g., Amos v. Taylor*, No. 4:20-cv-7-DMB-JMV, 2020 WL 7049848, at *9 (N.D. Miss. Dec. 1 , 2020) (finding objections other than privilege or work product were waived where party produced discovery responses "subject to" or "without waiving" the objections); *Davis v. Daytona Int'l Speedway, LLC*, No. 6:15-cv-1872, 2016 WL 8914358, at *3 (M.D. Fla. Nov. 22, 2016) (finding waiver of objection to RFP where party produced "some responsive documents"); *United States v. Jackson*, 155 F.R.D. 664, 666 (D. Kan 1994) (prosecutor waived objection by producing all or most responsive documents); *Sterling Inv. Res., Inc. v. Bell Atl. Props., Inc.*, No Civ. A. 87-8149, 1989 WL 89010, at *1 (E.D. Pa. July 7, 1989) ("well established principle of discovery practice" that objections to producing documents are waived when party allows inspection of responsive documents).

PQA's production of the Third-Party Documents will confirm two things: (1) PQA acted on its own in filing its petition and was not (and still is not) affiliated with Intel, VLSI, or OpenSky; and (2) there has been no abuse of process by PQA. Regarding the first point, PQA notes that no documentary evidence can prove a negative (e.g., that Intel is *not* a real party in interest to PQA's petition). However, the absence of privity with another party will be confirmed by the absence of any such evidence in the Third-Party Documents. PQA expects further confirmation that no other party is a real-party-in-interest based on the other parties' forthcoming disclosures in this proceeding. For example, Intel's document production should be void of evidence of any discussion, relationship, etc. with PQA related to the filing, settlement, or potential termination of PQA's petition.

Regarding the second point, the Third-Party Documents will confirm PQA acted in a manner consistent with the Office's standards and procedures, the purposes of the AIA, and the mission of

the Office, by filing a meritorious petition regarding a patent of significant public interest and thereafter responding to VLSI's efforts to discuss settlement. Communications between PQA and VLSI will confirm PQA acted with integrity and in accordance with the policies of the USPTO throughout this process.

Thank you for your consideration of this request.  Out of an abundance of caution and because there is no formal procedure in place for objecting to the Order's "mandatory discovery," PQA provides a preliminary list of objections below.  Given the exceptionally short, 14-day deadline for compliance, and noting the Order's requirements far exceed the established discovery practice in *inter partes* review proceedings, PQA provides preliminary objections and respectfully reserves the right to address these issues and others more fully after receiving the Director's additional guidance.

Respectfully,

/s/ Truman H. Fenton

Backup Counsel for Petitioner Patent Quality Assurance, LLC


## OBJECTIONS

PQA respectfully objects to answering interrogatories and/or searching for, reviewing, producing, and logging documents, communications, electronically stored information, emails, and any other responsive information for the following reasons:

**The Order Exceeds the Office's Statutory and Regulatory Authority:** The Order exceeds the Office's statutory authority at least because: (1) the Order is contrary to 35 U.S.C. § 6(c) as modified by the Supreme Court in *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1987 (2021) ("We conclude that a tailored approach is the appropriate one: Section 6(c) cannot constitutionally be enforced to the extent that its requirements prevent the Director from reviewing final decisions rendered by APJs."); and (2) the Order's "Mandated Discovery" exceeds discovery permitted under 35 U.S.C. § 316(a)(5) and 37 C.F.R. § 42.51.

**The Order is Inconsistent with Office Standards and Procedures:** The Order does not comply with the Board's precedential decision in *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, Case IPR2012-00001 (PTAB Mar. 5, 2013) (Paper 26) (precedential), which requires a showing that non-routine discovery is "necessary in the interests of justice." The Order fails to make the requisite showing at least with respect to *Garmin* factors 1, 4, and 5, as explained in the Office's Trial Practice Guide.

For example, under *Garmin* factor 1 the party requesting discovery should already be in possession of evidence or reasoning "tending to show beyond speculation that in fact something useful will be uncovered." *Garmin*, slip op. at 6. The Order does not identify what allegedly useful evidence the ordered discovery is designed to elicit or the evidence or reasoning supporting a finding that *Garmin* factor 1 could be satisfied. Because the Order does articulate a theory of abuse of process as to PQA and identify supporting evidence, the Order's discovery is based on mere allegation that something useful might be found to support an as-yet unidentified theory (based on unknown evidence) of abuse of process as to PQA.

As to the identities of other potential real parties in interest ("RPI"), PQA submitted a sworn declaration establishing PQA (and its members) have no relevant connection to Intel, VLSI, or OpenSky. Ex. 1032. VLSI has not contested the accuracy of the statements in this declaration, and there is no evidence the declarant perjured himself. Similarly, VLSI has not challenged RPI in this IPR or the accuracy or completeness of PQA's mandatory notices under 37 C.F.R. §42.8. Thus, there is no "show[ing] beyond speculation that in fact something useful will be uncovered" and discovery into PQA members' identities is unwarranted under 35 U.S.C. § 316(a)(5), 37 C.F.R. § 42.51, and the Office's standards and procedures. *See Ashworth Bros., Inc. v. Laitram, L.L.C.*, No. IPR2020-00593, 2020 WL 6324716, at *2 (Patent Tr. & App. Bd. Oct. 28, 2020 (denying request for discovery because Patent Owner "does not identify any evidence 'tending to show beyond speculation'"); *Zodiac Pool Sys., Inc. Petitioner v. Aqua Products, Inc.*, No. IPR2013-00159, 2013 WL 6514060, at *2 (Patent Tr. & App. Bd. Oct. 18, 2013) ("Patent Owner has not established more than the mere possibility of finding something useful, and the mere allegation that something useful will be found is insufficient basis for granting Patent Owner's motion").

As an additional example, *Garmin* factor 4 requires the discovery requests to be easily understandable. *Garmin*, slip op. at 6. The Order references "electronically stored information" but does not supply an ESI order and it is unclear whether the Order incorporates the Office's Model Order Regarding E-Discovery (Appendix C to the Trial Practice Guide).

As a final example, *Garmin* factor 5 demands any discovery requests must not be overly burdensome to answer, but the Order's discovery is overly burdensome under existing Office standards and procedures. First, PQA objects to the two-week timeframe provided to search for, review, produce, and log the expansive discovery described in the Order. This timeline for such extensive discovery is impractical and unprecedented. PQA's proposed production is the result of significant effort, time, and expense already incurred and has been prepared in an unusually short timeframe.  Thus, PQA reserves the right to further object to the Order on additional grounds as to discovery beyond its current proposed production.

The ordered discovery is also not "reasonably tailored to a genuine need" for the reasons described above for factor 1. Specifically, request (i) purports to seek "any communications related to . . . the formation of PQA" without identifying evidence "tending to show beyond speculation that in fact something useful will be uncovered" or to what genuine need the request is tailored. Request (iii) includes "all documents relating to the filing, settlement, or potential termination of this proceeding" without explaining how anything other than PQA's actions could bear on the issues under review. The discovery requests in the Order are overly burdensome because the scope undoubtedly encompasses documents that have no relevance to this proceeding. *See Mitek Sys., Inc. v. United Services Auto. Ass'n*, No. IPR2020-00882, 2020 WL 4375112, at *5 (Patent Tr. & App. Bd. July 30, 2020). As noted above, PQA is willing to produce the Third-Party Documents (i.e., communications between PQA and OpenSky, VLSI, Intel, governmental entities, and Dr. Singh). Such documents, and PQA's filings in this proceeding, represent all of PQA's actions potentially relevant to the issues under review.

For at least the foregoing reasons, PQA respectfully contends the Order improperly imposes new, burdensome, unidentified discovery standards and procedures for this proceeding in violation of 35 U.S.C. § 316(a)(5), 37 C.F.R. § 42.51, and the Administrative Procedure Act.

**The Order Violates PQA's and Its Members' Constitutional Rights:** The Order's requirement that PQA disclose its members' identities (via interrogatory response, privilege log, or other documents) will subject them to harassment by VLSI and its attorneys. As the Third-Party Documents will confirm, PQA has reason to distrust that VLSI and its attorneys will abide by contractual, legal, or ethical obligations (including the Protective Order in this proceeding). Moreover, VLSI's attorneys informed PQA by letter they are contemplating legal action against OpenSky and its members without identifying to PQA any legal basis for such a suit.  Under these circumstances, compelling PQA members to disclose their identities without evidence of wrongdoing or inaccurate mandatory notices would violate their First Amendment right to freedom of association and Fourteenth Amendment right to due process of law.

**The Order is Inconsistent with the Purposes of the AIA:** Congress intended discovery in *inter partes* review proceedings to be limited in scope and inexpensive. The Order contravenes Congressional intent by demanding production of formation documents, business plans and funding records, settlement discussions, and protected communications between a party and its lawyers and experts. These requests effectively require PQA to produce or log every document related to its existence without any evidence of wrongdoing and without adherence to the Office's statutory, regulatory, and precedential authority. The Director confirmed the merits of PQA's petition and the Institution Decision's compliance with existing Office practice and precedent. Thus, any documents that might be relevant to these discovery requests have no bearing on the institution decision in this proceeding which is the stated scope of the Director's review.

**The Order is Inconsistent with the Interim Guidelines for Director Review:** The Interim Guidelines (which do not have the force of law) foreclose new arguments or evidence in a Director Review except for issues of first impression, and the Order does not identify any issue of first impression. If the issue is abuse of process, the Order does not identify any evidence on which to base such a finding or articulate an alleged theory of abuse as to PQA. If the issue is one of standing, the Supreme Court has already determined that "[a]ny person—other than the patent owner himself— can file a petition to institute inter partes review of a patent." *Arthrex*, 141 S. Ct. at 1977.  If the issue is about RPI, the Office has established regulations and procedures for allowing parties to seek non-

routine RPI discovery, provided they satisfy the precedential *Garmin* factors. (Notably, Patent Owner VLSI could have asked—but did not ask—for any additional RPI discovery in the underlying proceeding.)

**The Order Would Unfairly Require PQA to Waive Privilege Objections:** Federal Courts throughout the United States "almost unanimously" find waiver of the attorney-client and work product privilege when a party discloses privileged documents to a federal agency. *In re Quest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1186 (10th Cir. 2006). Thus, PQA is not protected by the Office's assurance that it "does not consider a party to waive any applicable privilege by providing allegedly privileged documents to the Office for in camera review." Order at 11 n.6. PQA thus objects to logging privileged and work-product materials for the sole purpose of potential Director *in camera* review, which would likely result in PQA's waiver of attorney-client privilege and work-product protections as to any such documents (and potentially broader subject-matter waiver) in other proceedings.

Truman H. Fenton

**sgb** | **SLAYDEN GRUBERT BEARD** PLLC

401 Congress Avenue, Suite 1650
Austin, Texas 78701
Direct 512.402.3572
Mobile 512.468.7623
www.sgbfirm.com

This message was sent by an attorney at law and may contain privileged and/or confidential matter.  Please let the sender know if this message was received in error.



# PRESS RELEASES

Home (https://www.tillis.senate.gov/home)  /  News (https://www.tillis.senate.gov/news)

/  Press Releases (https://www.tillis.senate.gov/press-releases)

**Jan 5 2022**

f ()   🐦 ()   ✉ ()   🖶 ()

# Tillis to Support Kathi Vidal's Nomination for Director of the U.S. Patent and Trademark Office (https://www.tillis.senate.gov/2022/1/tillis-to-support-kathi-vidal-s-nomination-for-director-of-the-u-s-patent-and-trademark-office)

**WASHINGTON, D.C.** – Today, U.S. Senator Thom Tillis (R-NC) announced he will support the nomination of Kathi Vidal to be Director of the U.S. Patent and Trademark Office (USPTO) and Under Secretary of Commerce for Intellectual Property.

VLSI Technology LLC, Exhibit 2025
Page 2025 - 1
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

Appx124

"It's a well-known fact that I strongly support the reforms taken by former Director Andrei Iancu to make the Patent Trial and Appeal Board a more fair and equitable forum for patent owners. Before Director Iancu's reforms, the PTAB was rightly known as a place where big companies could game the system, engage in strategic and efficient infringement, and destroy the patent rights of small businesses and independent inventors. Thanks to Director Iancu's leadership, the PTAB now protects small businesses and has finally achieved the balance Congress intended when we passed the America Invents Act.

"I've been clear from the beginning that any nominee for USPTO Director must commit to continuing and building upon these reforms to receive my vote. During Kathi Vidal's confirmation hearing and in questions for the record, I asked tough questions on her views regarding these reforms and sought a simple yes or no commitment on if she would continue them. After reviewing her answers and talking with her one-on-one, I'm happy to say I've received such a commitment.

"Our conversations have convinced me that Ms. Vidal will be the exact type of visionary leader we need to succeed Andrei Iancu and will work tirelessly to ensure all inventors get a fair shake before the USPTO. She understands we need to reform our nation's patent eligibility laws to provide greater clarity, that inventors of all sizes depend on a fair and equitable IP system, and that strong intellectual property rights are the foundation of our economy. She knows that prior to Director Iancu's reform, PTAB wasn't the balanced forum Congress intended. She realizes that, absent the continuation of these reforms, bad actors like OpenSky Industries will use the PTAB as a form of strategic litigation to attack competitors. And, most importantly, she's willing to listen to all stakeholders, big and small, and make decisions based on what is best for everyone and the patent system as a whole.

VLSI Technology LLC, Exhibit 2025
Page 2025 - 2
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

"In addition to being a well-respected patent attorney, she possesses the management experience necessary to ensure the agency continues to provide high-quality services to all—whether assisting first-time patent and trademark applicants, providing policy advice to the Administration, or engaging with intellectual property offices around the world. She understands that we cannot take the United States' leadership in innovation for granted and that a robust intellectual property system is essential for America's future.

"For all these reasons, that's why I will proudly be voting to confirm Kathi Vidal as USPTO Director. I look forward to working with my colleagues and Leaders McConnell and Schumer to secure her confirmation."

### 

https://www.tillis.senate.gov/2022/1/tillis-to-support-kathi-vidal-s-nomination-for-director-of-the-u-s-patent-and-trademark-office (https://www.tillis.senate.gov/2022/1/tillis-to-support-kathi-vidal-s-nomination-for-director-of-the-u-s-patent-and-trademark-office)

VLSI Technology LLC, Exhibit 2025
Page 2025 - 3    3/4
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

Home (https://www.tillis.senate.gov) | Contact (https://www.tillis.senate.gov/email-me) | Privacy (https://www.tillis.senate.gov/privacy-policy)

𝗳 (https://www.facebook.com/SenatorThomTillis)

🐦 (https://twitter.com/senthomtillis)   📷 (https://instagram.com/senthomtillis/)

▶️ (https://www.youtube.com/channel/UCUD9VGV4SSGWjGdbn37Ea2w)

VLSI Technology LLC, Exhibit 2025
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

# United States Senate

**VIA ELECTRONIC TRANSMISSION**

April 27, 2022

The Honorable Kathi Vidal
Under Secretary of Commerce for Intellectual Property and
    Director United States Patent and Trademark Office
United States Patent and Trademark Office
600 Dulany Street
Alexandria, VA 22314

Dear Director Vidal:

We write to express our concern about the Patent Trial and Appeal Board's (PTAB's) recent decisions to institute inter partes reviews (IPRs) in *OpenSky Industries, LLC v. VLSI Technology LLC*[1] and *Patent Quality Assurance, LLC v. VLSI Technology LLC*.[2] The facts and circumstances around these proceedings suggest petitioners OpenSky Industries, LLC (OpenSky) and Patent Quality Assurance, LLC (PQA) brought the proceedings to manipulate the U.S. Patent and Trademark Office (USPTO) for their own financial gain. The PTAB's decisions to endorse this scheme are troubling and undermine the USPTO's recent efforts to ensure post-issuance proceedings are not used to harass patent owners.

The United States has long held the position as the world's leader in innovation. Our country's patent system has played a key role in securing this status. By granting inventors the exclusive right to practice their inventions for a limited period of time, the patent system incentivizes individuals and companies alike to invest their time, energy, and resources into the next generation of products and services. The result is a string of breakthroughs, including the light bulb, the telephone, the microchip, and many more.

In 2011, Congress enacted the America Invents Act. The centerpiece of this law was a new suite of post-issuance proceedings, including IPRs, to allow petitioners to challenge the validity of U.S. patents. Supporters of this law claimed such proceedings were necessary to "create an inexpensive and faster alternative to litigation."[3]

Unfortunately, a variety of petitioners have sought to weaponize the IPR process for their own financial gain.

For example, in 2015, hedge fund manager Kyle Bass formed the so-called Coalition for Affordable Drugs as a front group to file IPR petitions against patents held by pharmaceutical

---

[1] Case No. IPR2021-01064.
[2] Case No. IPR2021-01229.
[3] 157 Cong. Rec. H4496 (2011) (statement of Rep. Lamar Smith).

companies. All the while, his fund shorted the stocks of those companies and profited off the price drops caused by the very petitions Bass filed.[4]

More recently, OpenSky and PQA filed petitions challenging U.S. Patent Nos. 7,523,373 and 7,725,759 in an apparent attempt to extort money from patent owner VLSI Technology LLC. The motives behind these IPR petitions were suspect from the outset. For example,

- The companies were formed shortly before filing their petitions.
- The companies did not make, use, sell, or import *any* products, let alone any products that could subject them to claims of infringement.
- The companies filed their petitions only after VLSI had secured a $2.2 billion infringement judgment against Intel.
- And, most egregiously, the petitions filed by the companies were near "carbon copies" of petitions previously filed by Intel that had been rejected by the USPTO.[5]

Any doubt about OpenSky's motives was extinguished when VLSI filed with the USPTO an e-mail received from OpenSky's counsel. In the e-mail, OpenSky's counsel proposed a scheme in which the company would actively work to undermine the IPR it brought—thereby protecting VLSI's patents from other challenges—in exchange for monetary payment.[6]

These activities represent clear abuses of the IPR system. Yet, to date, it does not appear the USPTO has taken any steps to sanction those involved or otherwise act to deter future copycats. In fact, the PTAB has thus far granted two of the petitions filed by OpenSky and PQA. In one institution decision, the PTAB actually cited the timing of OpenSky's petition as a reason the petition should be granted.[7]

In recent years, the USPTO has made great strides in making the IPR process more fair and equitable. By adopting the *Phillips* claim construction standard, the USPTO ensured that PTAB reviews would more closely align with district court validity challenges. And, by adopting the *Fintiv* factors, the USPTO has reduced the burden faced by patent owners who too often are forced to defend their patents simultaneously on multiple fronts.

However, the abuses described above show that the USPTO's work is not finished. The USPTO must therefore review its policies and take all necessary actions to ensure the IPR process is not abused by parties filing petitions in bad faith and for reasons outside the intent of the America Invents Act.

To that end, please respond to the following questions no later than May 27, 2022.

---

[4] https://www.reuters.com/article/celgene-lawsuit-hedgefund/hedge-fund-manager-kyle-bass-escapes-sanctions-in-drug-patent-case-idUSL1N11Y1S120150928.

[5] https://news.bloomberglaw.com/ip-law/review-of-vlsi-patents-in-intel-fight-seen-enticing-opportunists.

[6] https://news.bloomberglaw.com/ip-law/intel-patent-verdict-tensions-spark-reveal-of-unusual-offer.

[7] Case No. IPR2021-01064, Paper No. 17 at 13 ("We determine that OpenSky has offered a reasonable explanation for the timing of the Petition. Here, it was reasonable for OpenSky to take interest in the '759 patent after a substantial damages award, and choose to challenge the patent at that time.")

1. Does the USPTO consider filing an IPR petition for the purpose of profiting from a resulting decrease in the price of the patent owner's stock a proper use of the IPR system? Why or why not?

2. Does the USPTO consider filing an IPR petition for the purpose of extorting money from the patent owner a proper use of the IPR system? Why or why not?

3. The America Invents Act gives the Director of the USPTO discretionary authority to deny IPR petitions. Do you consider it a proper use of that discretion to (1) deny an IPR petition filed for the purpose of profiting from the resulting decrease in the price of the patent owner's stock; or (2) deny an IPR petition filed for the purpose of extorting money from the patent owner? Why or why not?

4. What sanctions can the USPTO impose on parties that file IPR petitions in bad faith? Has the USPTO exercised this authority to date?  If so, please describe the circumstances.

5. What additional authorities, if any, does the USPTO require to ensure that parties do not file IPR petitions in bad faith and for reasons outside the intent of the America Invents Act?

We appreciate your attention to this matter. If you have any questions, please do not hesitate to contact us.

Sincerely,

Mazie K. Hirono
United States Senator

Thom Tillis
United States Senator

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD


PATENT QUALITY ASSURANCE, LLC,　　　)
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　 Petitioner,　　　 )
　　　　　　　　　　　　　　　　　　 )
　　　 vs.　　　　　　　　　　　　　 )　Case No.:
　　　　　　　　　　　　　　　　　　 )　IPR2021-01229
VLSI TECHNOLOGY LLC,　　　　　　　　 )　Patent 7,523,373
　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　 Patent Owner.　　 )
_____)



HIGHLY CONFIDENTIAL

REMOTE DEPOSITION OF

DR. ADIT SINGH, Ph.D.,

AUSTIN, TEXAS

MAY 12, 2022



REPORTED BY:  SANDRA S. PETRITSCH, CSR NO. 11684

FILE NO. 824015

VLSI Technology LLC, Exhibit 2053
Page 2053 - 1
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

Page 11

1      Q    Will you understand me to be referring to Intel

2  Corporation if I just say, Intel?

3      A    That should be fine.

4      Q    Fantastic.  When were you, approximately --

5  strike that.  Let me repeat the question.

6           Approximately when were you first approached by

7  Intel about working on an IPR against the '373 patent?

8      A    If I recall, that would be in the summer, I

9  think, of 2019 because that's before corporate.

10     Q    And when was the last time you communicated with

11 Intel or any attorney of Intel about the '373 patent?

12     A    I don't have a specific date, but I think I

13 recall getting an electronic message saying that the IPR

14 that we had filed with Intel was not instituted.

15     Q    When was the last time you submitted an invoice

16 to Intel in connection with any work on the '373 patent?

17     A    I would expect in 2021 sometime -- in 2019.

18 Sometime in the late summer/fall of 2019 because I did not

19 report any follow-up with them.

20     Q    Did you take any steps to terminate your

21 agreements with Intel?

22          MR. FENTON:  Objection.  Outside the scope.

23          THE WITNESS:  To be honest, I don't have a lot

24 of experience, but I typically assume that these are on

25 track with the sunset clause/sunset date, and I didn't

VLSI Technology LLC, Exhibit 2053
Page 2053 - 11
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

**MAGNA** ▶
**LEGAL SERVICES**

Appx132

Page 12

1  want to actually do anything.  I don't know if I actively

2  had done something to terminate or not.

3      Q    (By Mr. Slusarczyk)  You're being compensated by

4  PQA for your work on this particular proceeding.  Correct?

5      A    Correct.

6      Q    Are you being compensated by anyone else?

7      A    No.

8      Q    And what are the terms of your compensation from

9  PQA?

10      A    So the terms of my compensation from PQA are

11  $500 an hour.  And because PQA wanted to reuse, change,

12  modify the treatise and a lot of the work that I had done

13  earlier, I was concerned that they may not have been a

14  lot -- I was concerned that they may not have been many

15  additional hours of work in preparing the IPR this time

16  around, so I had asked for some minimum payment in the

17  first month of ten thousand dollars.  And if things did

18  not -- if the IPR did not get instituted, then I had

19  requested that I be hired in whatever way for an

20  additional $15 [sic] worth of time, whether in the same

21  case or I could help out with other cases.

22          So guaranteeing a minimum of $25,000 for

23  everything.

24      Q    Understood.  When you just said $15, did you

25  mean $15,000?

VLSI Technology LLC, Exhibit 2053
Page 2053 - 12
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

**MAGNA◉**
**LEGAL SERVICES**

Page 13

1      A      Yes.  I meant $15,000.  Total is twenty-five, so

2   ten in the first month and $15,000 over the duration of

3   the next year or so.  There is a sunset clause of some

4   kind.

5           MR. FENTON:  Real quick, before you ask another

6   question, is his sound strong?

7           (Discussion off the record.)

8      Q      (By Mr. Slusarczyk)  Approximately how much

9   compensation have you received from PQA so far in

10  connection with this proceeding?

11     A      I received the first month's compensation of

12  $10,000.

13     Q      And has PQA retained you in connection with any

14  other work besides this proceeding about the '373

15  patent?

16     A      No.  PQA has not retained me.

17     Q      When you were retained by Intel for purposes of

18  drafting that additional declaration that was filed in

19  Intel's IPR against the '373 patent, what was your hourly

20  compensation?

21     A      Exactly the same; $500,000 an hour.

22     Q      Was there any sort of minimum attached to

23  that?

24     A      No.  No there was no minimum attached to that

25  because I knew that the IPR was being done from scratch,

**MAGNA**
**LEGAL SERVICES**

Appx134

Page 14

1   but I had an earlier incident or deposition where a report

2   was re-used, and I had a similar arrangement of minimum

3   payments.

4        Q    Understood.  Is your compensation in this

5   proceeding in any way dependent on the outcome?

6        A    Not at all.

7        Q    When you started your work on this proceeding

8   for PQA, did you reconsider any portions of the opinion

9   you had rendered in connection with the Intel IPR against

10  the '373 patent?

11       A    Not -- no serious reconsideration of any points.

12  Just minor tweaks.  Because when you write something, you

13  always improve on the explanations in revisions.  So these

14  were minor tweaks and that was one of the reasons why I

15  asked for minimum first month because I did not expect

16  that I would rack up too many hours in working on revised

17  report.

18       Q    So as you started with the work you had done for

19  Intel, there wasn't any piece of what you had written that

20  you found to be in error or otherwise in any way

21  disagreeable to you; is that correct?

22       A    Yes.  That's correct.  Other than clarifications

23  of employable explanations, there were no dramatic changes

24  of any.

25       Q    And as you sit here today, are you aware of any

VLSI Technology LLC, Exhibit 2053
Page 2053 - 14
IPR2021-01229, Patent Quality Assurance, LLC v. VLSI Technology LLC

**MAGNA**
**LEGAL SERVICES**

| | |
|---|---|
| **From:** | Director_PTABDecision_Review |
| **To:** | Truman Fenton; Director_PTABDecision_Review; Trials |
| **Cc:** | ben.fernandez@wilmerhale.com; Cavanaugh, David; yvonne.lee@wilmerhale.com; Horn, Steven J; Bruce Slayden; Tecuan Flores; bredjaian@irell.com; weatherwax@lowensteinweatherwax.com; smith@lowensteinweatherwax.com; rose@lowensteinweatherwax.com; hsieh@lowensteinweatherwax.com; hendifar@lowensteinweatherwax.com; maloney@lowensteinweatherwax.com; linger@lowensteinweatherwax.com; VLSI_IPRs@lowensteinweatherwax.com |
| **Subject:** | RE: IPR2021-01229 – Urgent request to seal Paper 65 in view of a protective order violation |
| **Date:** | Friday, August 19, 2022 5:50:39 PM |

Counsel,

Petitioner-PQA's counsel requested that Paper 65 be removed from public availability for violating the Modified Default Protective Order. To address this issue, the Board designated Papers 65 and 52 as confidential materials viewable by the Board and Parties only.

The parties are required to meet and confer as to the required redactions for any confidential briefs, and to provide agreed-upon redacted briefs by August 26, 2022.

---

**From:** Truman Fenton <tfenton@sgbfirm.com>
**Sent:** Friday, August 19, 2022 5:47 PM
**To:** Director_PTABDecision_Review <Director_PTABDecision_Review@uspto.gov>; Trials <Trials@USPTO.GOV>
**Cc:** ben.fernandez@wilmerhale.com; Cavanaugh, David <david.cavanaugh@wilmerhale.com>; yvonne.lee@wilmerhale.com; Horn, Steven J <steven.horn@wilmerhale.com>; Bruce Slayden <bslayden@sgbfirm.com>; Truman Fenton <tfenton@sgbfirm.com>; Tecuan Flores <tflores@sgbfirm.com>; bredjaian@irell.com; weatherwax@lowensteinweatherwax.com; smith@lowensteinweatherwax.com; rose@lowensteinweatherwax.com; hsieh@lowensteinweatherwax.com; hendifar@lowensteinweatherwax.com; maloney@lowensteinweatherwax.com; linger@lowensteinweatherwax.com; VLSI_IPRs@lowensteinweatherwax.com
**Subject:** IPR2021-01229 – Urgent request to seal Paper 65 in view of a protective order violation

> CAUTION: This email has originated from a source outside of USPTO. **PLEASE CONSIDER THE SOURCE** before responding, clicking on links, or opening attachments.

Dear Director and Board,

At approximately 4pm ET today, Friday 8/19, Patent Owner VLSI filed Paper 65 in IPR2021-01229 purporting to be a redacted and public version of its response to the Director's order initiating Director Review. Paper 65 contains material designated under the Modified Default Protective Order (Ex. 3003, entered by Paper 36) that should not have been filed publicly. Counsel for petitioner PQA attempted to call counsel for Patent Owner VLSI and emailed the same, but was unable to obtain a response.

Petitioner provides two clear examples for reference only. First, each sentence but the last of the second paragraph of page 6 continuing to page 7 report or characterize the substance of documents

designated CONFIDENTIAL under the Protective Order and should have been redacted in full. Second, the first sentence of the first full paragraph on page 3 has two characters redacted when the unredacted portion of the sentence discloses the substance of a document designated CONFIDENTIAL under the Protective Order. The sentence should have been redacted in full.

Petitioner PQA requests the immediate sealing of Paper 65 until the parties have had an opportunity to resolve the apparent protective order violation.

Truman H. Fenton

**sgb** | **SLAYDEN GRUBERT BEARD** PLLC

401 Congress Avenue, Suite 1650
Austin, Texas 78701
Direct 512.402.3572
Mobile 512.468.7623
www.sgbfirm.com

This message was sent by an attorney at law and may contain privileged and/or confidential matter.  Please let the sender know if this message was received in error.

IN THE

**UNITED STATES PATENT AND TRADEMARK OFFICE**

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

PATENT QUALITY ASSURANCE, LLC
Petitioner

v.

VLSI Technology LLC
Patent Owner

———————————

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

———————————

**PETITION FOR *INTER PARTES* REVIEW UNDER 35 U.S.C. §§311-319 AND 37 C.F.R. §42**

———————————

Mail Stop Patent Board
Patent Trial and Appeal Board
P.O. Box 1450
Alexandria, VA 22313-1450

July 7, 2021

https://www.greyb.com/largest-patent-infringement-awards/. Because no examiner, court, or other tribunal has evaluated the '373 patent's validity in view of the grounds presented herein, review is necessary to instill confidence in the integrity of the patent system and to ensure that innovative U.S. companies (and their consumers) are not unfairly taxed by entities asserting invalid patents.

Another petition for IPR of the '373 patent is pending, *OpenSky Indus. v. VLSI Tech.*, IPR2021-01056 (filed Jun. 7, 2021). In *General Plastic Indus. v. Canon*, IPR2016-01357, Paper 19 at 15-16 (PTAB Sept. 6, 2017) (precedential), the Board articulated a non-exhaustive list of factors to determine whether to exercise discretion under §314(a) to deny a petition that challenges the same patent as a previous petition ("*GP* Factors"). As discussed below, the *GP* Factors weigh against denying this petition.

Factor 1 weighs against denial. Petitioner is unrelated to Intel or OpenSky and has not previously filed a petition. Additionally, Petitioner challenges claim 14—a claim not challenged in the other petitions.

———————————————

denied institution under *Fintiv. Intel v. VLSI Tech.*, IPR2020-00158, Paper 16 at 14 (May 20, 2020). Intel did not challenge validity at trial. Ex. 1031, at 5. The jury found Intel infringed claims 1, 5-6, 9, and 11 and awarded $1.5 billion for infringement of the '373 patent. *Id.*, at 2, 6.

Factors 2, 4, and 5 weigh against denial. Petitioner was formed on June 14, 2021, after Intel and OpenSky filed their petitions.

Factor 3 is neutral or weighs against denial. This factor is aimed at deterring petitioners from holding back prior art and taking a wait-and-see approach before filing a second petition. This is Petitioner's first petition and it uses the same prior art raised in the other petitions and thus, holding back prior art is not at issue.

Factors 6 and 7 focus on efficiency and are neutral or slightly weigh against denial. Intel's petition was denied based on *Fintiv*—the merits were not addressed. The Board can handle OpenSky's petition at the same time, negating any concerns of wasted effort.

Finally, the *GP* Factors are non-exhaustive, and there is reason to proceed with this IPR instead of OpenSky's IPR. As already discussed, this Petition challenges claim 14, while OpenSky's petition does not. Further, OpenSky's petition includes expert declarations from Dr. Singh and Dr. Hall-Ellis, but OpenSky merely copied the exact declarations from Intel's IPR petition without engaging either expert. In contrast, Petitioner *exclusively* engaged Dr. Singh and Dr. Hall-Ellis to challenge the '373 patent. Thus, OpenSky cannot present either expert for cross-examination as required. *See* 37 C.F.R. §42.51(b)(1) (providing for cross-examination of affiants). OpenSky must either dismiss its petition to refile with a new expert or risk exclusion of its expert declaration as mere hearsay. *See Celltrion*

*v. Genentech*, IPR2015-01744, Paper 11 (Oct. 2, 2015) (petitioner's motion to dismiss to avoid "the manifest prejudice" resulting from exclusion of its expert declaration); *1964 Ears, LLC v. Jerry Harvey Audio Holding*, IPR2016-00494, Paper 37 (Jan. 10, 2017) (striking declaration of unavailable expert); *see also* 37 CFR §42.62(a) ("Federal Rules of Evidence shall apply to a proceeding"); FRE 804(b)(1)(B) (allowing testimony of unavailable declarant only against a party who had an opportunity for cross-examination). The Board should not discretionarily deny this petition when OpenSky's petition is not properly supported and there is incomplete overlap between this Petition and the previously-filed petitions.

## IV.    TECHNOLOGY

The '373 patent relates to providing regulated voltages to a memory on an integrated circuit ("IC"). Ex. 1002, ¶29.

### A.    Common Components of ICs

ICs containing processors and memory have been known in the art for decades. Ex. 1008. These circuits integrate "the major functional elements of a complete end-product into a single chip or chipset." *Id.*, 3. The processors execute instructions; the memory stores data. Ex. 1009, 372-390. For example, memory can store data that a processor uses to execute its instructions. *Id.* Memory can be volatile or nonvolatile. Nonvolatile memory continues to retain information after being powered down; volatile memory does not. A fuse is an example of nonvolatile

IN THE

**UNITED STATES PATENT AND TRADEMARK OFFICE**

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————————

PATENT QUALITY ASSURANCE, LLC
Petitioner

v.

VLSI Technology LLC
Patent Owner

——————————

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

——————————

**PETITIONER'S REPLY TO PATENT OWNER'S PRELIMINARY
RESPONSE**

——————————

Under factor 3 (whether petitioner saw the POPR and Institution Decision), PO does not identify any unfair prejudice suffered when the Board did not address the merits of the Petition or the POPR. Factor 3 is neutral, and the balance of *GP* factors weighs strongly against discretionary denial.

### D. The Board Should Not Deny Institution under § 325(d)

PO also contends the Board should deny institution under § 325(d) based on *In re Vivint, Inc.*, 14 F.4th 1342 (Fed. Cir. 2021). *Vivint* is easily distinguished. First, the *Vivint* "holding … is narrow" and holds only that "the Patent Office, when applying § 325(d), cannot deny institution of IPR based on abusive filing practices then grant a nearly identical reexamination request that is even more abusive." *Id.* at 1354. That holding does not apply here where (1) there was no previous IPR denial under § 325(d) and (2) there is no reexamination request. Further, the Board reviewed **the merits** of *two* earlier, unsuccessful petitions filed by the same petitioner (the '997 and '129 petitions), and then discretionarily denied the '091 petition because it presented substantially the same arguments as the earlier petitions. *Id.* at 1346, 1353. Then a reexamination proceeding was instituted based on grounds presented in the '091 petition, which the Federal Circuit found to be an inconsistent application of § 325(d). In contrast, this is Petitioner's first Petition, and the Board has not previously addressed the merits of this or any petition challenging the '373 patent. Thus, this is not a "serial challenge … by the same petitioner." If

7

accepted, PO's complaints of harassment would preclude any future petitioner from seeking review of the '373 and forever insulate the Petition's grounds from review.

### E. The OpenSky Petition Does Not Support Denial of This Petition

The Board should not deny this Petition based on the pending OpenSky petition. PO agrees that OpenSky's petition should be denied for relying on inadmissible hearsay and because OpenSky cannot produce the experts for cross-examination. *See* POPR, Paper 9, IPR2021-01056, at 27–30. OpenSky admits it did not engage Drs. Singh or Hall-Ellis,[2] but argues it does not need their testimony (Paper 14, IPR2021-01056, at 8–9). However, OpenSky's petition controls, and *it* relies on experts OpenSky never engaged. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1356 (2018) ("Nothing suggests the Director enjoys a license to depart from the petition and institute a different inter partes review of his own design."). Moreover, OpenSky cannot produce Dr. Singh for deposition because Petitioner has exclusively engaged him at least through December 2022. Ex. 1033 ¶ 2–7; Ex. 1034. OpenSky suggests it will compel a deposition of Dr. Singh by subpoena, but the Federal Rules discourage such subpoenas. *See* Fed. R. Civ. P. 45(d)(3)(B)(ii) (court may quash a subpoena for "an unretained expert's opinion"). Finally, OpenSky's alternate request to have an unidentified different expert execute the same

---

[2] Petitioner erroneously claimed exclusivity with Dr. Hall-Ellis. Ex. 1033 ¶ 9.

declaration (sometime in the future) violates the Federal Rules. "Rule 26(a)(2)(B) explicitly states that a written [expert] report must be 'prepared and signed by the witness[]'" and "[p]reparing a witness report requires more than merely adopting another's report." *Mobility Worx v. Cellco Partnership*, No. 4:17-cv-00872, 2019 WL 5721814, at * 9 (E.D. Tex. Nov. 5, 2019). Unlike OpenSky's petition, this Petition is properly supported by admissible expert testimony. It would be inequitable to deny this Petition while instituting OpenSky's unsupported petition.[3]

### F. The Totality of Relevant Circumstances Does Not Support Denial

The totality of *relevant* circumstances weighs decidedly against denying institution. PO contends, however, the Board should consider additional circumstances not discussed above: (1) a pending $1.5 billion judgment against Intel; and (2) Petitioner's nature and alleged motives. First, PO argues institution would unfairly prejudice its effort to collect a pending $1.5 billion judgment against Intel, but Petitioner is not related to Intel. That a challenged patent is "the subject of an infringement verdict" (POPR at 1) does not affect the § 314(a) analysis—especially when invalidity was not decided as part of that verdict.

---

[3] Curiously, OpenSky does not disavow any relationship to VLSI or its parent, Fortress Investment Group. Nor does OpenSky explain why it has yet to submit a replacement expert declaration or identify its proposed replacement expert.

9

Trials@uspto.gov
571-272-7822

Paper No. 31
Date: June 7, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDERSECRETARY AND DIRECTOR
OF THE UNITED STATES PATENT AND TRADEMARK OFFICE

_____

PATENT QUALITY ASSURANCE, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01229
Patent 7,523,373 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

ORDER

IPR2021-01229
Patent 7,523,373 B2

On January 26, 2022, the Patent Trial and Appeal Board ("Board") issued a Decision granting institution of an *inter partes* review of claims 1– 16 of U.S. Patent No. 7,523,373 B2 ("the '373 patent").  Paper 10 ("Institution Decision").  VLSI Technology LLC ("Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 13; Ex. 3001.  Concurrent with this Order, the POP has dismissed the requests for rehearing and POP review.

I have reviewed the Board's Institution Decision, the Papers, and the Exhibits of record in this proceeding.  I determine that Director review of the Board's Institution Decision is appropriate because this case raises novel issues of law and policy, as well as issues of particular importance to the Office and the patent community.  *See Interim process for Director review*[1] Question 10 (setting forth issues that may warrant Director review), Question 22 (providing for sua sponte Director review of institution decisions in AIA proceedings and explaining that "the parties to the proceeding will be given notice" if Director review is initiated sua sponte). At this time, the case is not stayed and will proceed with the original panel according to the issued Scheduling Order.  *See* Paper 15.  I will issue an Order in due course setting forth a schedule for the Director review that includes dates for party and amicus briefing.

Accordingly, based on the foregoing, it is:

ORDERED that a sua sponte Director review of the Board's Institution Decision (Paper 10) is initiated;

---

[1] Available at https://www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

IPR2021-01229
Patent 7,523,373 B2

FURTHER ORDERED that, at this time, the case is not stayed and will proceed with the original panel according to the issued Scheduling Order; and

FURTHER ORDERED that a schedule including dates for party and amicus briefing will issue in due course.

3

IPR2021-01229
Patent 7,523,373 B2

PETITIONER:

Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com


PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com


Kenneth J. Weatherwax
Parham Hendifar
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com

4

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————

Case IPR2021-01229[*]
Patent 7,523,373

———————

**PATENT OWNER'S BRIEF IN RESPONSE
TO DIRECTOR REVIEW ORDER**

~~CONTAINS HIGHLY CONFIDENTIAL~~
~~PROTECTIVE ORDER MATERIAL~~
NON-CONFIDENTIAL REDACTED VERSION

———————

[*] Intel Corporation, which filed a petition in IPR2022-00479, has been joined as a party to this proceeding.

## I.    INTRODUCTION

This case raises the significant question of whether the Office should allow itself to be used to facilitate extortion.  After VLSI obtained a damages verdict, two entities, OpenSky and PQA, formed to file IPRs challenging the patents-at-issue.  Neither entity faces any threat of infringement and has no business aside from their attempts to profit from the IPRs.  OpenSky formed and filed first.  Second in line but seeing an opportunity to shove its way to the front, PQA exclusively retained OpenSky's declarant (Ex. 1034) to secure institution of its petition and the denial of OpenSky's.  Once OpenSky was out of the way, ███

███ █ ████████████████

█████  ████████  ████████████  █████

████  PQA's actual business, as revealed by its conduct, is extortion.

In accord with that corrupt purpose, PQA has steadfastly refused to allow any insight into its members, business plans, reasons for forming, profit distributions, and more and indeed refused to produce or log internal communications in willful violation of the Director's Orders.  Instead of complying, PQA accused the Director of conducting a "fishing expedition" that "shocks the conscience."  Ex. 1039, 7-8.  And although PQA declined to log any withheld documents, PQA sought *in camera* review of 260 of the 266 entries on VLSI's log without even suggesting the documents are not privileged.  Ex. 2087.

In sum, PQA was formed to file extortive IPRs.  It has shown contempt for

the Office, its rules, the Director, and her Orders.  PQA portends what is to follow

if parties with no skin in the game are allowed to weaponize IPRs for financial

gain.  Such harassment is a clear abuse of the system and inconsistent with the

goals of the Office and the AIA.  Respectfully, the Director should make clear that

IPRs are not to be used for extortion.  Nor should PQA's abuse permit Intel to

proceed with an otherwise time-barred challenge.  Lest PQA's conduct become

commonplace, this IPR should be terminated and the underlying institution and

joinder decisions should be vacated.  Such petitions should be denied to deter

speculators from leveraging IPRs into financial windfalls.

## II.    INTERROGATORY RESPONSES.

**A.    When was PQA formed?  For what purpose?  What is the business of PQA?  Who are members of PQA?  Which other persons or entities have an interest in PQA or any of its activities including this proceeding?  Explain.**

PQA formed as a South Dakota LLC on June 14, 2021 (Ex. 2009), exactly

one week after OpenSky filed petitions challenging VLSI's '373 and '759 patents.

PQA's business and purpose is to file IPRs against VLSI's patents in the hope of

extracting a large payout.  On June 9, just two days after OpenSky filed and five

days before PQA formed (Ex. 2009), PQA's outside counsel contacted Dr. Singh

(Ex. 2081) and the next day, Dr. Singh signed an exclusive engagement agreement

4 ("sanctions may include '[a]n order holding facts to have been established in the proceeding.'") (citing 37 C.F.R. § 42.12).

While PQA has not identified its members, PQA's pre-formation activities suggest that PQA is likely the creation of its outside counsel. It seems improbable that anyone else would see OpenSky's IPR filing on June 7, retain its counsel, and exclusively retain Dr. Singh within 72 hours (Ex. 1034). It seems most probable that PQA's outside counsel in this case is the driving force behind PQA's formation and efforts to misuse the IPR process.

**B.     What is the relationship between PQA and each of the other parties? Other than communications already in the record, what communications have taken place between PQA and each of the other parties?**

**Relationship And Communications Between VLSI And PQA**. PQA and VLSI have no relationship outside of this proceeding. On August 10, 2021, VLSI called PQA to discuss its IPR. PQA's counsel confirmed his clients were "business people" who would presumably be interested in having a conversation. Ex. 2024. PQA later responded with a made-for-litigation letter, claiming that the '373 posed "a unique threat to the integrity of the ... patent system," and PQA "does not believe a conversation ***at this stage*** makes sense." Ex. 1035.

On December 27, after OpenSky's IPR challenging the '373 was not instituted,



███████████████████████████████████████████

███████████████████████████████████ *See* Ex.

2064. ███████████████████████████████

████████████████████████████████████████████

████████████████████████ Ex. 2065. ██████████████████

█████████ █ █████ █ ████████████████████████ ████

████ ███████████████████████ █ ██████████████████

████████████████ ██████████ ██████████ █

███████████████████ █ █████████████ █ █████ (Exs. 2067,

2075-2076). ██████████████████████████ (Ex. 2068), ████

█████████████████ █████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████

██████████████████████████████████████████"

Ex. 2069. ████████████████████████████████████

_____

[1] The Director's Order precludes the submission of new declaratory evidence.

VLSI will submit declaratory evidence ████████████████████

████████████████████████ if requested by the Director.

"███████████" ███████████████████████████

███████████████████. Ex. 2071. ████████████████

████████ Exs. 2070, 2077-2078, 2073. ███████████████

████████ ██████████████████ (Ex. 2074), the day before the

institution decision issued.  VLSI and PQA ███████████████.

**Relationship and Communications Between Intel and PQA**.  VLSI does

not know the nature of Intel's relationship with PQA.  VLSI only knows that

(1) Intel and PQA have communicated regarding this proceeding, including about

"███████████████████████"; (2) Intel and PQA have withheld all

of their communications—including ████████████████████

████████████████ (Ex. 2088); (3) Intel is ████████████

████████████████████████ (Ex. 2089); (4) Intel

has not ████████████████████████████

████████████ whether Intel and PQA entered into any agreements; and (5) Intel

claims that it and PQA share a "common interest."  Ex. 2088

> **C.** **Could PQA be subject to claims of infringement of the '373 patent? Does PQA have development plans to create a product that could arguably infringe the '373 patent? Does PQA have a policy reason for filing the Petition that benefits the public at large beside any reasons articulated in the already-filed papers? Explain.**

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

PATENT QUALITY ASSURANCE, LLC,
INTEL CORPORATION,
Petitioners
v.

VLSI Technology LLC
Patent Owner

———————————

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

———————————

**PETITIONER'S OPENING BRIEF IN RESPONSE TO DIRECTOR REVIEW**

REDACTED

## III.   RESPONSE TO THE DIRECTOR'S INTERROGATORIES

PQA maintains its objections to the Director's orders as filed in Exhibit 1039

and communicated via email to the Director in Ex. 3004. The Director has not yet

ruled on any of those objections. PQA further objects to this review (i) because it is

precluded under 35 U.S.C. § 314(d) ("The determination by the Director whether to

institute an inter partes review under this section shall be final and nonappealable."),

and (ii) because the Office's revised Interim process for Director review—asserting

for the first time the Director may review institution decisions—issued

approximately three months *after* the panel's well-reasoned institution decision in

this case. Nothing in PQA's responses to the Director's interrogatories herein is

intended to constitute or shall be deemed a waiver or curtailment of any of PQA's

objections.

### A. When was PQA formed? For what purpose? What is the business of PQA? Who are members of PQA? Which other persons or entities have an interest in PQA or any of its activities including this proceeding? Explain.

PQA was formed on June 14, 2021. Ex. 1032 ¶ 3; Ex. 1045. The initial

authorized business of PQA is to challenge patent(s) to ensure patent quality. PQA's

members are United States citizens, none of whom are employed by, work for, or

are affiliated with Intel, OpenSky, or VLSI. Ex. 1032 ¶ 6. No other persons or entities

beyond PQA's members have an interest in PQA, its future revenues, profits, or

8

Since Intel's joinder as a petitioner on June 6, 2022, Intel and PQA have both been petitioners in this action and have a common interest in the prosecution of the merits of the unpatentability of the '373 patent—merits the Director has confirmed and which are not subject to the Director's review. *See* Paper 35 at 6–7 & n.5. Since Intel was joined to this proceeding, PQA and Intel have collaborated to cross examine VLSI's expert and prepare the Petitioner's reply in support of the petition. PQA otherwise has no formal or informal relationship with Intel (or any other entity).

Notably, VLSI has never contested the accuracy of PQA's mandated disclosures or questioned real-party-in-interest in this proceeding.

In sum, no other people or entities should be considered as potential real parties in interest because no facts exist to support such a claim.

**F. Did PQA ever condition any action relating to this proceeding, including but not limited to delaying, losing, not participating in, withdrawing from, or taking action that will influence any experts' participation in this proceeding, on payment or other consideration by Patent Owner or anyone else? Explain.**

REDACTED

17

REDACTED ███████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

Such unethical conduct has unnecessarily increased the cost of this proceeding and should not be rewarded.

REDACTED ████████████████████████████████

████████████████████████████████████, PQA never suggested delaying, losing, or not participating in the proceeding and never attempted to influence an expert not to participate in the proceeding. Similarly, while PQA's engagement with Dr. Singh is "exclusive," that provision may be waived on request. Ex. 1034. Since PQA's engagement of Dr. Singh, no party (including OpenSky) has ever sought to engage him in connection with the '373 patent, thus PQA has never declined any such request.

## IV.  POLICY DISCUSSION

Paper 35 poses two policy questions addressed below. Paper 35 at 7–8.

**A. Policy Question #1: What actions the Director, and by delegation the Board, should take when faced with evidence of an abuse of process or conduct that otherwise thwarts, as opposed to advances, the goals of the Office and/or the AIA?**

18

Director_PTABDecision_Review@uspto.gov            Paper No. 104
571-272-7822                                      Date: January 10, 2023


UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

INTEL CORPORATION[1],
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01229[2]
Patent 7,523,373 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office.*


ORDER
*Granting Motion for Extension of Time*
*37 C.F.R. § 42.5*

---

[1] Petitioner Patent Quality Assurance, LLC was dismissed from this
proceeding, subject to the Director, Board, and USPTO retaining jurisdiction
over the issuance of sanctions.  Paper 101, 4.

[2] Intel Corporation ("Intel"), which filed a petition in IPR2022-00479, was
joined as a party to this proceeding.  Paper 30.

IPR2021-01229
Patent 7,523,373 B2

On December 22, 2022, in my Decision on Director Review, I dismissed Petitioner Patent Quality Assurance, LLC ("PQA") from this proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions.  Paper 101 ("Dec." or "Decision"), 4.  I further ordered PQA "to show cause as to why it should not be ordered to pay compensatory expenses, including attorney fees, to VLSI as a further sanction for its abuse of process and misrepresentation of fact or misleading argument."  Dec. 62; 37 C.F.R. § 42.12(b)(6).

On January 4, 2023, PQA requested, via email, "clarification as to whether the Director views the Decision as 'non-final' or 'final' for purposes of PQA's rehearing request pursuant to the Interim Director Review Guidelines and 37 C.F.R. § 42.71(d)."  Ex. 3022.  PQA also requested that "If . . . the Director considers the Decision 'non-final' such that PQA's request for rehearing would be due on January 5, 2023, PQA respectfully requests a 14-day extension of time to file a rehearing request (i.e., due January 19, 2023)."  *See id.*[3]

The *Interim process for Director review* provides:

> Consistent with 37 C.F.R. § 42.71(d), parties requesting rehearing of a Director review decision must file their request within either (1) 14 days of the entry of a Director review decision on a non-final decision or a decision to institute a trial, or (2) 30 days of a Director review decision on a final decision or a decision not to institute a trial.

---

[3] In a separate email, also on January 4, 2023, PQA requested an extension of its deadline to brief the issue of attorney fees due to the holidays and the complex nature of the issues.  Ex. 3021.  I have addressed that request in a separate Order.  Paper 103.

2

IPR2021-01229
Patent 7,523,373 B2

*Id.*[4]

In view of the intervening holidays, I *grant* the requested 14-day extension of time, to January 19, 2023.

For the foregoing reasons, it is hereby:

ORDERED that the due date for PQA's request for rehearing is extended by 14 days, to January 19, 2023.

PETITIONER:

Benjamin Fernandez
David Cavanaugh
Yvonne Lee
Steven Horn
WILMER CUTLER PICKERING HALE AND DORR LLP
ben.fernandez@wilmerhale.com
david.cavanaugh@wilmerhale.com
yvonne.lee@wilmerhale.com
steven.horn@wilmerhale.com

Bruce Slayden
Tecuan Flores
Truman Fenton
SLAYDEN GRUBERT BEARD PLLC
bslayden@sgbfirm.com
tflores@sgbfirm.com
tfenton@sgbfirm.com

---

[4] Available at www.uspto.gov/patents/patent-trial-and-appeal-board/interim-process-director-review.

3

IPR2021-01229
Patent 7,523,373 B2

PATENT OWNER:

Babak Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Parham Hendifar
Patrick Maloney
Jason Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com

4

Petition for IPR2021-01229
U.S. Patent No. 7,523,373

IN THE

**UNITED STATES PATENT AND TRADEMARK OFFICE**

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————————

PATENT QUALITY ASSURANCE, LLC, and
INTEL CORPORATION,
Petitioners

v.

VLSI Technology, LLC
Patent Owner

—————————————

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

—————————————

**PATENT QUALITY ASSURANCE, LLC
MOTION FOR RECONSIDERATION OF DIRECTOR'S DECISION
DETERMINING ABUSE OF PROCESS, ISSUING SANCTIONS, ORDERING
PETITIONER PATENT QUALITY ASSURANCE, LLC TO SHOW CAUSE,
AND LIFTING STAY**

—————————————

Petitioner Patent Quality Assurance, LLC ("PQA") hereby moves the Director

to reconsider the Decision Determining Abuse of Process, Issuing Sanctions,

Ordering Petitioner Patent Quality Assurance, LLC to Show Cause, and Lifting Stay

("Sanction Decision") (Paper 101) because the Sanction Decision is based upon

manifest errors of law and fact.

Most pressing,[1] the dismissal and adverse inference sanctions imposed on

PQA are unlawful as not complying with the agency's own regulations governing

Board-imposed sanctions in IPRs. Time is of the essence, as the unlawful sanctions

affect PQA's procedural and due process rights as they relate at least to the

impending final written decision. Therefore, PQA requests (1) *immediate*

withdrawal of the dismissal and adverse inference sanctions, and (2) Office

compliance with the governing regulations before any sanctions are imposed (i.e.,

allowing PQA an opportunity to respond).

Specifically, the Sanction Decision does not comply with the Office's in-force

regulation that governs Board-imposed sanctions. 37 C.F.R. § 42.11(d)(3) requires

the Board (1) issue an order that "specifically describe[s]" the violative conduct and

---

[1] The Sanction Decision contains other errors of law and fact that PQA raised in its objections. PQA does not re-raise those issues here because the Sanction Decision overruled those objections; thus, rehearing is inappropriate.

1

the "specific sanction" and (2) provide the party an opportunity to show why that "specific sanction authorized by the Board should not be imposed." 37 C.F.R. § 42.11(d)(3). The Sanction Decision identifies for the first time:

- ***allegedly violative conduct***—e.g., exclusively engaging an expert witness and allegedly misrepresenting the nature of PQA's exclusive engagement (Sanction Decision at 3, 9–11, 43); and

- ***specific sanctions***—e.g., (1) dismissal; and (2) adverse inference that (a) PQA did not believe review of the '373 patent was necessary to instill confidence in the integrity of the patent system (*id.* at 43, 47); (b) PQA did not believe it may be sued for patent infringement and that fear of infringement did not motivate PQA to file its Petition (*id.* at 46); and (c) the sole reason PQA filed the Petition was for the improper purpose of extracting money from VLSI after VLSI's success before the jury (*id.* at 47, 48–50).

The Sanction Decision violated 37 C.F.R. § 42.11(d)(3) by not providing PQA with an opportunity to show why those "specific sanction[s] authorized by the Board should not be imposed." 37 C.F.R. § 42.11(d)(3).

This was a manifest error of law because agencies must follow their own regulations. *See Drumheller v. Dep't of Army*, 49 F.3d 1566, 1574 (Fed. Cir. 1995)

2

(collecting Federal Circuit cases holding government officers must follow their own regulations). Moreover, the Director's actions "seriously undermine the principle that agencies should provide regulated parties 'fair warning of the conduct [a regulation] prohibits or requires.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 157 (2012).

These errors resulted in manifestly unfair and unjust adverse inferences and an extreme sanction of dismissal (and potential attorney fee shifting). PQA therefore respectfully requests immediate withdrawal of the already-imposed sanctions and an opportunity to show why they should not be imposed.

January 11, 2023

*/s/ Truman H. Fenton*
Bruce W. Slayden II (Reg. No. 33,790)
Truman H. Fenton (Reg. 64,766)
Brian C. Banner (*Pro Hac Vice forthcoming*)

Slayden Grubert Beard PLLC
401 Congress Avenue, Suite 1650
Austin, Texas 78701
Attorneys for Petitioner, Patent Quality
Assurance LLC

3

# UNITED STATES PATENT AND TRADEMARK OFFICE

_____

# BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

OPENSKY INDUSTRIES, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

Case IPR2021-01056
Patent 7,523,373

_____

# PATENT OWNER'S PRELIMINARY SUR-REPLY

11036645

latest business venture.  OpenSky refused to offer Mr. Larocca for deposition, preventing exploration of these facts.  Plainly, the full story has not been told. OpenSky's untested claim that its affiliates were unaware of the litigation prior to the verdict should be discounted.

As to Factor 3, OpenSky concedes that it had both the prior POPR and institution decision available to it and does not dispute that it availed itself of those materials by adjusting its Petition to respond to VLSI's prior arguments.  POPR, 25.  The Board has repeatedly confirmed that such improper roadmapping "weighs strongly against institution."  POPR, 24 (citing cases).  As for Factor 5, OpenSky fancifully asserts that it "felt that patent system integrity demanded consideration of the prior art."  Reply, 5.  But Mr. Larocca's declaration is conspicuously silent concerning his motives, and OpenSky's proclamations of alleged disinterestedness are unsubstantiated, at best.  Regarding Factors 6 and 7, OpenSky again relies upon its false premise that *GP/Valve* only applies following merits denials.  The Board already expended extraordinary resources here and instituting would flood it with (and subject patent owners to) harassing challenges brought by fly-by-night LLC's facing no threat of litigation.  The *GP* factors uniformly favor denial.

## III.    The Reply Concedes Its Expert Declarations Are Hearsay.

Institution should also be denied because the Reply ***confirms*** it is based on hearsay.  OpenSky admits it refiled the Intel expert declarations without retaining

the declarants. Indeed, it *still* hasn't contacted them. Reply, 9. OpenSky asserts

that it will contact the witnesses "[p]ost-institution." *Id.* OpenSky contends that

had it contacted Intel's experts prior to filing it would indicate Intel is an RPI,

rendering the petition time-barred. *Id.* OpenSky's self-professed plan, thus, is to

wait till the matter is instituted and *then* convert Intel into an RPI, in a naked effort

to evade the § 315(b) bar. This plan would be still more reason for denial. Such

chicanery should be repudiated, not encouraged.

　　Critically, OpenSky does not dispute that the declarations are indeed

hearsay. POPR, 27-29. That alone is sufficient reason to deny institution. *Id.*

OpenSky's arguments to the contrary fall flat. OpenSky muses that expert

testimony is theoretically unnecessary (Reply, 8-9), ignoring its over 100 citations

to Dr. Singh's declaration and its reliance upon it for every limitation-at-issue.

POPR, 28. Similarly, its plan to "approach" PQA/Intel's experts post-institution is

doomed to fail. PQA had already indicated that it has "exclusively" retained the

experts. *Id.* OpenSky questions whether Dr. Singh is exclusively retained,

accusing PQA of violating its duty of candor and ethical obligations. Strong words

from OpenSky—whose own petitions did not disclose that it had not retained or

even contacted its declarants. And OpenSky's accusations are false. PQA publicly

filed its engagement letter with Dr. Singh, which provides that, "for the Duration

of this matter, you further agree you will not accept new consulting engagements

related to the Challenged Patent without [PQA's] prior written consent." Ex. 2037 [11/15/21 Singh Engagement] 2 (IPR2021-01229, Ex. 1034). PQA's attorney similarly testified to this fact. Ex. 2038 [Fenton-Decl.] ¶ 7 (IPR2021-01229, Ex. 1033). Thus, notwithstanding what OpenSky finds "unfathomable" (Reply, 10), Dr. Singh **has** been exclusively retained by PQA. OpenSky has not identified any reason to think it could secure the deposition of experts it has not contacted.

OpenSky next speculates that it (or VLSI) could subpoena the testimony of Drs. Singh and Hall-Ellis. But OpenSky does not provide any citation to any case where the Board authorized a party to seek a deposition of an ***expert*** under like circumstances. Even if the Board authorized a subpoena, it would have to be brought per 35 U.S.C. § 24, in a federal court empowered to quash subpoenas of "an unretained expert's opinion." FED. R. CIV. P. § 45(d)(3)(B)(ii). OpenSky points to no instances in which such a subpoena has been authorized by the Board, much less enforced by a court; it provides no explanation for how the lengthy subpoena process could work in an IPR's tight timeframe; and it offers no justification for why VLSI should be so materially prejudiced by its failures.

OpenSky next contends that it should be allowed to submit a substitute expert, citing *Corning*. Reply, 11. There, a substitution was permitted because its current expert contracted cancer. *Corning Optical Communications RF, LLC v. PPC Broadband, Inc.*, IPR2013-00347, Paper 18, 1-3 (PTAB Dec. 23, 2013). But

- 9 -

here, the problem is not that Dr. Singh is ill: it's that he was not retained or even

contacted before his testimony was filed.  OpenSky does not cite any authority

allowing a party to submit a new declaration because it failed to retain an expert.

*Contra Intelligent Bio-Systems v. Illumina Cambridge Ltd.,* 821 F.3d 1359, 1369

(Fed. Cir. 2016) (petitioners obligated "to make their case in their petition").

## IV.    The Reply Does Not Even Address The Totality Of The Circumstances.

OpenSky's Petition should be denied under *Fintiv* and *General Plastic/Valve*

and because it is founded upon hearsay.  These are each independently sufficient

reasons for denial.  While each of these bases stand alone, they are also mutually

reinforcing, and the totality of the circumstances overwhelmingly favors denial.

POPR, 30-31.  There is no comparison between the prejudice that VLSI would

suffer if instituted versus the lack of prejudice OpenSky would suffer if institution

is denied.  Where VLSI bore the extraordinary costs of litigating through trial,

OpenSky did nothing more than pick up Intel's Petition, revising it only to gain the

improper advantages of roadmapping.  It faces no infringement threat, found no

art, crafted no grounds, hired no witnesses, and prepared no testimony.  *Id.*

OpenSky simply has no response and no explanation for how the totality of the

circumstances might favor institution.

In accordance with the Board's and the Federal Circuit's precedents and the

purposes undergirding the AIA, institution should be denied.

Trials@uspto.gov                                    Paper No. 18
571-272-7822                             Date: December 23, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

OPENSKY INDUSTRIES, LLC,
Petitioner,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

———————————

IPR2021-01056
Patent 7,523,373 B2

———————————

Before THOMAS L. GIANNETTI, BRIAN J. MCNAMARA, and
JASON W. MELVIN, *Administrative Patent Judges*.

MELVIN, *Administrative Patent Judge*.

DECISION
Denying Institution of *Inter Partes* Review
35 U.S.C. § 314

## I.    INTRODUCTION

OpenSky Industries, LLC ("Petitioner") filed a Petition (Paper 2, "Pet.") requesting institution of *inter partes* review of claims 1–3, 5, 6, 9–11, and 13 ("the challenged claims") of U.S. Patent No. 7,523,373 B2 (Ex. 1001, "the '373 patent"). VLSI Technology LLC ("Patent Owner") filed a Preliminary Response. Paper 9 ("Prelim. Resp."). As authorized, Petitioner filed a Preliminary Reply (Paper 14 ("Prelim. Reply")), and Patent Owner filed a Preliminary Sur-Reply (Paper 17 ("Prelim. Sur-Reply")). As also authorized, Patent Owner filed a Supplemental Brief regarding *In re Vivint, Inc.*, 14 F.4th 1342 (Fed. Cir. 2021). Paper 12. Petitioner filed an opposition brief. Paper 16.

### A.    Related Matters

The parties both identify the following matter related to the '373 patent: *VLSI Technology LLC v. Intel Corporation*, No. 6:19-cv-00254-ADA (consolidated as 1:19-cv-00977) (W.D. Tex.) (trial concluded with jury verdict). Pet. 4; Paper 5. Patent Owner identifies the following additional matters: *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00057 (W.D. Tex.); *VLSI Tech. LLC v. Intel Corp.*, No. 6:21-cv-00299 (W.D. Tex.); *Intel Corp. v. VLSI Tech. LLC*, IPR2020-00158 (PTAB) (on appeal to Federal Circuit, No. 21-1616). Paper 5.

### B.    Real Parties in Interest

Petitioner identifies only itself as the real party in interest. Pet. 4. Patent Owner identifies VLSI Technology LLC and CF VLSI Holdings LLC as real parties in interest. Paper 5.

IPR2021-01056
Patent 7,523,373 B2

### C.   THE '373 PATENT

The '373 patent is titled Minimum Memory Operating Voltage Technique. Ex. 1001, code (54). It describes a method of determining the minimum operating voltage for integrated-circuit memory, storing the value of that voltage in nonvolatile memory, and using the value to determine when an alternative power-supply voltage may be switched to the memory or ensuring that the minimum operating voltage is otherwise met. *Id.*, code (57).

### D.   CHALLENGED CLAIMS

Challenged claim 1 is reproduced below:

1.   A method, comprising:

   providing an integrated circuit with a memory;

   operating the memory with an operating voltage;

   determining a value of a minimum operating voltage of the memory;

   providing a non-volatile memory (NVM) location;

   storing the value of the minimum operating voltage of the memory in the NVM location;

   providing a functional circuit on the integrated circuit exclusive of the memory;

   providing a first regulated voltage to the functional circuit;

   providing a second regulated voltage, the second regulated voltage is greater than the first regulated voltage;

   providing the first regulated voltage as the operating voltage of the memory when the first regulated voltage is at least the value of the minimum operating voltage; and

   providing the second regulated voltage as the operating voltage of the memory when the first regulated voltage is less than the value of the minimum operating voltage, wherein while the second regulated voltage is provided

3

IPR2021-01056
Patent 7,523,373 B2

> as the operating voltage of the memory, the first
> regulated voltage is provided to the functional circuit.

Ex. 1001, 13:7–28. Claims 9 and 16 are independent and recite limitations

similar to claim 1. *Id.* at 13:59–14:15, 14:40–62.

### E.   PRIOR ART AND ASSERTED GROUNDS

Petitioner asserts the following grounds of unpatentability:

| Claim(s) Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 3, 5, 6, 9–11, 13 | 103 | Harris,[1] Abadeer,[2] Zhang[3] |
| 2, 11 | 103 | Harris, Abadeer, Zhang, Cornwell[4] |

Pet. 6. Petitioner relies also on the Declaration of Adit Singh, Ph.D.

(Ex. 1002) and the Declaration of Sylvia D. Hall-Ellis, Ph.D. (Ex. 1027).

## II.   ANALYSIS

Patent Owner argues that Petitioner relies on expert declarations filed

by Intel in another proceeding. Accordingly, unless cross-examination is

available, those declarations are hearsay in this proceeding.

Prelim. Resp. 27.[5]

The declarations of Dr. Singh (Ex. 1002) and Dr. Hall-Ellis

(Ex. 1027) were prepared for and filed in a prior IPR proceeding, *Intel*

*Corporation v. VLSI Technology LLC*, IPR2020-00158 ("the Intel IPR").

The Board denied institution in the Intel IPR. IPR2020-00158, Paper 16

---

[1] US 5,867,719, issued Feb. 2, 1999 (Ex. 1003).

[2] US Pub. 2006/0259840 A1, published Nov. 16, 2006 (Ex. 1004).

[3] US Pub. 2003/0122429 A1, published July 3, 2003 (Ex. 1005).

[4] US 7,702,935 B2, issued Apr. 20, 2010 (Ex. 1006).

[5] Fed. R. Evid. 804(b)(1) provides a hearsay exception for former testimony
offered against a party who had an "opportunity and similar motive" to
develop it by cross-examination. That does not apply here.

IPR2021-01056
Patent 7,523,373 B2

(denying institution), Paper 20 (denying rehearing). Petitioner filed
Dr. Singh's and Dr. Hall-Ellis's declarations here without change, as
reflected by the title pages indicating the Intel IPR. *See* Exs. 1002, 1027.

Patent Owner argues that Petitioner will be unable to produce its
declarants for cross examination, and therefore their statements should be
given little weight in this proceeding.[6] Prelim. Resp. 27–29. In that regard,
Patent Owner relies on statements in a petition challenging the '373 patent
filed by another party, Patent Quality Assurance ("PQA"), in
IPR2021-01229 ("the PQA IPR"), in which PQA asserts that it has
"'exclusively' engaged Dr. Singh and Dr. Hall-Ellis." *Id.* at 28–29 (quoting
IPR2021-01229, Paper 1, 4–5).[7] Since filing its petition, PQA has corrected
itself to confirm that it has an exclusive arrangement with Dr. Singh but not
with Dr. Hall-Ellis. IPR2021-01229, Paper 8, 8 n.2 (stating that the
petitioner in that case "erroneously claimed exclusivity with Dr. Hall-Ellis."
(citing IPR2021-01229, Ex. 1033 ¶ 9); *id.*, Ex. 1034 (engagement agreement
between PQA and Dr. Singh)). Thus, we consider only the effect of
Dr. Singh's agreement with PQA.

Petitioner's Preliminary Reply addresses Patent Owner's arguments,
and submits that we should not decline institution on the basis of Dr. Singh's
expert declaration for a number of reasons. First Petitioner submits that
expert testimony is not necessary in every case. Prelim. Reply 8–9. That
argument is beside the point. Whether it is necessary or not, the Petition

---

[6] Under our rules, cross examination of declaration testimony of retained
  experts is authorized as mandatory discovery. 37 C.F.R. § 42.51(b)(1)(ii).
[7] The PQA IPR was filed July 7, 2021, and the institution decision in that
  proceeding is due by January 27, 2021.

relies on expert support,[8] and Petitioner has not explained why such support is unnecessary. Rather that retaining an expert who would be available for cross examination, Petitioner chose to rely on Dr. Singh's declaration throughout the Petition. Having made that choice, it strains credibility for Petitioner to say that its reliance on Dr. Singh's testimony was, after all, unnecessary.

In the Preliminary Response, Patent Owner raises multiple factual disputes that may depend on more than the references themselves—Patent Owner relies on its own expert declaration to dispute Petitioner's assertions. *See* Prelim. Resp. 33–41 (disputing Harris's low-power embodiment and how it would be combined with Zhang's voltage regulators) (citing Ex. 2002 ¶¶ 23–34, 46–52, 78–82, 85–89), 42 (disputing Petitioner's support for combing Harris's low-power embodiment with Abadeer and Cornwell) (citing Ex. 2002 ¶¶ 63–66), 42–46 (discussing Harris's failure mode, including how a skilled artisan would understand the disclosures, and how it would be combined with Zhang) (citing Ex. 2002 ¶¶ 91, 92, 96, 97), 47–52 (discussing the relative voltages of Harris's supplies and how skilled artisans would read Harris in light of related disclosures) (citing Ex. 2002 ¶¶ 93, 98–100), 55–59 (asserting the Petition relies on multiple of Harris's embodiments) (citing Ex. 2002 ¶¶ 35–39, 41–43, 59–72). While some of the disputes may turn on plain disclosures in the prior art, the Petition cites to Dr. Singh's declaration in some instances as the sole support for an assertion. *See* Pet. 26–28 (justifying combining Abadeer with Harris), 30–33 (justifying combining Zhang with Harris). We do not address those disputes

---

[8] Patent Owner asserts that the Petition contains "over 100 citations to Dr. Singh's declaration." Prelim. Sur-Reply 8.

IPR2021-01056
Patent 7,523,373 B2

in this decision, but they confirm the potential significance of expert testimony here.

Petitioner contends further that it will seek Dr. Singh's cooperation if trial is instituted. Prelim. Reply 9. That suggestion, however, stands at odds with Dr. Singh's agreement to work exclusively with PQA. *See* IPR2021-01229, Ex. 1033 (declaration describing PQA's engagement of Dr. Singh), Ex. 1034 (engagement agreement between PQA and Dr. Singh). Petitioner submits that because Dr. Singh submitted his declaration in the Intel IPR and in the PQA IPR, "[i]t is unfathomable that a witness who submits two declarations would refuse to testify." Prelim. Reply 10. But that argument ignores that Dr. Singh has agreed to work exclusively with PQA, which has not given any indication that it would release Dr. Singh from his agreement. Moreover, we have no evidence from Dr. Singh that he would be willing to testify here. Without some factual support to demonstrate that it reasonably expects Dr. Singh to cooperate, in light of the exclusive agreement with PQA, Petitioner's assertion is speculation and does not demonstrate sufficiently that Dr. Singh would likely participate in this proceeding.

Petitioner challenges PQA's assertion of its exclusive agreement with Dr. Singh as "vague and ethically questionable" (*id.* at 9–10). This is more speculation. As noted above, PQA has produced its agreement with Dr. Singh (IPR2021-01229, Ex. 1034) and we have no basis to question the agreement's legitimacy. Petitioner allowed this unusual situation by relying on a prior declaration by Intel's expert, rather than retaining its own expert for a new declaration. Whether the agreement with Dr. Singh complies with ethical rules and whether it permits Dr. Singh to testify here are matters not before us. Moreover, they may present issues of contract law for the courts

IPR2021-01056
Patent 7,523,373 B2

to decide, which may cause delay and prevent us from meeting our statutory deadlines, were we to institute a trial with the issues unresolved.

Petitioner argues next that the Board can allow a substitute witness, citing *Corning Gilbert Inc. v. PPC Broadband, Inc.*, IPR2013-00347, Paper 18. That nonprecedential case does not support Petitioner. In *Corning Gilbert*, the panel considered an already-instituted proceeding in which a willing declarant was diagnosed with cancer and appeared unlikely to be available for a deposition. IPR2013-00347, Paper 18, 2. The panel permitted the petitioner there to secure an alternative declarant who would execute the same declaration as the original declarant. *Id.* at 3. Here, the circumstances are different. This case is also distinguished from the circumstances in *Google LLC, v. Hammond Development Int'l, Inc.*, IPR2020-00020, Paper 18 (PTAB July 2, 2020). There, prior to institution, Petitioner certified that, for reasons unrelated to the merits of the matter, it could no longer work with the expert whose declaration was filed in support of the petition (*see id.*, Paper 13). The Board permitted Petitioner to substitute another expert who executed a declaration that was in substance the same as that of the previous expert. *See id.*, Paper 18. Petitioner has not proposed such an alternative in this case.

While departing from the Board's usual procedure may be justified by unforeseen circumstances that arise with no warning and at no fault of the party, Petitioner has placed itself in this situation by relying on another party's expert declaration. There is no indication that Petitioner ever spoke to Dr. Singh or attempted to retain him for this proceeding or secure his availability for cross examination before filing his declaration. Under these circumstances we see no basis for permitting Petitioner to substitute for Dr. Singh.

IPR2021-01056
Patent 7,523,373 B2

We conclude that the circumstances here do not justify instituting review with the mere expectation that Petitioner will find an acceptable substitute declarant once trial is instituted.

Petitioner argues that the best approach would be to institute review first and consider Patent Owner's objections later. Prelim. Reply 11 (distinguishing cases cited by Patent Owner). We agree that, under normal circumstances, Patent Owner's objections might be addressed in a trial. However, this is not a normal situation. Other than speculation, Petitioner has not provided any showing that Dr. Singh would be released from his obligation to PQA. Here, the facts suggest that this would be unlikely, for Patent Owner has shown that Dr. Singh has agreed to work exclusively for a party other than Petitioner, and Petitioner has not provided any factual support from Dr. Singh or PQA. There is no indication in the record that Petitioner has even met Dr. Singh, much less discussed what he might do if released from his agreement with PQA.

Given the facts surrounding Dr. Singh's testimony, we do not consider him likely to be a willing participant in this proceeding. It is Petitioner's burden to show unpatentability, and in support of its case Petitioner has brought forth the testimony of an expert that Petitioner likely cannot produce for cross-examination and would likely be excluded.[9] Under the circumstances, we determine that the Petition does not warrant institution.

---

[9] Patent Owner's suggestion that the Board issue a subpoena to compel Dr. Singh's testimony has no merit. Our rules and procedures place the responsibility of producing Dr. Singh on Petitioner. Consolidated Trial Practice Guide 23 (November 2019); 37 C.F.R. § 42.53(g).

IPR2021-01056
Patent 7,523,373 B2

## III. CONCLUSION

Having weighed the parties' arguments and the full record, we conclude that the Petition does not warrant institution. *See* Consolidated Trial Practice Guide, 58 ("There may be other reasons besides the 'follow-on' petition context where the 'effect . . . on the economy, the integrity of the patent system, the efficient administration of the Office, and the ability of the Office to timely complete proceedings,' 35 U.S.C. § 316(b), favors denying a petition even though some claims meet the threshold standards for institution under 35 U.S.C. §§ 314(a), and 324(a)."). Accordingly, we deny institution.

## IV. ORDER

Accordingly, it is

ORDERED that, pursuant to § 314(a), no *inter partes* review of the '373 patent is instituted in this proceeding.

10

IPR2021-01056
Patent 7,523,373 B2


PETITIONER:

Andrew T. Oliver
Vinay V. Joshi
AMIN, TUROCY & WATSON LLP
aoliver@atwiplaw.com
vjoshi@thepatentattorneys.com


PATENT OWNER:

Baback Redjaian
IRELL & MANELLA LLP
bredjaian@irell.com

Kenneth J. Weatherwax
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
Jason C. Linger
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com
linger@lowensteinweatherwax.com


11

Director_PTABDecision_Review@uspto.gov
571-272-7822
Paper No. 121
Date: December 22, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

DECISION
Denying Request for Rehearing, Affirming Decision on Remand,
Dismissing Petitioner OpenSky Industries, LLC,
Ordering Patent Owner to Show Cause, and Lifting Stay

---

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.    INTRODUCTION

On October 4, 2022, I issued a Director review decision (Paper 102, "Decision") determining that Petitioner OpenSky Industries, LLC ("OpenSky") abused the *inter partes* review ("IPR") process by filing an IPR petition in an attempt to extract payment from Patent Owner VLSI Technology LLC ("VLSI") and joined Petitioner Intel Corporation ("Intel"), and by expressing a willingness to abuse the process in order to do so. *OpenSky Indus., LLC v. VLSI Tech. LLC*, IPR2021-01064, Paper 102, 3 (PTAB Oct. 4, 2022). I sanctioned OpenSky by precluding OpenSky from actively participating in the underlying proceeding, and I elevated Intel to the role of lead petitioner, pending further review of the merits of the Petition. *Id.* at 47.

## II.    DISMISSAL OF OPENSKY UNDER 37 C.F.R. § 41.12(B)(8)

In the Decision, I determined that OpenSky, through its counsel, abused the IPR process by filing this petition in an attempt to extract payment from VLSI and joined Petitioner Intel, and expressed a willingness to abuse the process in order to do so. In addition to abusing the IPR process, I further determined that OpenSky engaged in further sanctionable conduct including discovery misconduct, violation of an express order, and unethical conduct. 37 C.F.R. § 42.12(a)(6).

At the time of my Decision, I did not dismiss OpenSky from the proceeding because the issue before me was one of first impression and I needed additional time to determine the appropriate course of action under such extraordinary circumstances. Now having the benefit of additional time to consider this case, as well as *Patent Quality Assurance, LLC, v. VLSI Tech. LLC*, IPR2021-01229, I conclude that the best course of action is to

2

IPR2021-01064
Patent 7,725,759 B2

dismiss OpenSky from this case to ensure that OpenSky does not benefit from its abuse of the IPR process. Accordingly, I dismiss OpenSky from this proceeding, subject to the Director, Board, and USPTO retaining jurisdiction over the issuance of sanctions. *See* 37 C.F.R. § 42.12(b)(8).

## III.    SHOW CAUSE FOR FAILURE TO COMPLY WITH 37 C.F.R § 42.11

In its Rehearing Request (Paper 113 ("Rehearing Request" or "Req. Reh'g")), VLSI advances several arguments as to the Board panel's compelling merits determination in its Remand Decision (Paper 107 ("Remand Decision")). Specifically, VLSI argues that the Remand Decision is inconsistent with the Board's Institution Decision (Paper 17 ("Institution Decision")), ignores factual issues identified by the Institution Decision, and relies on inadmissible hearsay. *See generally* Req. Reh'g. I am not persuaded by these arguments for the reasons I detail below, and furthermore I admonish VLSI and its counsel for supporting their arguments with misleading statements of law and fact in contravention of their obligations under 37 C.F.R. § 11.303 (Candor Toward the Tribunal) ("A practitioner shall not knowingly: (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the practitioner. . . ."); 37 C.F.R. § 42.11(a), (c). This is not the first time VLSI has made misleading statements of law or fact in an attempt to mislead me or the Board.[2]

---

[2] From VLSI's initial appearance, VLSI misrepresented the Federal Circuit's case law on secondary indicia of obviousness. *See* Prelim. Resp. 69–70 ("Significant for our purposes, both the Federal Circuit and the Board have relied upon an infringement verdict to find objective indicia of non-

3

For this reason, VLSI is ordered to show cause as to why it should not be ordered to pay Intel the reasonable attorney fees they incurred responding to VLSI's Rehearing Request. 37 C.F.R. § 42.11(d)(3) ("On its own, the Board may order an attorney, registered practitioner, or party to show cause why conduct specifically described in the order has not violated paragraph (c) of this section and why a specific sanction authorized by the Board should not be imposed."). While I recognize the amount of these fees may not be significant, I want to make clear to the parties and the public that we will hold attorneys and parties accountable for the ethical obligations they owe to the Board.

Within two weeks of this Decision, VLSI and Intel shall each file a 5-page paper addressing whether an award of attorney fees is appropriate as a sanction for VLSI's misleading statements of law and fact. Intel shall also identify its attorney fees incurred in responding to VLSI's Rehearing Request and may submit such evidence as necessary to support that identification. Within one week of the filing of such papers, VLSI and Intel may each file a 3-page paper in response.

---

obviousness, such as commercial success."). Further, in Patent Owner's Request for Reconsideration of my October 4, 2022 Decision, Paper 106 at 11–15, in arguing that having the same Board panel decide both compelling merits at institution and the final determination on patentability in the final written decision violated the Due Process Clause, VLSI misrepresented the holdings of the Federal Circuit and Supreme Court cases it cited. *See* Order Denying Request for Reconsideration, Paper 114 at 7–10 ("The cases on which VLSI relies do not stand for the positions for which VLSI cites them.").

4

Director_PTABDecision_Review@uspto.gov                    Paper No. 102
571-272-7822                                     Date: October 4, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE OFFICE OF THE UNDER SECRETARY OF COMMERCE
FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED
STATES PATENT AND TRADEMARK OFFICE

_____

OPENSKY INDUSTRIES, LLC,
INTEL CORPORATION,
Petitioners,

v.

VLSI TECHNOLOGY LLC,
Patent Owner.

_____

IPR2021-01064[1]
Patent 7,725,759 B2

_____

Before KATHERINE K. VIDAL, *Under Secretary of Commerce for
Intellectual Property and Director of the United States Patent and
Trademark Office*.

DECISION
Determining Abuse of Process, Issuing Sanctions, and Remanding to Patent
Trial and Appeal Board Panel for Further Proceedings

_____

[1] Intel Corporation ("Intel"), which filed a petition in IPR2022-00366, has
been joined as a party to this proceeding.

IPR2021-01064
Patent 7,725,759 B2

## I.    INTRODUCTION

On December 23, 2021, the Patent Trial and Appeal Board ("PTAB" or "Board") issued a Decision granting institution of an *inter partes* review ("IPR") of claims 1, 14, 17, 18, 21, 22, and 24 ("challenged claims") of U.S. Patent No. 7,725,759 B2 ("the '759 patent"), based on a Petition filed by OpenSky Industries, LLC ("OpenSky").  Paper 17 ("Institution Decision"). VLSI Technology LLC ("VLSI" or "Patent Owner") subsequently filed a rehearing request and a request for Precedential Opinion Panel ("POP") review.  *See* Paper 20 ("Req. Reh'g"); Ex. 3002.  I initiated Director review of the Board's Institution Decision on June 7, 2022.  Paper 41.  Concurrent with my Order, the POP dismissed the rehearing and POP review requests. Paper 42.  On June 8, 2022, the Board joined Intel as a Petitioner in this case.  Paper 43.

I explained that Director review would address questions of first impression as to what actions the Director, and by delegation the Board, should consider when addressing allegations of abuse of process or conduct that otherwise thwarts the goals of the United States Patent and Trademark Office ("USPTO" or "Office") and/or the America Invents Act ("AIA"). Paper 47, 7.  Due to the importance of the issues to the Office in fulfilling its mission, I ordered the parties to respond to interrogatories and to exchange information ("Mandated Discovery") to assist me in evaluating these issues of first impression.  *Id.* at 8–11; *see also* Paper 51.

For the reasons below, I determine that OpenSky has engaged in discovery misconduct by failing to comply with my Order for interrogatories and Mandated Discovery.  *See* Paper 47, 8–11.  Failure to comply with an order is sanctionable.  37 C.F.R. § 42.12(a)(1).  Accordingly, when

2

analyzing whether OpenSky's conduct amounted to an abuse of process, I apply a negative inference and hold facts to have been established adverse to OpenSky. *See* 37 C.F.R. § 42.12(b)(1) (providing that sanctions may include "[a]n order holding facts to have been established in the proceeding"); Paper 47, 10 ("Any attempt to withhold evidence based on a narrow interpretation of the requests will be reviewed in conjunction with any other subject conduct and may, alone or in combination with other conduct, be sanctionable."); Paper 52, 4 ("As highlighted in the Scheduling Order, failure to comply with my Order may be sanctionable. . . . For example, and without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding.'").

Based on the evidence of record and the facts held to have been established, I determine that OpenSky, through its counsel, abused the IPR process by filing this IPR in an attempt to extract payment from VLSI and joined Petitioner Intel, and expressed a willingness to abuse the process in order to extract the payment. OpenSky's behavior in this proceeding is entirely distinguishable from conventional settlement negotiations that take place in an adversarial proceeding. I also find that OpenSky engaged in abuse of process and unethical conduct by offering to undermine and/or not vigorously pursue this matter in exchange for a monetary payment. *See Woods Servs., Inc. v. Disability Advocs., Inc.*, 342 F. Supp. 3d 592, 606 (E.D. Pa. 2018) ("The essence of an abuse of process claim is that proceedings are used for a purpose not intended by the law."). Each aspect of OpenSky's conduct—discovery misconduct, violation of an express order, abuse of the IPR process, and unethical conduct—taken alone, constitutes sanctionable conduct. 37 C.F.R. § 42.12(a)(6). Taken together,

IPR2021-01064
Patent 7,725,759 B2

the behavior warrants sanctions to the fullest extent of my power. Not only are such sanctions proportional to the conduct here, but they are necessary to deter such conduct by OpenSky or others in the future. *See* 37 C.F.R. § 42.11(d)(4).

Given OpenSky's conduct, from this day forward OpenSky and their counsel are precluded from actively participating in the underlying proceeding. The conduct of the individual attorneys in this case might also rise to the level of an ethical violation under the rules of their respective bars. OpenSky is precluded from filing further papers into the record or presenting further argument or evidence in the underlying proceeding or on Director review unless expressly instructed to do so by me or the Board. *See* 37 C.F.R. §§ 42.12(b)(2–4) (providing that sanctions include "[a]n order expunging or precluding a party from filing a paper"; "[a]n order precluding a party from presenting or contesting a particular issue"; and "[a]n order precluding a party from requesting, obtaining, or opposing discovery").

Moreover, I order OpenSky to show cause as to why it should not be ordered to pay compensatory damages to VLSI, including attorney fees, to compensate VLSI for its time and effort in this proceeding. I further order OpenSky to address the appropriate time period for which any fees should be assessed. *See* 37 C.F.R. § 42.12(b)(6) (providing that sanctions include "[a]n order providing for compensatory expenses, including attorney fees"). As set forth below, I order briefing from OpenSky and VLSI on this issue.

Lastly, as to the underlying proceeding, for the reasons articulated below, I am remanding for the Board to determine, within two weeks of the date of this Order, whether OpenSky's Petition, based only on the record before the Board prior to institution, presents a compelling, meritorious

4

IPR2021-01064
Patent 7,725,759 B2

### A.    *Intel's Prior Petitions and Litigation*

After being sued by VLSI, Intel filed two petitions for IPR, challenging claims of the '759 patent.  IPR2020-00106, Paper 3; IPR2020-00498, Paper 4.  Considering the factors set forth in the Board's precedential decision in *Apple Inc. v. Fintiv, Inc.*, IPR2020-00019, Paper 11 (PTAB Mar. 20, 2020) (precedential) ("the *Fintiv* factors"), the Board exercised discretion to deny institution of both proceedings.  IPR2020-00106, Paper 17, 13; IPR2020-00498, Paper 16, 10.  In particular, the Board highlighted "the advanced stage of the Western District of Texas litigation, a currently scheduled trial date approximately seven months before the would-be deadline for a final written decision, and the overlap between the issues." IPR2020-00106, Paper 17, 13; *see* IPR2020-00498, Paper 16, 6, 10.  The Board did not address the merits of the Petition, other than determining "that the merits of the Petition[s] do not outweigh the other *Fintiv* factors." IPR2020-00106, Paper 17, 13.  Notably, the Board issued these decisions prior to the issuance of the Memorandum, which clarifies that "the PTAB considers the merits of a petitioner's challenge when determining whether to institute a post-grant proceeding in view of parallel district court litigation" and that "compelling, meritorious challenges will be allowed to proceed at the PTAB even where district court litigation is proceeding in parallel." Memorandum at 4–5.

Intel requested POP review of the Board's decisions, which was denied.  IPR2020-00106, Papers 19 and 20; IPR2020-00498, Papers 19 and 20.  The trial in the Western District of Texas began on February 22, 2021, months after the date that was presented to the Board for the discretionary denial analysis.  *See* Ex. 2025; *cf.* Memorandum at 8 ("A court's scheduled

IPR2021-01064
Patent 7,725,759 B2

trial date [] is not by itself a good indicator of whether the district court trial
will occur before the statutory deadline for a final written decision."). The
trial resulted in a jury verdict finding that Intel neither literally nor willfully
infringed the '759 patent, but did infringe claims 14, 17, 18, and 24 under
the doctrine of equivalents. Ex. 1027, 2–4. The jury also found that Intel
had not proven by clear and convincing evidence that claims 14, 17, 18, and
24 were invalid as anticipated. *Id.* at 5. The invalidity basis presented to the
jury during the trial did not overlap with the grounds for unpatentability in
Intel's Petitions. Institution Decision 8. The jury awarded VLSI $675
million in damages for infringing the '759 patent.[3] *Id.* at 6. Intel appealed
to the Federal Circuit, and that appeal is currently pending as *VLSI
Technology LLC v. Intel Corporation*, No. 22-1906 (Fed. Cir. June 15,
2022). The appeal will not resolve the patentability issues pending before
the Board.

### B.    OpenSky's Petition

On June 7, 2021, OpenSky filed the Petition for IPR in this
proceeding, challenging claims 1, 14, 17, 18, 21, 22, and 24 of the
'759 patent. Paper 2 ( "Pet."). OpenSky also filed a Petition for IPR,
challenging claims 1–3, 5, 6, 9–11, and 13 of U.S. Patent No. 7,523,373 B2
("the '373 patent"). IPR2021-01056, Paper 2. OpenSky copied extensively
from Intel's two earlier petitions. Ex. 2024 (redline comparison of portions
of the Petition in this IPR with portions of Intel's petitions in IPR2020-

---

[3] Concurrently, the jury found that Intel had also infringed U.S. Patent
No. 7,523,373 B2 ("the '373 patent"), owned by VLSI, and awarded VLSI
$1.5 billion in damages. Ex. 1027, 6. The '373 patent is the subject of
IPR2021-01229.

7

IPR2021-01064
Patent 7,725,759 B2

### B.    *OpenSky's Failure to Comply with Mandatory Discovery*

OpenSky failed to comply with the discovery requirements set forth in the Scheduling Order by: (1) refusing to provide confidential documents to the other parties in the proceeding, or instead, a privilege log listing privileged documents withheld for in camera review; and (2) failing to respond in good faith to the interrogatories, including with supporting evidence. Paper 47, 8–10. Each of these failures to comply is independently sanctionable. *Id.* at 10.

### 1.    *OpenSky refused to produce confidential documents under seal, or a privilege log of what was not produced*

As explained above, the deadline for the exchange of documents and communications was August 4, 2022. On August 11, 2022, VLSI requested in camera review, as to the production made by OpenSky. Paper 62. VLSI asserts that it:

> cannot identify with specificity documents for in camera review in OpenSky's responsive documents, because OpenSky has (i) failed to produce internal documents; (ii) failed to produce any documents it deems either confidential or highly-confidential under the Director's modified direct protective order, Ex. 3011; and (iii) failed to provide any privilege log in this matter, each in violation of the Director's Orders (see Papers 47, 51, and 52).

*Id.* at 1. VLSI asserts that "OpenSky produced approximately 170 documents, all 'nonconfidential,' largely consisting of public filings and correspondence already available to all parties." *Id.* at 3. VLSI contends that the produced non-public documents include only emails from OpenSky's lead counsel, Andrew Oliver, and "a single internal communication." *Id.* at 3–4. Notably, VLSI asserts that "OpenSky has not logged a single document." *Id.* at 4. VLSI argues that, due to OpenSky's

19

IPR2021-01064
Patent 7,725,759 B2

The Director[11] has the authority to impose sanctions against a party for misconduct.  35 U.S.C. § 316(a); 37 C.F.R. § 42.12(a); *see Apple Inc. v. Voip-Pal.com, Inc.*, 976 F.3d 1316, 1323 (Fed. Cir. 2020); *see also* AIPLA, 9; BAS, 6–7; Unified, 3–5, 12–17; Naples, 6.  Though 37 C.F.R. § 42.12(a) uses the permissive language "may" ("The Board may impose a sanction against a party for misconduct"), the sanctity of practice before the Board is best preserved by imposing sanctions for misconduct as a matter of course absent extenuating circumstances.

Whether sanctions are appropriate is a highly fact-specific question, and the relevant considerations will vary from case to case.  Prior sanction contexts have considered:

(1) whether the party has performed conduct warranting sanctions;

(2) whether that conduct has caused harm (to, for example, another party, the proceedings, or the USPTO); and

(3) whether the potential sanctions are proportionate to the harm.

*See, e.g.*, *R.J. Reynolds Vapor Co. v. Fontem Holdings 1 B.V.*, IPR2017-01318, Paper 16 at 5 (PTAB Aug. 6, 2018).  The Director may impose sanctions, for example, for "[f]ailure to comply with an applicable rule or order in the proceeding"; "[a]buse of discovery"; "[a]buse of process"; or "[a]ny other improper use of the proceeding, including actions that harass or cause unnecessary delay or an unnecessary increase in the cost of the proceeding."  37 C.F.R. §§ 42.12(a)(1), (5), (6), (7).  Sanctions may include, for example, "[a]n order holding facts to have been established in the

---

[11] The Director of the USPTO, the Deputy Director of the USPTO, the Commissioner for Patents, the Commissioner for Trademarks, and the Administrative Patent Judges constitute the PTAB.  35 U.S.C. § 6(a). Accordingly, the Director may levy sanctions as a member of the Board.

26

IPR2021-01064
Patent 7,725,759 B2

proceeding"; "[a]n order precluding a party from filing a paper"; and "[a]n order providing for compensatory expenses, including attorney fees." *Id.* §§ 42.12(b)(1), (2), (6). Additionally, the Director may issue sanctions not explicitly provided in 37 C.F.R. § 42.12(b). *See Voip-Pal.com*, 976 F.3d at 1323–24. Any sanction must be commensurate with the harm caused. *See R.J. Reynolds*, IPR2017-01318, Paper 16 at 5.

As a result of OpenSky's failure to comply with my ordered Mandated Discovery provisions, I, VLSI, and Intel do not have a complete record to fully examine OpenSky's assertion that it has not committed an abuse of the IPR process, or to evaluate whether its allegation of "harassment" is supported.

OpenSky should not be allowed to profit from its discovery misconduct. Accordingly, I determine that the proper sanction is to hold disputed facts as established against OpenSky. 37 C.F.R. § 42.12(b)(1); Paper 52, 4 (warning parties that "failure to comply with my Order may be sanctionable," and specifically warning that "without limitation, sanctions may include '[a]n order holding facts to have been established in the proceeding" under 37 C.F.R. § 42.12(b)(1)). The Federal Circuit has approved this remedy of adverse inference in the context of district court litigation, stating that "when 'the alleged breach of a discovery obligation is the non-production of evidence, a district court has broad discretion in fashioning an appropriate sanction, including the discretion to . . . proceed with a trial and give an adverse inference instruction.'" *Regeneron Pharms., Inc. v. Merus N.V.*, 864 F.3d 1343, 1363 (Fed. Cir. 2017) (quoting *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir. 2002)).

27

IPR2021-01064
Patent 7,725,759 B2

and pursued settlement negotiations, and not vice versa (*see* Paper 71, 13–16; Paper 91, 4–9 (*see* Exs. 1063, 1065)), I draw an adverse inference and find that OpenSky initiated settlement negotiations. *See Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("Even the mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that" the evidence would have exposed facts unfavorable to the non-disclosing party.).  Typically, the query about who initiated settlement talks does not raise questions about abuse of the IPR process.  *See* Patent Trial and Appeal Board Consolidated Trial Practice Guide ("Consolidated Practice Guide")[12] at 86 ("There are strong public policy reasons to favor settlement between the parties to a proceeding").  However, the adverse inference here that OpenSky initiated settlement negotiations is relevant to the larger question of whether OpenSky's pursuit of the IPR constitutes improper, abusive conduct.

After institution, OpenSky contacted Intel about collaborating in the IPR.  *See* Paper 84, 6 (citing Ex. 2095, 2096); Paper 66, 11–12 (citing Ex. 1520).  OpenSky's counsel told Intel's counsel that "VLSI has already reached out to OpenSky to discuss resolving the newly instituted IPR," but "[w]hile OpenSky remains open to discussing this matter with VLSI, OpenSky would prefer to discuss the matter directly with Intel." *Id.* (emphasis omitted). Specifically, OpenSky sought monetary payment from Intel in return for success in the IPR.  Paper 66, 12 (citing Exs. 1520, 1521).  "Intel rejected OpenSky's request and stated that it would not make

---

[12] Available at www.uspto.gov/TrialPracticeGuideConsolidated.

30

discussions with Intel. Indeed, after Intel was joined to this proceeding (IPR2022-00366, Paper 43), it became clear that OpenSky had no interest in meaningfully pursuing the unpatentability grounds in its Petition.[14] Ex. 1524. For example, OpenSky proposed that it might rest on "its initial filings and may decide not to depose VLSI's expert or file a reply brief." *Id.* OpenSky allegedly offered Intel the leading role in the case, but only if Intel compensated OpenSky "for its prior work in the IPR" as well as "additional remuneration." *Id.* OpenSky did not notice VLSI's expert for deposition until after Intel proposed going to the Board to seek a more active role. Paper 44. Even then, OpenSky's counsel noticed the deposition for July 7, 2022—a mere four days before its reply brief was due, leaving little time to incorporate VLSI's expert testimony into the brief. Ex. 1525. In addition, OpenSky's counsel indicated they were scheduled to be in trial between June 24–30, 2022, leaving little time to prepare the reply brief (or prepare for the deposition). *Id.*

Given OpenSky's representations, Intel offered to help "with Dr. Conte's deposition and the petitioner's reply," and suggested that OpenSky seek a two-week extension "to give more time to integrate the deposition materials into the petitioner's reply." Ex. 1526. OpenSky's counsel proceeded with Dr. Conte's deposition on July 7, 2022, with the benefit of

---

[14] To be clear, parties will make choices during the course of an IPR regarding what arguments to make, papers to file, issues to pursue, etc. Those kinds of judgment calls and tactical decisions do not reflect a failure to "meaningfully pursue the merits." As explained further below, OpenSky's conduct here goes beyond ordinary strategic decisions and reflects a failure to essentially take any steps to develop or otherwise pursue an unpatentability case.

IPR2021-01064
Patent 7,725,759 B2

Intel's deposition outline.  Ex. 1062.  However, OpenSky declined to seek an extension to file its reply brief.

On Friday, July 8, 2022—three days before its reply brief was due—OpenSky's counsel initiated discussions with Intel in which OpenSky's counsel maintained that, as a result of the need to respond to the Scheduling Order (Paper 47), OpenSky intended to "refrain from considering or making further invalidity arguments and to file a reply on Monday [July 11, 2022] indicating that OpenSky believes that its original petition establishes invalidity and OpenSky rests on the arguments in that petition," and not file a reply.  Ex. 1528.

At the same time, OpenSky "offered to let Intel write the reply on OpenSky's behalf in exchange for remuneration and indemnity against any lawsuit brought by VLSI against OpenSky based on the IPR proceeding." Ex. 1529.  Intel declined OpenSky's offer but agreed to provide OpenSky with a fully complete reply brief with supporting expert declaration.  *Id.* OpenSky agreed to "file it in full or in part" (*id.*), and did so two days later, as Paper 49 (July 11, 2022).

On August 11, 2022, VLSI requested oral argument.  Paper 61. OpenSky did not request oral argument (the deadline passed August 11, 2022; Paper 18, 11) and did not meaningfully participate in the oral hearing.

### C.    Case-specific Considerations

#### 1.    Petitioner's interest in the proceeding

I am mindful that Congress did not itself include a standing requirement for IPRs.  35 U.S.C. § 311(a); *see Cuozzo*, 579 U.S. at 279 ("Parties that initiate [IPRs] need not have a concrete stake in the outcome; indeed, they may lack constitutional standing."); *see also* Engine, 13–14

34

IN THE

**UNITED STATES PATENT AND TRADEMARK OFFICE**

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

PATENT QUALITY ASSURANCE, LLC
Petitioner
v.

VLSI Technology LLC
Patent Owner

_____

*Inter Partes* Review Case No. IPR2021-01229

Patent No. 7,523,373

_____

**NOTICE OF STIPULATION**

_____

Honorable Board:

Petitioner Patent Quality Assurance, LLC ("PQA") hereby stipulates it will not request this IPR be terminated in exchange for compensation from Patent Owner VLSI. PQA has notified the Precedential Opinion Panel of this stipulation and respectfully requested the Precedential Opinion Panel deny VLSI's request for POP review and allow this IPR to proceed unencumbered by politics, baseless allegations, and suggestions of impropriety. *See* Attachment A.

May 16, 2022                         */s/ Bruce W. Slayden II*
                                     Bruce W. Slayden II (Reg. No. 33,790)
                                     Truman H. Fenton (Reg. 64,766)
                                     Brian C. Banner (*Pro Hac Vice*
                                         *forthcoming*)
                                     Tecuan Flores (Reg. 77,668)


                                     Slayden Grubert Beard PLLC
                                     401 Congress Avenue, Suite 1650
                                     Austin, Texas 78701
                                     Attorneys for Petitioner, Patent Quality
                                     Assurance LLC

1